## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**ANGELA ANDERSON, Personally,**
**and on behalf of the WRONGFUL DEATH BENEFICIARIES**
**of PRINCESS ANDERSON, Deceased**                                **PLAINTIFF**

**VS.**                                **CIVIL ACTION NO. 3:12cv92-MPM-SAA**

**MARSHALL COUNTY, MISSISSIPPI, and**
**BAPTIST MEMORIAL HOSPITAL – DESOTO**                                **DEFENDANTS**

### DEFENDANT MARSHALL COUNTY, MISSISSIPPI'S MEMORANDUM OF AUTHORITES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant Marshall County, Mississippi, by and through counsel and files this its Memorandum of Authorities in Support of its Motion for Summary Judgment, and would show stated in support thereof as follows:

### I.    INTRODUCTION

The summary judgment record in this Section 1983 action establishes Marshall County's entitlement to summary judgment because the plaintiff, the mother of a mental detainee who was housed at the Marshall County jail for three days in February 2011 on an involuntary commitment writ issued by the Chancery Court of Marshall County, cannot show a violation of the right to medical care under the 14th Amendment under the "deliberate indifference" standard. Ultimately, there is no proof that the relevant Marshall County policies evinced deliberate indifference towards the right to medical care of detainees and neither is there any proof that jail staff were "subjectively deliberately indifferent" to the decedent's known serious medical needs, especially since the detainee, Princess Anderson, was medically cleared and deemed appropriate for a jail setting on the day she was brought to the Marshall County jail.

## II. FACTS AND PROCEDURAL HISTORY

On February 7, 2011, Princess Anderson and her boyfriend Reginald Harris appeared at Baptist Memorial Hospital–Collierville, Tennessee emergency room at which time Anderson was complaining of nausea and vomiting. (Collierville medical records, Exhibit A hereto). Anderson remained in the emergency room for approximately seven hours that day during which time emergency room staff administered IV fluids and undertook several tests, determining that Anderson was likely pregnant with a "possible" ectopic pregnancy. Refusing further treatment and examination, Anderson was released at approximately 3:00 p.m. that day. (Collierville records). Later that evening, at approximately 10:30 p.m., Anderson arrived by ambulance at Baptist Memorial Hospital–DeSoto County (BMH-DeSoto) emergency room, again complaining of nausea and vomiting. (DeSoto medical records, Exhibit B hereto). The DeSoto treatment records reflect that Anderson admitted that she had smoked marijuana and drank an "unknown amount" of cough syrup with codeine that afternoon since leaving the Collierville hospital. The records also reflected Reginald's statement to treatment staff that Anderson became upset upon learning she was pregnant and ingested the marijuana and the cough syrup in reaction to the news and that Anderson would repeatedly "fall on the ground" stating that she wanted to die. (DeSoto records).

BMH–DeSoto emergency staff nurse Lindsey Nixon recalled receiving Anderson at approximately 10:30 p.m. on February 7, at which time Anderson had an elevated heart rate and was agitated. At approximately 11:40 p.m., Anderson became increasingly agitated, removed her hospital gown and disconnected herself from monitors and an IV. (Nixon, p. 25; Exhibit C hereto). Anderson soon became very combative with hospital staff to the point that hospital security intervened, Anderson was placed in restraints (which, according to Nixon, took several

individuals to accomplish) and was administered a dose of Ativan, an anti-anxiety medication. (Nixon, pp. 25–28). Dr. Black, the attending emergency room physician, ordered a CT scan, an OB/GYN consult and a consult with Region IV mental health staff to evaluate Anderson's mental status and possible organic causes of her behavior. (Nixon, pp. 29–31). A urinalysis and a drug screen test were completed which showed that Anderson had indeed ingested marijuana and "opiates." At approximately 1:30 a.m. on February 8, Anderson again became extremely agitated, requiring another dose of Ativan. Nixon described this episode as involving Anderson's swinging at the staff with her arms, pushing, shoving and grabbing at the staff and that Anderson was "as physical as you can get." (Nixon, pp. 38, 41). DeSoto records reflect an admitting diagnosis of "drug reaction, possible pregnancy, acute psychoses and substance abuse." (DeSoto records).

