**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**ANGELA ANDERSON, personally,
and on behalf of the wrongful death beneficiaries
of PRINCESS ANDERSON, deceased**

                                                        **PLAINTIFF**

**vs.**                                      **Civil Action No. 3:12cv92-DMB-SAA**

**MARSHALL COUNTY, MISSISSIPPI,
and BAPTIST MEMORIAL
HOSPITAL-DESOTO, INC.**                        **DEFENDANTS**

**<u>MEMORANDUM BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT
BY DEFENDANT
BAPTIST MEMORIAL HOSPITAL-DESOTO, INC.</u>**

COMES NOW Defendant Baptist Memorial Hospital-DeSoto, Inc. ("BMH-DeSoto") and submits to the Court its Memorandum Brief in support of its Motion for Partial Summary Judgment as against certain claims asserted against it in this matter. In support of its motion, BMH-DeSoto would show unto the Court as follows, to wit:

**I.**      **INTRODUCTION**

The Plaintiff makes state law medical malpractice claims against BMH-DeSoto in this matter, arising out the discharge of Princess Anderson from the emergency room into the care of DeSoto County deputy sheriffs under a Writ of Commitment to receive additional medical and mental health screening and physician evaluation within forty eight (48) hours. The Defendant BMH-DeSoto requests that this Court grant partial summary judgment on claims asserted by the Plaintiff in this action.

1

Summary judgment should be granted on any claim that the emergency room physicians should have ensured follow up care for Ms. Anderson's pregnancy, insofar as she suffered no complications from her pregnancy and the conditions that caused her death were not legally foreseeable from any supposed failure to provide follow up pregnancy care. Summary judgment should be granted as to any claim for failure to perform medical testing for the conditions rhabdomyolysis or hypernatremia, as the Plaintiff does not have admissible expert medical testimony that Princess Anderson had those conditions at the time such that testing would have revealed those conditions and changed her course of treatment. Further, with these claims appropriate for summary judgment, summary judgment is appropriate as to any claims based on the alleged actions or inactions of BMH-DeSoto nurses or other employees, leaving only the remaining claims based on the alleged conduct of emergency room physicians Dr. Larry Black and Dr. Thomas Olmstead.

Finally, should this Court dismiss the co-defendant Marshall County from this action on their anticipated dispositive motion, thereby removing from the court the sole basis of federal jurisdiction, BMH-DeSoto requests this Court follow the usual practice of Courts within the Fifth Circuit and dismiss without prejudice all of the Plaintiff's state law claims against BMH-DeSoto.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff instituted the present action with the filing of her Complaint with this

2

Court on October 15, 2012.   In her Complaint, the Plaintiff makes federal law claims against the Co-Defendant Marshall County, Mississippi  arising under 42 U.S.C. § 1983 related the detention of Princess Anderson at the Marshall County Jail pending a Court-ordered mental health evaluation.    Additionally, the Plaintiff asserts claims against BMH-DeSoto arising entirely under Mississippi law for medical malpractice in the evaluation and care of Ms. Anderson at the emergency room of BMH-DeSoto and prior to Ms. Anderson's release to law enforcement officials under the terms of that same court-ordered involuntary commitment.    As such, this Court exercises supplemental jurisdiction over the claims of the Plaintiff against BMH-DeSoto.   The facts underlying the case are as follows:

At about 2224 on February 7, 2011, Princess Anderson arrived at the BMH-D emergency department by ambulance and accompanied by her boyfriend, Reggie. Exhibit "A," BMH-DeSoto Medical Record Excerpts, p. 26.    Just prior to arrival, she had been hyperventilating.   Id. at  29.   On arrival, she denied pain, was cooperative and was noted as being alert and oriented to time, place and person.   Id.   Nurses noted that she showed symptoms of depression and anxiety.   Id.

During triage, Ms. Anderson and her boyfriend Reggie informed the nursing staff that she had been to BMH-Collierville earlier that day, where they informed her she was three weeks pregnant.   Id.   She left BMH-Collierville then later that evening smoked marijuana and drank some unknown amount of cough syrup containing codeine.   Id. at 29.   Further, Ms. Anderson stated she was "nervous" and had been nauseated, vomiting

3

twice that day.    Exhibit "A," BMH-DeSoto Medical Record Excerpts, p. 39.