Nixon's shift ended at 7:00 a.m. on February 8, at which time staff nurse Shasta Faulkner took over Anderson's care. (Shasta Faulkner, pp.7-11; Exhibit D hereto). Faulkner's notes reflected Anderson's continued extreme agitation and hallucinations through the morning of February 8. At 7:15 a.m., Faulkner noted that Anderson had a sitter and in-house security in the hallway monitoring her behavior. At this point Anderson was no longer restrained as reflected by the fact that Anderson was pacing the room, asking for her clothes, was anxious but denied having suicidal thoughts or ideations. Anderson refused Faulkner's offer of breakfast, began yelling that she was "going to die," laid down on the floor but was then assisted to bed. (Faulkner, pp. 19-25). At 8:00 a.m. Dr. Olmstead, the attending ER physician who had taken over from Dr. Black, "medically cleared" Anderson for release from the hospital while mental health staff from Lakeside Behavioral arrived to evaluate Anderson for an involuntary civil commitment. (Faulkner, pp. 27-30). Lakeside staff interviewed Anderson, Reginald Harris and

hospital staff and determined that Anderson was in need of psychological care and that therefore she was a candidate for involuntary commitment. (DeSoto records). DeSoto records reflect that as of 8:25 a.m., Olmstead determined that Anderson was "medically cleared and appropriate for transport to jail." (DeSoto records, p. 31).

Anderson's mother, Angela Anderson, arrived at the emergency room at 9:05 a.m. on February 8. On her arrival, emergency room staff informed her that her daughter was in immediate need of psychological care and treatment and that the Lakeside staff had submitted an affidavit before the DeSoto County Chancery Court, seeking and obtaining a writ under the Mississippi involuntary commitment statutory provisions directing that Anderson be taken into custody for further psychological evaluation. (Angela Anderson, pp. 32-34; Exhibit E hereto). At 9:20 a.m., a CT scan was finally performed and, upon Anderson's return to the emergency room, she was provided breakfast. (Faulkner, pp. 34-39). According to Angela Anderson, her daughter's mood and behavior "changed" after her return from the CT scan, describing that Princess went into "freeze mode" and that she would "lock up" and engage in a "deep stare." (Angela Anderson, pp. 40-42). She also recalled telling emergency room staff that she wanted to take her daughter home but the staff informed her that the chancery court had ordered a mental evaluation and that Princess would be going to the Marshall County jail until a bed was available. (Angela Anderson, pp. 49-51).

At 11:45 a.m., DeSoto County sheriff deputies arrived to transport Anderson to the Marshall County jail pursuant to the writ issued by the DeSoto County Chancery Court. (Faulkner, p. 40). Informed that Anderson was a resident of Marshall County, the DeSoto County Chancery Court transferred the cause to the Chancery Court of Marshall County for all further proceedings. (Marshall County Chancery Court records; Exhibit F hereto). Marshall

4

County jail records reflect that Anderson arrived at the jail at approximately 1:00 p.m. on February 8. (Marshall County jail records; Exhibit G hereto). Adella Anderson, the jail booking officer, recalled that Anderson was brought in handcuffs by the DeSoto County deputies, who informed her that Anderson became very agitated during the transport from the DeSoto County hospital and had to be restrained. (Adella Anderson, pp. 25-33; Exhibit H hereto). The DeSoto deputies presented the DeSoto County writ and a sealed envelope containing the medical records from the DeSoto hospital and informed her that Princess Anderson had just been released from the hospital. (Adella Anderson, pp. 25-29). Because she regarded Princess Anderson as potentially violent, she took her immediately to the cell without completing the booking process in order to avoid upsetting Princess and "getting someone hurt or using force on her." (Adella Anderson, p. 30).