Emergency room physician Dr. Larry Black obtained copies of Princess Anderson's medical records from her visit to BMH-Collierville earlier that same day by fax, including the lab testing results that showed, among other results, that she had normal sodium, BUN and creatinine  levels.    Exhibit "B," BMH-Collierville Medical Record Excerpts p. 9.    The records also indicated that she was approximately 2-3 weeks pregnant and that her urine was slightly concentrated.  Id. at 9-10.  Dr. Black ordered lab tests, including a urinalysis and a drug screen.   The drug screen later came back positive for marijuana and for codeine.   Exhibit "A," BMH-DeSoto Medical Record Excerpts, p. 73.   The urinalysis showed that while Princess Anderson still had a level of concentration in her urine, it remained yellow.  Id. at 74.  This, with the normal sodium levels detected at BMH-Collierville earlier that day, demonstrated that she had no significant dehydration.   Id. at 74; Exhibit "B," BMH-Collierville Medical Record Excerpts p. 9.    Dr. Black then issued an order for a mental health screening.   Id. at 31 ("227 Help"); 70 ("MD ordered 227 Help").

Dr. Black examined Ms. Anderson at approximately 2320.    He noted the severity of  Ms. Anderson's condition to be "mild."   Exhibit "A," BMH-DeSoto Medical Records, p. 29.    The boyfriend, Reggie, was bedside.   Shortly thereafter, at about 2340, Ms. Anderson became agitated and physically combative with the nursing staff. She removed her hospital gown, pulled out her IV, disconnected herself from the beside monitor and shoved members of the nursing staff.   She shouted at her boyfriend,"Reggie,

4

why did you do this to me?"    Id. at p. 40.

Nursing staff called hospital security.    Dr. Black ordered that Ms. Anderson be restrained and that she be given an intramuscular injection of a sedative, Ativan.    Nursing staff placed Ms. Anderson in soft restraints at approximately 2354 and administered the Ativan to her at approximately the same time.    Id. at 44.

Ms. Anderson continued to be agitated while in the presence of her boyfriend. Once nursing staff removed Reggie from the room, Ms. Anderson soon calmed down and was able to communicate with nursing staff.    A sitter was summoned to stay outside Ms. Anderson's room and security likewise remained in the hallway.    Id.

At 0035, nurses again noted that Princess Anderson was calm.    At approximately 0048, Dawn Flannigan from the Region IV mental health facility arrived in response to Dr. Black's order and evaluated Ms. Anderson.    Id.    She also interview the boyfriend, Reggie, who related a number of ongoing problems and told her that Princess Anderson had gotten no sleep for two nights, had experienced mood swings for approximately one year, "tears up the house" once or twice monthly,  "talks about killing herself all the time," and even spoke about a plan to commit suicide by taking pills.    Id. at 58, 60.   Ms. Flannigan ultimately determined that Ms. Anderson was "experiencing suicidal thoughts secondary to what presents as psychosis and delirium" and found that she was "a present and credible threat to herself and her baby."    Id. at 61, 70.

At approximately 0124, nursing staff explained to Ms. Anderson that the restraints would be removed for her to get a CT scan.  When the restraints were removed,  Ms.

5

Anderson again became agitated. She got up and would not get back in bed or lie down on the CT table. She started trying get the nurses to let her leave, stating "I need to go to the restroom," "I need to go outside," and when that didn't work, stating "my two year old with cancer is outside. I have to go to her." Exhibit "A," BMH-DeSoto Medical Records at p. 43

Nursing staff contacted Dr. Black, who ordered an additional injection of Ativan. Ms. Anderson remained again pulled out her IV. Nursing staff administered that injection at 0130 and then again placed Ms. Anderson in soft restraints. Id.

Dr. Black returned to see Ms. Anderson at approximately 0210 and again discussed with Ms. Anderson that she would be released from the restraints if she cooperated with the emergency room staff. Ms. Anderson agreed and nursing staff released her from the soft restraints at approximately 0215. Soon thereafter, nurses noted that Ms. Anderson remained calm and showed no signs of agitation. Id.