After placing Princess in a single cell in the female pod, Adella removed the handcuffs and returned them to the DeSoto County deputies who then returned to DeSoto County. Adella then reviewed the information contained in the Chancery Court records in order to retrieve pertinent personal and medical information, but she did not review the sealed records out of privacy concerns and given that, in her mind, that information was for the medical doctors who were going to evaluate Princess Anderson for an involuntary commitment within the next several days. (Adella Anderson, pp. 47-52). She later attempted to talk with Princess to obtain the necessary medical history but she found Princess "unresponsive" to her questions. (Adella Anderson, pp. 60-61). Adella recalled during this afternoon that Princess and she talked about Adella's hair and that she generally found Princess to be "pleasant" and not physically agitated. (Adella Anderson, pp. 45-46).

5

During the morning of February 9, Angela Anderson appeared at the Marshall County Chancery Clerk's office and signed and submitted an affidavit in support of the writ, alleging "she [Princess] keep repeating every sentence, she say over and over. She tells everyone she is real high, lays on the ground outside and says she's dying. And she don't put her words together in a sentence correctly anymore. But she talks good." (Marshall County Chancery Court Records). As a consequence, the chancery court issued an order directing issuance of writ to take custody later that day. In turn, the chancery clerk appointed an attorney, Shirley Byers, to represent Anderson during the course of the commitment proceedings and set the commitment hearing on February 11 at 8:30 a.m. (Marshall County Chancery Court records). Adella Anderson, in the meantime, called Communicare to set up the physician and psychologist evaluations for February 10 and an initial, in jail, prescreening psychological evaluation by Debra Shelton, a Communicare staff psychologist, for February 9. (Adella Anderson, pp. 17, 79).

Angela Anderson arrived at the Marshall County jail at 9:15 a.m. on February 9 to visit her daughter. Because it was not standard visiting hours, Bobby Harris, the jail administrator, was asked to give permission for the visit, which was granted. Adella Anderson and Angela arrived at Princess's cell and found Princess lying on the floor naked. (Adella Anderson, pp. 71–72; Angela Anderson, pp. 80-85). They both entered the cell, helped Princess to her bed and proceeded to clean the cell and dress Princess with the help of other female inmates. Angela wanted to give Princess a blanket but the jailers refused because Princess was under "suicide" watch which prohibited any items that would potentially be used to inflict self-harm. (Angela Anderson, p. 85). Angela was told that she could return the next day, February 10, for another visit with her daughter. (Angela Anderson, p. 85). After Angela left the jail, Debra Shelton arrived at approximately 11:15 a.m. to conduct the prescreening evaluation. (Adella Anderson,

6

pp. 75-78). Shelton found Princess to be generally unresponsive to her questions which she noted on her evaluation form. Anderson was standing, fully clothed without any obvious signs of medical need during the course of the evaluation as reflected by the absence of any such findings on Shelton's evaluation form. (Shelton, pp. 40-44, Exhibit I hereto).

Marshall County jail policy required jail staff to regularly check on all inmates, including mental detainees, who were to be checked on more frequently than the general population. In particular, as the policy states and jail staff recalled, staff checked on Anderson at least every 30 to 45 minutes through a visual and oftentimes verbal check on her status. (Harris, pp. 39-45, Exhibit J hereto). Marshall County policy with regard to the medical care provided inmates, including detainees, required jail staff to provide medical care in the form of doctor visits, emergency medical services whenever an inmate requested treatment or whenever jail staff observed apparent need by physical appearance. (Adella Anderson, pp. 6-12, 17-23, 56- 60, 79; Marshall County policy manual, Exhibit K hereto). All jail staff are trained as to the policy requirements, are certified jailers by the State of Mississippi and are provided CPR training. (See, for example, Adella Anderson, pp. 7-10; Rahman, pp. 10-12, 24; Harris, p. 11). Marshall County jail policy and Jail records show that jail staff checked on Anderson at 8:30 p.m. on February 8 and every half hour through 11:00 p.m. on February 8. Staff also checked on Anderson at 12:30 a.m. on February 9 and again 6:15 a.m. (Marshall County Jail Logs, Exhibit L hereto).