Ms. Anderson remained calm and cooperative until approximately 0355, when she starting crying. At 0413, nursing staff noted she was "beginning to become anxious" and pulled at her blood pressure cuff and pulse oximeter. Nursing staff spoke with her, convinced her to take deep breaths and she relaxed. Nursing staff noted at 0502 that the sitter stated Ms. Anderson "has been becoming increasingly calm." Exhibit "A," BMH-DeSoto Medical Records at p. 43

Dawn Flannigan, the Region IV screener, returned to Ms. Anderson's bedside to discuss treatment options at 0555. She discussed a voluntary admission for a mental

6

health evaluation, which Ms. Anderson refused.     Id.

Dr. Black dictated his notes of Ms. Anderson's emergency room visit at 0614.   By this time, Dr. Black had:

- examined Ms. Anderson;

- received the results of drug screening which showed positive results for marijuana and opiates, as well the results of a urinalysis indicating her urine was yellow;

- obtained and reviewed the emergency room records from BMH-Collierville, including the lab results from urine testing (such as a normal sodium level) and blood testing as well as the results of gynecologic examination;

- consulted with OB GYN physician Dr. Aimee Robinson, who informed Dr. Black that there no medical reason to admit Ms. Anderson to the hospital because of her pregnancy;

- Dr. Black noted that while Ms. Anderson initially demonstrated erratic behavior and had to be restrained, "after an ER stay, however, she began to become more lucid and calmed down."     Ultimately, Dr. Black determined Ms. Anderson to be medically "improved" and "stable."     As to her mental state, Dr. Black reported that "[p]lans were made for a voluntary admission to a psych facility, she refused voluntary admission and, at this point, it was felt she did require admission.  Plans were made to have her reevaluated for an involuntary admission."

Id. at p. 35.

Emergency room physician Dr. Olmstead then accepted a transfer of care for Princess Anderson from Dr. Black at 0700.  Id. at p. 31.

Brittany Hyman from Lakeside Behavioral Health arrived and completed an evaluation of Ms. Anderson for potential involuntary mental health commitment at 0850. Id. at p. 71.  Ms. Hyman determined it was appropriate for  Ms. Anderson to be admitted

to the Region IV mental health facility in Batesville, Mississippi involuntarily as Ms. Anderson was demonstrating signs of psychosis and paranoid delusions.   Id. at 66.   Ms. Hyman then proceeded to complete forms for an involuntary mental health commitment with the Chancery Court of DeSoto County, which were then filed and presented to the Court.

Following the evaluation at 0815, nurses noted Ms. Anderson was lying down on the floor and screaming "I'm going to die!"    Nursing staff assisted her back to bed. Nurses administered a single dose of 1 mg Ativan by mouth at 0825 pursuant to a verbal order from Dr. Olmstead.   Exhibit "A," BMH-DeSoto Medical Records at p. 50.

 By 0905, Ms. Anderson's mother was bedside and Princess Anderson was again calmer and agreed to go for the head CT scan previously ordered by Dr. Black.   Id. After returning from the CT scan, nurses noted Ms. Anderson to be "a little more anxious."   The radiology department completed their report on the CT scan of Ms. Anderson's head, finding no abnormalities.  Id. at 75.   After returning from the CT scan, and although she had refused breakfast earlier, she accepted a breakfast tray from the nurses.  Id. at 41.

At 1001,  Special Master Melinda Meachum of the DeSoto County Chancery Court issued a "Writ to Take Custody for Mental Examination" for Princess Anderson.[1]

---

[1]Under Mississippi law, there will be a "pre-evaluation screening" of the individual after the issuance of the writ as well as a physical and mental health examination by physicians.   The physicians appointed to complete a mental and physical examination of her were required to do so within forty-eight (48) hours of the issuance of the order unless they sought and obtained an extension of no more than eight (8) hours from the Court.  Miss. Code Ann. § § 41-21-67; 41-21-

Id. at p. 50.