Jailer Janice Rahman was on duty the afternoon of February 9 and recalls checking on Anderson that afternoon who was standing at the cell door fully clothed. (Rahman, pp. 12-16, Exhibit M hereto). Later that evening, around 9:15 p.m., Rahman responded to female inmates who informed her that Princess had fallen. Rahman checked on Princess, found that she had

blood on her fingers, washed her hands and face and asked a fellow jailer to also check in on Princess's status. They both talked to Princess and finding no injury, decided that medical care was not needed in that instance. (Rahman, pp. 48-52). On February 10, jail records reflect that Princess was checked on at 12:30 a.m., 3:00 a.m. and 7:30 a.m., when it was noted that Princess was observed lying on the floor naked. She responded to jailer requests to get up off the floor. (Marshall County jail logs; Adella Anderson, p. 80). Adella again checked on Anderson at 11:00 a.m., finding that she was lying on the floor naked but she would not respond to her request to get up off the floor. At this time, Adella gave Princess a blanket, lunch and checked on the bruises on her legs. When she returned at 1:15 p.m., she saw Princess standing at the cell door. (Marshall County jail logs; Adella Anderson, pp. 85-89).

Because of a snowstorm that day, Communicare canceled the physician evaluation scheduled for that day which prompted the chancery court to continue the commitment hearing from February 11 to February 15 to permit the physician examinations to take place prior to the hearing. (Marshall County Chancery Court records). The storm also prevented Angela from visiting her daughter that day as had been arranged with jail staff. (Angela Anderson, p. 85-87).

On February 11, staff checked the female inmates at 12:00 a.m., 3:00 a.m. and again at 5:30 a.m., when Princess was observed lying naked on the floor of her cell. (Marshall County jail logs). At 8:00 a.m., jailer Stevella Faulkner checked on Princess who was clothed, recalling that all of the inmates were asleep at this time, including Princess. (Stevella Faulkner, pp. 15-29, Exhibit N hereto).

At some time prior to 12:00 p.m. on February 11, Angela Anderson approached the Marshall County Chancery Court Judge, informing her that she recently found out that Princess possibly had an ectopic pregnancy and needed immediate testing according to the Collierville

medical records. After contacting Lakeside personnel regarding the possibility of issuing a general release, the chancery court judge was informed by the Lakeside staff not to release Princess from custody. Accordingly, the court issued a limited order permitting Angela to transport her daughter to the local hospital for the test. (Angela Anderson, pp. 93-95; Marshall County Chancery Court records). At 12:30 p.m., jail officials received a call from the chancery clerk advising that they were to prepare Princess for transport to the local hospital. When jail staff appeared at Princess's cell, they found her lying on the floor of her cell, naked and unresponsive. Anderson's mother arrived at the jail a few minutes later and was allowed access to her daughter's cell. Because Anderson was unresponsive, jail staff called for paramedics who in turn, upon examining Princess, called an ambulance and immediately transported her to the hospital in Holly Springs. (Adella Anderson, pp. 90-91; Stevella Faulkner, pp. 29-34; Angela Anderson, pp. 96-102).

Due to a lack of appropriate facilities and given Anderson's lack of responsiveness, she was transported from the Holly Springs hospital to Baptist Memorial Hospital–Union County for further evaluation and treatment later that same day. Princess arrived at the Union County Hospital at 7:00 p.m. on February 11. Union County intake records reflected that Anderson was suffering from dehydration, psychosis and sepsis. (Fowlkes report, Exhibit O hereto; Dr. Fowlkes, pp. 114-24, Exhibit P hereto). After several days, Anderson was transported to the DeSoto County hospital where she remained for several weeks until her demise on March 15, 2011. An autopsy was subsequently performed by the Mississippi State Medical Examiner who determined the cause of death as "multi-system organ failure of uncertain etiology." Significant findings include the lack of any "documented traumatic injury that would have resulted in her death." (Autopsy, Exhibit Q hereto).