Dr. Olmstead then re-examined Ms. Anderson at 1030, finding her condition to be improved. Exhibit "A," BMH-DeSoto Medical Records at p. 31. Nursing staff noted her to be "still anxious, but cooperative not combative" at that time. Id. at 41. Dr. Olmstead then authorized Ms. Anderson's discharge from the hospital for further mental health and physical evaluation under the commitment order that by this time had been issued from the DeSoto County Chancery Court. Id. at p. 56

There was no subsequent indication of any substantial anxiety or aberrant conduct prior to her discharge into the custody of DeSoto County Sheriff's deputies at 1145 pursuant to the writ, who then transferred her to the care of Marshall County Sheriff's deputies and the Marshall County Jail because there was not yet an available bed at the mental health facility. She was to await pre-evaluation screening and physician examination that was to occur within forty eight (48) hours.

There is no evidence of any contact with BMH-DeSoto about the condition of Princess Anderson until she was returned there by transfer from BMH-Union County days later on February 14, 2011.

Lakeside Hospital employee Debra Shelton examined Princess Anderson at the Marshall County Jail the following day, February 9, 2011 and recommended immediate

_____

69. As such, short of getting an extension, it was fully expected that there would be both a pre-evaluation screening and an examination by physicians of Princess Anderson no later than 10:01 a.m. on February 10, 2011.

psychiatric hospitalization.   Exhibit "C," Department of Mental Health Pre-Screening Form.   There is no evidence that Lakeside or anyone else acted on this recommendation or that the physician examination ever occurred.

Three days after discharge from BMH-Desoto, and after being found on the floor of her jail cell unresponsive, Princess Anderson arrived by ambulance from the Marshall County Jail to the Alliance Hospital in Holly Springs, Mississippi  at approximately 1310 on February 11, 2011.   Exhibit "D," Alliance Hospital Record Excerpts.   She was largely unresponsive, but did respond to painful stimuli.   Medical staff there noted her to have bruising on her arms, "coca-cola" colored urine and that she was "thrashing" about in the hospital bed.   Id.   Physicians there listed her condition as "guarded" and transferred her that day to BMH-Union County located in New Albany, Mississippi for additional care.  Id.

Despite additional care and treatment at BMH-Union County, and even further treatment back at BMH-DeSoto after transfer there on February 14, 2011, Princess Anderson died on March 15, 2011 as a result of multi-organ failure and brain damage.

III.    DISCUSSION

   A.    SUMMARY JUDGMENT STANDARD

The standard for evaluating summary judgment is well known to the Court:

> It may award summary judgment if, viewing all evidence in the light most favorable to the non-movant, the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. See United Fire & Cas. Co. v. Hixson Bros., Inc., 453 F.3d 283, 285 (5th Cir.

10

2006); Fed. R. Civ. P. 56(a). A dispute gives rise to a genuine issue of material fact when the evidence permits a reasonable jury to return "a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "Summary judgment must be affirmed if it is sustainable on any legal ground in the record, and it may be affirmed on grounds rejected or not stated by the district court." S&W Enterprises, L.L.C. v. SouthTrust Bank of Alabama, NA, 315 F.3d 533, 537-38 (5th Cir. 2003) (citations omitted).

Sanders v. United States, 736 F.3d 430, 435 (5th Cir. Miss. 2013).

## B. GOVERNING SUBSTANTIVE STATE LAW

Where, as here, the Court has supplemental jurisdiction over claims arising under state law, as is the case here, the Court will apply the substantive law of the forum state to those claims. See, e.g., Cosby v. Vicksburg Healthcare, LLC, 2013 U.S. Dist. LEXIS 69636 (S.D. Miss. May 16, 2013) ("[A] federal court exercising supplemental jurisdiction over a state law claim must apply the substantive law of the state in which it sits.") (quoting Zavala v. City of Houston, Tex., 196 F.3d 1256, 1999 WL 800008, at *2 (5th Cir. Sept. 24, 1999) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)).