Angela Anderson, in her capacity as mother and next friend of Princess Anderson, filed the present lawsuit against Baptist Memorial Hospital–DeSoto and Marshall County and its sheriff, Kenneth Dickerson, alleging that Princess failed to receive an adequate degree of medical care while at the DeSoto hospital and while temporarily detained at the Marshall County jail and that said failures proximately caused her untimely death. As articulated in her Complaint, Plaintiff's claims against Marshall County are brought under the 14th Amendment and assert that Princess, as a pretrial detainee, was entitled to a "reasonable degree" of medical care during her three day detention and that the "Marshall County sheriff's office was deliberately indifferent to the serious medical needs of the decedent, Princess Anderson and that due to the deliberate indifference decedent failed to receive necessary medical care and as a direct proximate cause or proximate contributing cause, thereby died." (Complaint, ¶ 35). The Complaint further alleges that "Marshall County violated decedent's constitutional rights set forth above by failing to provide reasonable medical care for a serious condition and by deliberately and knowingly failing to provide medical care or call for medical help for detainee who is objectively suffering from a serious life-threatening medical condition." (Complaint, ¶ 37). The plaintiff concludes her allegations by contending that "Marshall County had actual knowledge of the decedent's deteriorating condition but purposefully and deliberately ignored the condition thereby resulting in the death of the decedent. (Complaint, ¶ 38) Essentially, the Complaint advances a theory of *respondeat superior* liability as to Marshall County as any allegation of a causally related County policy, required under Section 1983, is glaringly absent.

10

## III. ARGUMENT

Defendant Marshall County, Mississippi (Marshall County) is entitled to summary judgment in this Section 1983 action because the plaintiff cannot prove that Marshall County jail staff were subjectively deliberately indifferent to the apparent medical needs of Princess Anderson, a mental detainee temporarily housed at the Marshall County jail pursuant to a Marshall County Chancery Court involuntary commitment writ. Even if there were genuine issues of material fact on the subjective deliberate indifference standard, there is no proof that the constitutionally offending actions were affirmatively caused by the execution of an unconstitutional Marshall County policy. Because, under Monell, Section 1983 liability cannot be imposed on Marshall County under *respondeat superior* principles but rather County liability depends on proof that an official's unconstitutional action was caused by that official's execution of an unconstitutional county policy, Marshall County is entitled to summary judgment on all issues.

### A. Summary judgment standards

Under F.R.C.P. 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment bears the initial burden of informing the court of the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). QBE Ins. Corp. v. Brown & Mitchell, Inc., 591 F.3d 439, 442 (5th Cir. 2009). A fact is material only if its resolution would affect the outcome of the action...." Wiley v. State Farm Fire and Cas. Company, 585 F.3d 206, 210 (5th Cir.2009). "Factual disputes that are irrelevant or unnecessary will not be

counted." Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if it is real and substantial, as opposed to "merely formal, pretended, or a sham." Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Boyle v. Allstate Ins. Co., 615 F.3d 350, 355 (5th Cir. 2010). The moving parties, however, did not negate the elements of the nonmovant's case, that is, those elements of the case upon which the nonmovant bears the burden of proof at trial. Boyle, 615 F.3d at 355; Boudreau v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials of the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. Celotex Corp., 477 U.S. at 322; Boyle, 615 F.3d at 355; Smith ex rel. Estate of Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004). The nonmovant's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, by speculation, by the mere existence of some alleged factual dispute, or by only a scintilla of evidence." Boudreau, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Celotex Corp., 477 U.S. at 322; Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). "Where the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial, no genuine issue of material fact can exist." <u>Apache Corp. v. W</u> <u>& T Offshore, Inc.</u>, 66 F.3d 789, 793 (5th Cir. 2010). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp.</u>, 477 U.S. at 322 – 23.