Under Mississippi substantive law, with rare exceptions not applicable in this case, it is required for a Plaintiff to come forward with admissible expert medical testimony to support each of the essential elements of their claims:

> The Maxwells had the burden to prove medical malpractice at trial; thus, they had the burden to produce evidence demonstrating the existence of a genuine issue of material fact. To accomplish this, the Maxwells were required to produce proof of each element of their medical malpractice claim. Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So. 2d 1346, 1356-57 (Miss. 1990). These elements include: "(1) the

11

existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant." <u>Hubbard v. Wansley</u>, 954 So. 2d 951, 956-57 (Miss. 2007).   Moreover, expert testimony is required to establish these elements. <u>Id.</u> at 957.   "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." <u>Id.</u> (quoting <u>Barner v. Gorman</u>, 605 So. 2d 805, 809 (Miss. 1992)).   In the absence of expert testimony supporting each element, Baptist was entitled to summary judgment.   "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," entitling the moving party to a judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 323.

<u>Maxwell v. Baptist Mem. Hospital-Desoto, Inc.</u>, 15 So. 3d 427, 434 (Miss. Ct. App. 2008).

## C.   ALLEGED FAILURE TO "FOLLOW UP" ON PRINCESS ANDERSON'S PREGNANCY

Among the claims asserted against BMH-DeSoto by the Plaintiff's designated expert, Dr. Richard Sobel, is that BMH-DeSoto emergency room physicians should have done more to ensure follow up examination of Princess Anderson in light of her pregnancy and the possibility that she might have had an ectopic[2] pregnancy.   <u>See</u>, <u>e.g.</u>, Exhibit "E," Deposition of Dr. Sobel, p. 28.   More specifically, Dr. Sobel testified that, in his opinion, the potential that Ms. Anderson had an ectopic pregnancy that could rupture and become life-threatening required a follow up ultrasound as well as lab testing.   <u>Id</u> at

---

[2]Ectopic pregnancies are a rare condition where the embryo develops outside of the mother's uterus.

12

28-30.   For this reason, Dr. Sobel argues, while Princess Anderson's pregnancy was ***not*** a causative factor in her death, the necessary follow up care required that the BMH-DeSoto emergency room physicians ensure that she was returned to the hospital for additional examination within forty-eight (48) hours - which he claims would have prevented her death based, presumably, upon the contention that other, unrelated  medical problems and conditions would have been discovered and treated.   <u>Id.</u>

Again, however, Dr. Sobel concedes that Ms. Anderson did not have an ectopic pregnancy and the fact of her pregnancy was not a causative factor in her death.   Exhibit "E," Deposition of Dr. Sobel, p. 29 ("***Her pregnancy did not contribute to her death*** . . .") (emphasis added).

Sitting as a Federal Court exercising supplemental jurisdiction over state law claims, this Court applies Mississippi substantive law.     Under Mississippi law, just as is common nationwide, an essential element of any negligence claim is proximate cause.  Proximate cause itself is further comprised to two elements - "cause in fact" and the distinct question of foreseeability.   The two concepts are separate and must be analyzed as such:

> Mississippi case law is replete with forseeability cases. Two such cases are <u>Donald v. Amoco Production Co.</u>, 735 So. 2d 161 (Miss. 1999), and <u>Gulf Refining Co. v. Williams</u> 183 Miss. 723, 185 So. 234 (1938). Another case decided by a United States District Court is <u>Smith v. United States</u>, 284 F. Supp. 259 (S.D. Miss. 1967), *aff'd per curiam*, 394 F.2d 482 (5th Cir. 1968).In <u>Smith</u>, the district court held:
>
> > It is the universal rule in tort actions that mere proof of injury complained

of raises no presumption of negligence. 'Forseeability, as respects liability of the negligent person, does not include events which are bizarre or so unique as to be without the contemplation of one reasonably prudent'. *'A person charged with negligence in that he should have anticipated the probability of injury from an act done by him is not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence, although such happening is within range of possibilities.'* 284 F. Supp. at 261-62 (citations omitted & emphasis added).

In <u>Donald</u>, this Court held "*[a] defendant is obligated solely to safeguard against reasonable probabilities and is not charged with foreseeing all occurrences, even though such occurrences are within the range of possibility*." 735 So. 2d at 175 (citations omitted & emphasis added).In <u>Williams</u>, this Court held:   The general language of the courts in stating the rule of law of negligence in regard to the liability of the actor as to harmful results which are foreseeable is that he will be liable for all such harm as a reasonably prudent person would or should have anticipated as the natural and probable consequences of his act.