### B. Section 1983 standards

The Civil Rights Act of 1871, 42 U.S.C. Section 1983, creates a private right of action for redressing the violation of federal constitutional rights by those acting under color of state law. <u>See</u> <u>Goodman v. Harris County</u>, 571 F.3d 388, 394 (5th Cir. 2009). Section 1983 is not itself a source of substantive rights "but merely provides a method for vindicating federal rights elsewhere conferred." <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994); <u>Sepulvado v. Jindal</u>, 729 F.3d 413, 420 n.17 (5th Cir. 2013). Therefore, in order for Anderson to recover, she must first show that Marshall County deprived her of a right guaranteed by the Constitution or the laws of the United States. <u>See</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 329-31 (1986). In other words, the first step in a Section 1983 case "is to identify the specific constitutional right involved." <u>Oliver v.</u> <u>Scott</u>, 276 F.3d 736, 744 n. 10 (5th Cir. 2002). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." <u>Victoria W. v. Larpenter</u>, 369 F.3d 475, 482 (5th Cir. 2004). Anderson must also prove that the alleged Constitutional deprivation was "intentional" or due to "deliberate indifference" – not the result of mere negligence. <u>See Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994); <u>Daniels</u>, 474 US at 328. The negligent deprivation of life, liberty or property is not a Constitutional violation and does not give rise to liability under section 1983. <u>See</u> <u>McLendon v. City of Columbia</u>, 305 F.3d 314, 326 (5th Cir. 2002).

13

### 1. Governmental liability

When a Section 1983 suit is brought against a local governmental entity, a plaintiff "must plead facts which show that: (1) a policy or custom existed, (2) the governmental policy makers actually or constructively knew of its existence, (3) a constitutional violation occurred, (4) and the custom or policy served as the moving force behind the violation." Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 533 (5th Cir. 1996); see also Bustos v. Martini Club, Inc., 599 F.3d 458, 467 (5th Cir. 2010). "The unconstitutional conduct must be directly attributable to the municipality [or County] through some sort of official action or imprimatur." Piotrowski v. city of Houston, 237 F.3d 567, 578 (5th Cir. 2001); see also James v. Harris County, 577 F.3d 612, 617 (5th Cir. 2009). Moreover, when attempting to establish County liability under Section 1983, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff…" Piotrowski, 237 F.3d at 579. Thus, in order to state a viable claim of liability under Section 1983 against a local governmental entity, Anderson must point to more than isolated unconstitutional actions of County jail employees; instead, she must "identify a policymaker with final policymaking authority and a policy that is the moving force behind the alleged constitutional violation." Rivera v. Houston Ind.Sch. Dist., 349 F.3d 244, 247 (5th Cir. 2003). Conversely, a governmental entity may not be held liable for the acts of its employees under a theory of *respondeat superior*. See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978); see also Zarnow v. City of Wichita Falls, 614 F.3d 161, 167 (5th Cir. 2010). "Municipalities are not vicariously liable for the actions of their employees under section 1983. Municipal liability inures only when execution of a local government's policy or custom causes the injury." Baker v. Putnall, 75 F.3d 190, 200 (5th Cir. 1996).

In order to hold a governmental entity liable for the acts of a nonpolicymaking employee, a plaintiff, like Anderson, must allege and prove that: "(1) a policy or custom existed, (2) the governmental policy makers actually or constructively knew of its existence, (3) a constitutional violation occurred, and (4) the custom or policy served as the moving force behind the violation." Piotrowski, 237 F.3d at 579. "Where a plaintiff claims that a municipality has not directly inflicted an injury, but nonetheless has caused the employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Board of County Comm'rs of Bryan County, v. Brown, 520 U.S. 397, 405 (1987) "These requirements must not be diluted for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" Bryan County, 520 U.S. at 415; see also Piotrowski, 237 F.3d at 580. The requisite proof of "culpability" on the part of the local governmental entity requires that a plaintiff demonstrate that the municipal decision or policy at issue reflects "deliberate indifference to the risk that a violation of a particular constitutional right will follow the decision. Bryan County, 520 US at 411 moreover, with regard to proximate causation, the governmental entity does not incur liability under Section 1983 unless there exists "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, 49 U.S. at 383; see also Piotrowski, 237 F.3d at 580. In Bryan County, the Supreme Court explained that "it is not enough for a Section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a

direct causal link between a municipal action and the deprivation of federal rights." Bryan County, 520 U.S. at 404.