* * *

'Probability arises in the law of negligence when viewed from the standpoint of the judgment of a reasonably prudent man, as a reasonable thing to be expected'

* * *

It is true, as already mentioned, that remote possibilities are not within the rules of negligence as respects forseeability . . . *these rules do not demand 'that a person should prevision or anticipate an unusual, improbable, or extraordinary occurrence, though such happening is within the range of possibilities.   Remote possibilities do not constitute negligence from the judicial standpoint.'*

185 So. at 235-36 (citations omitted & emphasis added).  *We wish to emphasize that the question of forseeability is different from the question of causation.*

<u>City of Jackson v. Estate of Stewart</u>, 908 So. 2d 703, 712-713 (Miss. 2005) (emphasis added); <u>see</u> <u>also</u> <u>City of Jackson v. Law</u>, 65 So. 3d 821, 834 (Miss. 2011).

14

In the Estate of Stewart case, for example, the Court determined that while there was sufficient evidence that the decedent's fall from a van was the cause-in-fact of her stroke and ultimately, her death, the stroke itself was legally unforeseeable. Estate of Stewart, 908 So. 2d at 713.

In this case, Dr. Sobel essentially argues that the supposed failure to secure follow up care for Ms. Anderson's pregnancy was a "cause in fact" of her death. That does not, however, render Ms. Anderson's death from non-pregnancy related conditions developed in the Marshall County Jail legally foreseeable from a supposed failure to render follow-up pregnancy related care. The foreseeable harm that might come from the failure to diagnose or treat an ectopic pregnancy are those "that naturally arise when an ectopic pregnancy is mis-diagnosed and untreated." See, e.g., Brown v. Bd. of Hosp. Managers for Flint, 2011 Mich. App. LEXIS 49 (Mich. Ct. App. Jan. 13, 2011). That is not the case here and Dr. Sobel even concedes that fact.

Regardless of whether Ms. Anderson's ultimate medical conditions were "within the range of possibility" from her condition at BMH-DeSoto, the Plaintiff cannot present a viable claim for reasonably forseeable injuries arising from any supposed failure to provide follow up pregnancy care. As such, she is unable to establish an essential element of this claim and any claim of medical malpractice against BMH-DeSoto for the supposed failure to provide care for her pregnancy should be dismissed. There are no

15

genuine issues of material fact as to this claim and BMH-DeSoto is entitled to the entry of a judgment as a matter of law on this claim.

### D.     ALLEGED FAILURE TO PERFORM MEDICAL TESTING

Additional claims asserted by Dr. Sobel against BMH-D are that there was a failure to perform certain laboratory testing for certain medical conditions - including rhabdomyolysis[3]  and hypernatremia.[4]

Dr. Sobel claims in his deposition that it was a breach of the standard of care for ER physician "Dr. Olmstead and the nurses not to screen her for rhabdo. . . "   Exhibit "E," Deposition of Dr. Sobel, p. 32 (emphasis added).   Yet, Dr. Sobel admits that he holds no position as to whether Ms. Anderson even ***had*** rhabdo at the time such that it would have been discovered and changed Ms. Anderson's treatment in any way.   Id. at p.  31 ("Well, I don't have an opinion on that point . . ."); p. 32  ("Now, whether or not she had rhabdo at that point, I couldn't tell you . . .").   Similarly, Dr. Sobel gave no opinion as to whether Ms. Anderson suffered from hypernatremia while at BMH-DeSoto. Id. at 20 ("So, whether or not she was hypernatremic, for example, I couldn't say with a reasonable degree of medical certainty . . .").   The designated medical expert witness for Marshall County agrees on this point.   Exhibit "F," Deposition of Dr. Fowlkes, p. 108

---

[3]"Rhabdo," or rhabdomyolysis, is a condition where muscle tissue breaks down and releases muscle fiber contents in the bloodstream.

[4]Hypernatremia is a condition where sodium levels in the blood are highly elevated.