## 2. Anderson's claim against Marshall County

Anderson alleges that Marshall County is liable for the untimely death of Princess Anderson because "the County" acted with deliberate indifference to her known serious medical needs. The complaint allegations do not address whether the alleged deliberate indifference took the form of a formal policy or custom within the jail operations. In any event, as delineated above, is Anderson's obligation to demonstrate that individual jail staff acted with "subjective deliberate indifference to her serious medical needs in order to establish the underlying constitutional violation required under Section 1983. Assuming a genuine issue of material fact is established as to this prong of her claim against Marshall County, Anderson must then go forward and also prove that the subjective deliberate indifference of identified jail employees was "affirmatively cause" by the execution of a policy or custom which itself evinces a deliberate indifference to Anderson's serious medical needs. As observed by the Fifth Circuit in Tamez v. Manthey, 589 F.3d 764, 769 (5th Cir. 2009), to show subjective deliberate indifference, a plaintiff must present evidence: (1) that each defendant had subjective knowledge of facts from which an inference of a substantial risk of serious harm could be drawn, (2) each defendant actually drew that inference and (3) each defendant's response to the risk indicates that they subjectively intended to cause that harm to occur." Id at 770; see also McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997). The "stringency" of the proof required to establish subjective deliberate indifference is illustrated in Tamez where it was alleged that individual jailers were subjectively deliberately indifferent to an inmate's serious medical needs when they failed to provide medical care despite being told that a detainee "needed medical clearance and that he

had dilated pupils." Although the detainee soon died at the jail, the Fifth Circuit found that there was nothing about the detainee's behavior, including combativeness and bipolar behavior, that showed that the sheriff's deputies and jailers were deliberately indifferent since they were not aware of the symptoms or characteristics of the illness which caused the detainee's death, nor were they aware of other facts that would indicate some unjustifiably high risk to the detainee's health. Tamez, 589 F.3d at 771; see also Brown v. Callahan, 623 F.3d 249, 255 (5th Cir. 2010) (deliberate indifference implies an officials actual knowledge of facts showing a risk of serious harm exists as well as the officials having actually drawn that inference).

The summary judgment record before this Court clearly shows that Marshall County jail staff were not subjectively deliberately indifferent to Princess Anderson's apparent serious medical needs. The proof shows a demonstrable degree of attentiveness towards Princess Anderson as reflected by frequent jail checks, the scheduling of a jail psychological evaluation by Debra Shelton, and the scheduling of a physician and psychologist evaluation which would been provided on February 10 were it not for an act of God. Although the plaintiff points to Anderson's bizarre behavior in the form of lying on her cell floor, naked, and her general unresponsiveness to questions as signs that she was experiencing a "serious medical" issue, the reality is that Anderson's behavior was consistent with the very reason that brought her to the Marshall County jail under the chancery court writ, that is, a behavior consistent with psychosis and not any underlying medical issue, as determined by the physicians at the DeSoto hospital. It is clearly worth emphasizing that DeSoto physicians "medically cleared" Anderson and deemed her appropriate for a jail setting given her psychotic and combative behavior. This behavior, as Dr. Fowlkes emphasized in his deposition and report, was consistent at the DeSoto emergency room and the Marshall County jail. Ultimately, however, there was nothing in Anderson's

behavior which led any of the individual jailers to subjectively infer that Anderson was suffering from a serious "medical"—not psychological—need. Indeed, although Anderson was determined to be suffering from a serious medical need upon her intake at the Union County hospital on February 11, that was determined by hospital physicians after laboratory testing.