(cannot give opinion on whether Princess Anderson was hypernatremic at time of discharge from BMH-DeSoto).

Dr. Sobel does, however, indicate the difference between Princess Anderson's ultimate condition when found on the floor of her jail cell days later and her condition while at BMH-DeSoto. Dr. Sobel has opined that the cause of Princess Anderson's condition following her incarceration was that "she became progressively dehydrated and [as a result] suffered rhabdomyolysis, acute kidney failure, other organ injury and severe hypernatremia" which led to neurological injury. Id. at 49. In fact, according to Dr. Sobel, "This is a -- this is the result of progressive water depravation **over the course of days**. That is severe hypernatremia. **It cannot occur in just a few hours**." Id. at 102 (emphasis added).

In any event, the Plaintiff is without properly supported expert proof of what the test results would have been if given at BMH-DeSoto.[5] Without expert medical proof that the test results would have shown an abnormal result requiring particular treatment,

_____

[5]This is not to say that there is not evidence supporting the fact that testing was in fact given for rhabdomyolysis at BMH-DeSoto and that testing was negative for rhabdomyolysis:.

> A:    But there's some other findings on here - I mean, there some other findings that are as well signifant.    The blood - the dip blood is negative so she did not have Rhabo.  She did not have Rhabdo at this time.
> Q:    Rhabdo?
> A:    Rhabdomyolysis.
> Q:    Your're saying Rhabdo - if she did have Rhabdo it would result in blood in the urine?
> A:    It would result in the dip test being positive.

Exhibit "F," Deposition of Dr. Fowlkes, p. 73.  The fact of this testing, and Dr. Fowlkes testimony supporting it, stands as an additional reason summary judgment is appropriate for this supposed "failure to test."

the Plaintiff cannot establish the essential element of proximate cause for an alleged

"failure to test."

> The district judge, while dealing with the other points, made no mention of this one, suggesting that after concluding, correctly, that it was poor medical practice to omit the test, he failed to consider the degree to which the evidence demonstrated that, had the test been given, it would have been abnormal and thus served as a "red flag."

Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 10 (1st Cir. N.H. 1982); see also Flores-

Hernandez v. United States, 944 F. Supp. 2d 26, 31 (D.D.C. 2013) (noting, in finding that

Plaintiff failed to carry her burden of proof, that "if she had proven that an endometrial

biopsy would have been performed in late 2007 or early 2008, she still 'failed to establish

that the results of such a biopsy would have led to a cone biopsy any sooner' or otherwise

accelerated her course of treatment."); Ramos v. Marcisz, 2008 U.S. Dist. LEXIS 74158

(S.D. Cal. Sept. 24, 2008) ("Even if Dr. Marcisz ordered further diagnostic testing after

the first craniotomy, Plaintiff's expert cannot say with any probability what the tests

would have shown."); Fruiterman v. Granata, 276 Va. 629, 638 (Va. 2008) (Plaintiff's

verdict reversed because plaintiff "not prove to a reasonable degree of medical probability

that, if she had undergone CVS, the result would have shown the chromosomal

abnormality indicative of Down syndrome.").

For these reasons, the Plaintiff is unable to present a properly supported claim

against BMH-DeSoto for the supposed "failure to test" for these conditions   Any such

claims should be dismissed as there are no genuine issues of material fact as to that claim and BMH-DeSoto is entitled to a judgment as matter of law.

### E. CLAIMS OUTSIDE THOSE ASSERTED AGAINST THE EMERGENCY ROOM PHYSICIANS

In addiiton to claiming that BMH-D nursing staff should have ordered testing, Dr. Sobel also lumps in the nursing staff in his opinion that Princess Anderson should not have been discharged from BMH-DeSoto on February 8, 2011.  Exhibit "E," Deposition of Dr. Sobel, p. 59  (Stating opinion that "a reasonable prudent nurse would know . . . [that the ER physicians] failed to follow usual and customary procedure for medical clearance of this patient.") .   Yet, just has they do not have the power to issue physician's orders, nurses do not have the authority to make decisions on patient discharge and there is no evidence they do have such power.   Moreover, the medical record in this case is clear that the decision to discharge Ms. Anderson was that of ER physician Dr. Olmstead and not that of any nurse.   Exhibit "A," BMH-DeSoto Medical Record Excerpts, p. 56.   Again, there is a failure of properly supported  proof on essential elements of the Plaintiff's claim.