Even if the plaintiff can demonstrate a genuine issue of material fact as to whether there was an underlying constitutional violation, that is, that an employee was subjectively deliberately indifferent to Princess Anderson's serious medical needs in violation of Anderson's 14th Amendment rights to a reasonable degree of medical care, Monell requires that the plaintiff must also demonstrate that it was the execution of a Marshall County policy, which itself demonstrates deliberate indifference to Princess Anderson's serious medical needs, that was the "moving force" of the constitutional deprivation. Proof of deliberate indifference as it relates to a potentially culpable County policy or custom typically requires a plaintiff to show a pattern of similar violations and that the nature of the policy or custom was obviously likely to result in the very kind of deprivation experienced by Anderson. City of Canton v. Harris, 489 U.S. 378, 390 (1989). "Deliberate indifference of this sort is a stringent test, and a showing of simple or even to heightened negligence will not suffice to prove municipal culpability." Piotrowski, 237 F.3d at 579.

The summary judgment record on this issue shows a complete absence of any evidence that any other mentally ill detainee was denied medical care for serious medical needs. The proof also shows that the Marshall County policies acknowledged the special needs of the mentally ill by requiring routine, frequent jail checks, the provision of a psychological examination at the jail and a medical and physical examination by a physician and psychologist within 48 hours of the issuance of a writ. Further, jail policy and practice was to provide medical care upon request or

apparent need for this was provided as a routine practice or on an emergency basis depending on the circumstances. Although Anderson was not examined by a medical doctor and a psychologist on February 10, again, that was no fault of Marshall County policy. As stated, the circumstances of this case are virtually identical to those presented in Boston v. Lafayette County, 743 F. Supp. 462 (N.D. Miss. 1990) where the proof showed that there were no instances of other mentally ill detainees being denied medical care and that the decedent was temporarily detained at the Lafayette County jail on an involuntary commitment writ but was not seen by a physician and psychologist because of a scheduling error and not as a matter of jail policy and procedure. The proof in Boston also showed that the jailers arranged for professional medical care on request or upon observation of serious medical needs and that the jailers visually checked on detainees every 30 minutes as a matter of policy. Boston, 743 F. Supp. at 474. Based on this evidence, the district court concluded that the plaintiff failed to show that the relevant jail policies were unconstitutional and were the moving force of the mental detainee's death. See also Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001).

In conclusion, because Anderson cannot demonstrate a viable constitutional claim given the lack of adequate proof that any individual jailer was "subjectively deliberately indifferent" to a known serious medical need which, in turn, proximately caused or contributed to Anderson's demise and, further, given the lack of any proof that a Marshall County policy or custom was likewise deliberately indifferent to the serious medical needs of detainees and which was executed by the jail employee who exhibited subjective deliberate indifference, Marshall County is entitled to summary judgment on all issues.

## IV. CONCLUSION

Based upon the foregoing, Defendant Marshall County respectfully requests this Court grant the present motion and enter a judgment in favor of Marshall County on all issues and award the defendant its costs incurred in the defense of this matter.

Respectfully submitted,

MARSHALL COUNTY, MISSISSIPPI

*s/ David D. O'Donnell*
**DAVID D. O'DONNELL, MSB# 3912**
dodonnell@claytonodonnell.com

Of Counsel:
CLAYTON O'DONNELL, PLLC
1300 Access Road, Suite 200
P.O. Drawer 676
Oxford, MS 38655
Telephone: (662) 234-0900
Facsimile: (662) 234-3557

## CERTIFICATE OF SERVICE

I, David D. O'Donnell, hereby certify that I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to the following:

Daniel M. Czamanske, Jr.
Chapman Lewis & Swan
P. O. Box 428
Clarksdale, MS 38614
dan@chapman-lewis-swan.com
*Attorney for Plaintiff*

Walter Alan Davis
Dunbar & Associates
324 Jackson Avenue East
Oxford, MS 38655
kembry@dunbardavis.com
*Attorney for Baptist Memorial Hospital – DeSoto, Inc.*

This the 14th day of March, 2013.

*s/ David D. O'Donnell*
**DAVID D. O'DONNELL, MSB# 3912**
dodonnell@claytonodonnell.com