The Plaintiff's sole expert Dr. Sobel does not levy any other claims of negligence anyone at BMH-DeSoto outside of the claims made against the emergency room physicians.    As such, this Court should dismiss all claims against BMH-DeSoto from this case except those that remain against the emergency room physicians Dr. Black and Dr. Olmstead, for which the Plaintiff contends BMH-DeSoto should be vicariously liable.

There are no genuine issues of material fact as to those claims and BMH-DeSoto is entitled to the entry of a judgment as a matter of law.

## F.     DISCRETION TO DECLINE SUPPLEMENTAL JURISDICTION

The Plaintiff has asserted federal law claims against the co-defendant Marshall County, Mississippi arising under the federal civil rights statute, 42 U.S.C. 1983.     As such, this Court exercises supplemental jurisdiction over the Plaintiff's claims against BMH-DeSoto, which arise entirely under state law.    28 U.S.C. § 1367(a);  Energy Mgmt. Servs., LLC v. City of Alexandria, 739 F.3d 255, 258 n. 1 (5th Cir. La. 2014).

BMH-DeSoto anticipates that the co-defendant Marshall County may file its own Motion for Summary Judgment or other dispositive motion in an effort to dismiss the claims against it and dismiss it from this case.     While BMH-DeSoto takes no position with regard to any anticipated motion, should the Court grant the motion and dismiss Marshall County from this case, there would no longer be a viable claim arising under federal law upon which to make the purely state law claims against BMH-DeSoto "ancillary."

Should that be the case and all claims against Marshall County be dismissed, BMH-DeSoto requests that this Court dismiss all claims against BMH-DeSoto without prejudice, as is the preference of the Courts within the Fifth Circuit:

> A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  ***Indeed, if all the federal law***

20

***claims are dismissed prior to trial, a district court should dismiss the state law claims.*** Robertson v. Neuromedical Center, 161 F.3d 292, 296 (5th Cir. 1998). Further, "the dismissal of the pendent claims should expressly be without prejudice so that the plaintiff may refile his claims in the appropriate state court." Bass v. Parkwood Hosp., 180 F.3d 234, 246 (5th Cir. 1999) (emphasis in original).

Sprague v. Dep't of Family & Protective Servs., 2013 U.S. App. LEXIS 23089 (5th Cir.

Tex. Nov. 15, 2013) (emphasis added).

WHEREFORE, PREMISES CONSIDERED, the Defendant BMH-DeSoto, Inc. requests that this Court grant partial summary judgment as set forth above. BMH-DeSoto, Inc. further requests that should this Court dismiss the co-defendant Marshall County in light of its anticipated dispositive motion, that it also dismiss all claims against BMH-DeSoto, Inc. without prejudice

Respectfully submitted, this the 14th day of March 2014.

BAPTIST MEMORIAL HOSPITAL-DESOTO, INC.

BY: *s/Walter Alan Davis*
WALTER ALAN DAVIS, MSB #9875
waltdavis@dunbardavis.com

Of Counsel:
DUNBAR DAVIS, PLLC
Attorneys at Law
324 Jackson Avenue East
Oxford, MS 38655
(662) 281-0001

21

## CERTIFICATE OF SERVICE

       I, Walter Alan Davis, do hereby certify that I have this date served a true and correct copy of the above and foregoing document by electronic mail to:

> Mr. Daniel M. Czamanske, Jr.
> dan@chapman-lewis-swan.com
> *Attorney for Plaintiff*
>
> Mr. Ray Hill
> rhill@claytonodonnell.com
> *Attorney for Defendants Marshall County, MS and Kenny Dickerson*
>
> Mr. David D. O'Donnell
> dodonnell@claytonodonnell.com
> *Attorney for Defendants Marshall County, MS and Kenny Dickerson*

This, the 14th day of March 2014.

> *s/Walter Alan Davis*
> WALTER ALAN DAVIS