1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

ANGELA ANDERSON, Personally,
and on behalf of the WRONGFUL
DEATH BENEFICIARIES of PRINCESS
ANDERSON, Deceased                    PLAINTIFF

VS.                          NO. 3:12-CV-92-MPM-SAA

MARSHALL COUNTY, MISSISSIPPI and
BAPTIST MEMORIAL HOSPITAL-DESOTO      DEFENDANTS

**************************************************

DEPOSITION OF THOMAS FOWLKES, M.D.

**************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFF
IN THE LAW OFFICES OF CLAYTON O'DONNELL, PLLC
1300 ACCESS ROAD, SUITE 200, OXFORD, MISSISSIPPI
ON JANUARY 9, 2014, BEGINNING AT 9:00 A.M.

APPEARANCES NOTED HEREIN

Reported by:  LUANNE FUNDERBURK, CCR, 1046
_____

ADVANCED COURT REPORTING
P.O. BOX 761
TUPELO, MS 38802-0761
(662) 690-1500

---

3

TABLE OF CONTENTS

WITNESS                                        PAGE

THOMAS FOWLKES, M.D.

    Examination by Mr. Czamanske..........    4

EXHIBITS

    1  Curriculum Vitae.................    14

    2  Report and Curriculum Vitae of Dr.
          Richard Sobel.................    37

    3  Medical Records of Baptist Union..    51

    4  Condensed Copy of Dr. Richard
          Sobel's Deposition.............    51

    5  Notes on Altered Sensorium........    53

    6  Notes on Mississippi Civil
          Commitment Law.................    53

    7  Report from Dr. Fowlkes to David
          O'Donnell dated 11/22/13.......    53

    8  Designation of Expert Witness.....    54

    9  Mississippi Code Section 41-21-61.    88

   10  Reference Documents...............   125

   11  Handwritten Notes.................   132

---

2

APPEARANCES:

For the Plaintiff:

         DANIEL M. CZAMANSKE, JR., ESQUIRE
         Chapman, Lewis & Swan, PLLC
         501 First Street
         P.O. Box 428
         Clarksdale, MS  38614
         (662) 627-4105

         DANESE BANKS, ESQUIRE
         The Cochran Firm
         One Commerce Square
         40 South Main, Suite 1700
         Memphis, TN  38103
         (901) 523-1222

For the Defendant
Marshall County, Mississippi:

         DAVID D. O'DONNELL, ESQUIRE
         Clayton O'Donnell, PLLC
         1300 Access Road, Suite 200
         P.O. Box 676
         Oxford, MS 38655-0676
         (662) 234-D900

For the Defendant
Baptist Memorial Hospital-DeSoto:

         WALTER A. DAVIS, ESQUIRE
         Dunbar Davis, PLLC
         324 Jackson Avenue E., Suite A
         Oxford, MS 38655-3808
         (662) 281-0001

---

4

1          THOMAS FOWLKES, M.D., after being

2    duly sworn, testified as follows:

3              EXAMINATION

4    BY MR. CZAMANSKE:

5        Q.  Would you please state your full name for

6    the record.

7        A.  Thomas Fowlkes.

8        Q.  And I don't need your specific address, but

9    generally where do you reside?

10       A.  I live in Oxford, Mississippi.

11       Q.  And, Dr. Fowlkes, have you ever given a

12   deposition before like we're doing here today?

13       A.  I have.

14       Q.  I introduced myself just before we started,

15   my name is Dan Czamanske.  And I along with Danese

16   Banks, we represent the family of Princess Anderson.

17   Do you understand that?

18       A.  I do.

19       Q.  You understand that every question I ask

20   and every answer you give is going to be taken down

21   today?

22       A.  I do.

23       Q.  You understand that you're sworn in under

24   oath to testify just the same as if you were sitting

25   in a courtroom?

**EXHIBIT**
**1**

5

1    A.   I do.

2    Q.   If I ask you a question that you don't

3  understand for some reason, tell me and I'll rephrase

4  it for you.  Okay?

5    A.   Okay.

6    Q.   If I ask you a question you think is

7  unfair, please, tell me and I'll do my best to

8  rephrase it, as well.  Okay?

9    A.   Okay.

10    Q.   If you need to look at any document to give

11  me your best answer on any question I ask, you're

12  free to look at any document that you want.  Do you

13  understand that?

14    A.   Yes.

15    Q.   I was looking through your documents, and I

16  want to go through this real quick just to see what

17  we've got here.  Let me go ahead and start with this.

18  I'm going to identify some things.  I'm not going to

19  mark everything because some of these things we

20  already have and they're filed in the case.  The

21  first thing you have, obviously, is a copy of your

22  opinion dated November 22, 2013.  Is that true?

23    A.   That is correct.

24    Q.   All right.  The second thing we have is a

25  copy of your curriculum vitae, which is two pages

6

1  long.  And I've been provided a copy, but in case

2  this is an updated one can I go ahead and mark this

3  one?

4    A.   Yes.  I don't believe it's updated, but,

5  yes.

6    Q.   Okay.  Well, I do see a difference, though,

7  in the cases because the case list that I had only

8  had two cases listed and this case list has six.  Is

9  this case list that's -- it's Page 3 of your CV.  Is

10  that an up-to-date case list in which you've offered

11  expert opinions?

12    MR. O'DONNELL: I think the difference

13  is the time frame.

14    A.   It's up to date.  It's the same that I

15  submitted earlier.

16    Q.   All right.  So maybe this one goes back

17  further, is that what it is?

18    MR. O'DONNELL:  That's right.

19    Q.   Okay.  In any of the cases listed on your

20  case list, have you testified that a medical

21  provider, any medical provider, breached standard of

22  care in your opinion in any of these six cases?

23    A.   Yes.

24    Q.   Which ones?

25    A.   This case (Indicating).

7

1    Q.   Tell me the name of it.

2    A.   Hauss et al versus Wallace et al.

3    Q.   What kind of case was that?

4    A.   Medical malpractice.

5    Q.   Who were you retained by?

6    A.   The plaintiff.

7    Q.   Who was the plaintiff's lawyer, do you

8  remember?

9    A.   A firm in Tupelo.  Steve Corban was the --

10    MR. DAVIS:  Mitchell Voge?

11    A.   Yes.  He went to work -- he quit in the

12  middle of the case, and went to work for People's

13  Bank as the corporate counsel, and turned it over to

14  Charlie Merkel in Clarksdale.  You might say Charlie

15  Merkel was the -- I mean, that was the ultimate.

16    Q.   Did it go to trial?

17    A.   No.

18    Q.   Did you give a deposition in that case?

19    A.   Yes.

20    Q.   Any other case that you have listed here

21  where you testified that a medical provider breached

22  the standard of care?

23    A.   No.

24    Q.   Do all six of those cases involve issues of

25  medical malpractice?

8

1    A.   No.

2    Q.   Which of those cases involve issues of

3  medical malpractice?

4    A.   Only that one.

5    Q.   The other five cases, did they involve

6  issues of prisoners' rights or inmates' rights?

7    A.   They involved issues regarding prisoners.

8  I don't know that it was their rights.

9    Q.   All right.  Well, tell me -- you describe

10  for me, if you can -- now, look, if the five cases

11  that we're talking about, if they can't be

12  categorized as a single type of case, that's fine.

13  Describe for me if you would the type of cases that

14  were involved.

15    A.   We could start right here.

16    Q.   Sure.

17    A.   This was a case in which I did a competency

18  evaluation for chancery court (Indicating).

19    Q.   Tell me the name of it.

20    A.   In re, Conservatorship, Curtis Mize.

21    Q.   So you were retained by the court to

22  examine a person and render an opinion as to their

23  competency?

24    A.   That's correct.

25    Q.   What sort of issues were you looking at to

9

```
 1   determine that person's competency?
 2        A.   Their mental function, their intellectual
 3   function, their ability to reason and to make
 4   financial decisions.
 5        Q.   Were you looking -- well, go ahead.  What's
 6   the next one?
 7        A.   These two cases -- the State versus --
 8   Mississippi versus White was a criminal case, in
 9   which case I was retained by, I actually don't recall
10   whether it was the plaintiff or the defense, but it
11   was a murder case in which the defendant was
12   significantly impaired due to alcoholism and I
13   testified about that.  Essentially for her.  I think
14   I was actually called by the prosecutor, but I
15   mean -- well, no, I was -- I can't recall.  I was an
16   expert witness for one or the other, but it was to
17   testify about her -- about her mental state at the
18   time of the crime.
19        Q.   All right.  And what sort of opinion did
20   you -- did you testify in court?
21        A.   I did.
22        Q.   What opinion did you reach with regard to
23   her mental state?
24        A.   That she was -- well, it was that she was
25   significantly impaired due to intoxication at the
```

10

```
 1   time.  And that subsequently, when I took care of her
 2   -- the reason I got involved in the case I took care
 3   of her in jail.  She developed severe alcohol
 4   withdrawal and she was a severe alcoholic, and we
 5   ultimately had to care for her for a long period of
 6   time.  She became -- she had organic brain syndrome
 7   as a result of her long term alcoholism, so she
 8   remained -- I don't know -- she did not remain
 9   incompetent because she was ultimately convicted in
10   the case, but she had significant impairment in her
11   mental function later on as a result of her chronic
12   alcoholism.
13        Q.   All right.  And what was the next one?
14        A.   This State of Mississippi versus Grose,
15   Grose and Jordan.  I was retained by the defense on a
16   person whose name was not on there.  This was a
17   sexual abuse case in which one of the defendants had
18   significant organic brain syndrome as a result of
19   chronic drug use and chronic inhalation use --
20   inhalant use, huffing.  And she -- the person I was
21   retained for made a -- was not one of these people.
22   She made a plea deal because she was -- her mental
23   capacity.  She was mentally retarded and had
24   significant mental impairments due to her chronic
25   drug use.
```

11

```
 1        Q.   So was your opinion with regard to the
 2   issue of mental impairment due to drug use?
 3        A.   And mental retardation.
 4        Q.   And I take it then you did not testify at
 5   trial because she apparently pleaded out?
 6        A.   No.  I did testify at trial because she was
 7   a witness against co-defendants.
 8        Q.   Okay.  What's the next one?
 9        A.   The one I told you about, the medical
10   malpractice, Hauss versus Wallace.
11        Q.   Yeah, let's skip that.
12        A.   These other two, this was --
13        Q.   Go ahead and say the name.
14        A.   State versus -- Mississippi versus Dill.
15   Was a criminal case in which a young man was on trial
16   for vehicular manslaughter.
17        Q.   What sort of opinions did you offer in that
18   case?
19        A.   I was an expert for the prosecution
20   regarding the causation of the wreck and his level of
21   impairment.
22        Q.   So you would have testified based upon
23   certain evidence what that individual's impairment
24   was at the time of the accident?
25        A.   Yes.  In addition to that I was -- in
```

12

```
 1   addition to that I testified as -- I was the medical
 2   examiner investigator that ruled on the cause of
 3   death as well in the case.  So I testified about the
 4   cause of death and the causation of the accident.
 5        Q.   And the top one, State of Mississippi
 6   versus Joiner looks like?
 7        A.   I was called as an expert, but that was a
 8   criminal case, State of Mississippi versus Joiner, in
 9   which he was charged with vehicular manslaughter, or
10   actually, something more than vehicular manslaughter.
11   But it was a vehicle case, in which I testified about
12   the injuries to the decedent and the cause of her
13   death.  That was the medical examiner investigator in
14   that case.
15        Q.   Now I notice that all these are trial
16   testimony than as expert testimony list; is that
17   right?
18        A.   With the exception of the one here, which I
19   gave only a deposition and did not testify at trial.
20        Q.   Oh, in the one with Charlie Merkel?
21        A.   That's right.
22        Q.   So is this a complete list?  Does this
23   include all cases in which you've offered an expert
24   opinion, all civil or criminal cases?
25        A.   Yes.  There is one -- there is a present
```

13

1   case which I have offered an opinion -- I have
2   offered a report on another conservatorship, and I
3   cannot, even tell you the name of that case. I've
4   offered the opinion to the attorney, but I've not
5   heard -- about six months, and have heard nothing
6   since.
7       Q.   And does that have to do with the level of
8   mental impairment of the individual?
9       A.   Yes.
10      Q.   So to make sure I understand the areas in
11  which you've offered expert testimony according to
12  your expert list and according to what you've told me
13  today, you've offered opinions with regard to cause
14  of death, right?
15      A.   Yes.
16      Q.   With regard to injury causation?
17      A.   Yes.
18      Q.   With regard to the standard of care?
19      A.   Yes.
20      Q.   And with regard to mental impairment, as
21  well?
22      A.   Yes.
23      Q.   Okay. Have you offered previously in any
24  case any expert opinions on the area of institutional
25  liability with regard to the care and treatment of

14

1   inmates?
2       A.   No.
3       Q.   Okay. Have you offered any opinions --
4   strike that. I forgot to write this down, with
5   regard to that Mauss case, did that involve an
6   emergency room setting?
7       A.   It involved an urgent care setting.
8            MR. CZAMANSKE: We're going to mark
9   -- well, it's more than just the CV. It's the CV,
10  case list, plus your opinion. We're going to mark
11  that as Exhibit 1.
12           (Exhibit No. 1 was marked).
13      Q.   You went to the University of Tennessee
14  Medical School?
15      A.   That is correct.
16      Q.   You would have graduated in 1989?
17      A.   That is correct.
18      Q.   Did your residency at the University of
19  Pittsburgh in emergency medicine?
20      A.   That's correct.
21      Q.   After your residency tell me about your
22  work history.
23      A.   I worked in Memphis for three years as an
24  emergency physician. Moved to Oxford in 1996 and
25  practiced as an emergency physician since that time.

15

1       Q.   As far as your experience goes, it sounds
2   like your experience is primarily in the area of
3   emergency medicine. Is that a fair characterization?
4       A.   It was that until three years ago when I
5   have developed experience in addiction medicine as
6   well -- four years ago, I'm sorry. Time marches on.
7       Q.   So up through about 2010, somewhere -- I'm
8   not going to hold you to an exact date -- but
9   somewhere around in there, your primary professional
10  focus would have been emergency medicine?
11      A.   And correctional medicine.
12      Q.   Tell me what you mean when you say
13  correctional medicine.
14      A.   I have been the medical director and the
15  jail doctor, for lack of a better term, since
16  approximately 1996 at the Lafayette County Detention
17  Center.
18      Q.   What type of facility is that? What type
19  of inmates do they house?
20      A.   Two types. It's a county jail, so much
21  like any other county jail in Mississippi. In
22  addition to that, we're the federal holding facility
23  for the Northern District Court, Federal and Northern
24  District Court, so we hold federal pre-trial
25  detainees.

16

1       Q.   And so you've been the medical director
2   there since 1996 through the present?
3       A.   That's right. Everyday.
4       Q.   Was that an appointment? Did you apply?
5   How did you get that position?
6       A.   It's a contract with the -- I'm a
7   contractor of the county.
8       Q.   Is it an annual contract? Is it an every
9   five year contract? How does that work?
10      A.   It's a contract until terminated by either
11  party, and it's been ongoing since '96.
12      Q.   You've been working under the same contract
13  since you started there?
14      A.   That's right. Essentially, I am
15  responsible for outpatient health care at the jail.
16  So in other words, it's a contract where I am charged
17  with being in charge of all the inmates' health care
18  and I'm responsible for providing all outpatient
19  health care.
20      Q.   As part of your responsibilities, do you go
21  to the jail and see or examine inmates?
22      A.   Yeah, absolutely.
23      Q.   Do you do that on -- do you have a routine
24  like every certain day of the week or every couple of
25  days of the week you go down there --

17

```
 1      A.   I'm responsible for the inmates 24/7.  I
 2  have had a variety of different schedules over the
 3  course of my 15 years, but the short version is that
 4  I'm responsible for their care 24/7 and I go there on
 5  a daily or almost daily basis.
 6      Q.   And you currently work in the capacity as
 7  an emergency room physician?
 8      A.   I do.
 9      Q.   Where is that?
10      A.   Well, I have -- I don't work in the
11  emergency department, but I work as an emergency
12  physician at the Lafayette County Detention Center,
13  and I have my own urgent care walk-in clinic.
14      Q.   What's the name of that?
15      A.   Thomas Fowlkes Medical Clinic.
16      Q.   Is that here in Oxford?
17      A.   It is.
18      Q.   How long have you had that?
19      A.   Four years.
20      Q.   And so let's go four years back.  Let's go
21  to 2010.  Well, let me ask you this.  When was the
22  last time you worked in an emergency room, in a
23  hospital?
24      A.   2007 or '8.  2008 I would say.
25      Q.   Which hospital would that have been in?
```

18

```
 1      A.   The last -- the very last place that I
 2  worked would have been Tupelo, North Mississippi
 3  Medical Center.
 4      Q.   And I know -- you know, I know a lot of the
 5  emergency departments, they contract out for ER
 6  physicians, and a lot of physicians moonlight as ER
 7  physicians, do it on the side, as well.  Tell me what
 8  your arrangement was with Northwest Mississippi --
 9  North Mississippi Medical Center.
10      A.   Contract physician for a contract
11  management company.
12      Q.   And from the time of the end of your
13  residency when you came back here, through 2008 or
14  thereabouts, did you work in an emergency room
15  department continuously during that time?
16      A.   Either in an emergency department or an
17  urgent care, acute care -- there are other venues in
18  which you can work other than a hospital based on
19  emergency department.  And for a number of years I
20  worked in an urgent care in Tunica County.  So I mean
21  -- either urgent care or --
22      Q.   What was the name of that?
23      A.   Robinsonville Clinic, I think.  I'm not
24  sure.  Tunica County Medical Clinics or Urgent Care.
25  I'm not sure of the exact name of it.  But an urgent
```

19

```
 1  care that was operated by Tunica County up in
 2  Robinsonville.
 3      Q.   Well, tell me which hospitals other than
 4  North Mississippi Medical Center in Tupelo, which
 5  hospitals you've worked the ER departments at.
 6      A.   Baptist Hospital in Oxford.  Baptist
 7  Hospital in Booneville.  St. Joseph Hospital in
 8  Memphis.  St. Francis Hospital in Memphis.
 9      Q.   And can you give me dates for those, rough
10  dates -- I don't need the exact dates -- so I can get
11  an idea of which time period we're talking about.
12      A.   Ten years or more.  Ten years or more ago.
13      Q.   But can you give me dates like when you
14  worked for St. Francis, when you worked for St.
15  Joseph, when you worked for Baptist Oxford?
16      A.   I have worked part-time at a number of
17  hospitals over a number of years.  I've also done
18  other things along the way, as well.  I mean, in
19  other words, I have worked -- done this type of
20  correctional medicine contract for 15 years.  I've
21  been doing that.  For the last four years I've had my
22  own urgent care.  The last two years I've had my own
23  drug alcohol treatment facility.  I became board
24  certified in addiction medicine in 2009 or '10.  And
25  I have a substance abuse treatment facility now.
```

20

```
 1      Q.   Where is that?
 2      A.   Etta, Mississippi.
 3      Q.   What's the name of that clinic?
 4      A.   The Oxford Centre.
 5      Q.   The Oxford Centre?
 6      A.   Uh-huh (Indicating yes).  C-E-N-T-R-E.
 7      Q.   So let's say in the last year, 2013, give
 8  me an idea of how much of your time would have been
 9  spent working with the county inmates working with
10  the addiction folks, working the urgent care -- I'm
11  trying to get an idea of how your time is divided
12  between these various groups.
13      A.   Okay.  Does it have to add up to 100
14  percent?  Or can it add up to 150 percent?  I spend
15  about three quarters time -- no, I have an urgent
16  care that I work at everyday.  I also have a nurse
17  practitioner, whom I supervise all day everyday.  So
18  right now I'm supervising a nurse practitioner at
19  that urgent care.  And I do that everyday.  And so
20  that is a full-time job, and I have -- at my walk-in
21  clinic, my urgent care, primary care practice.  I do
22  that daily.
23      Q.   Let me interrupt you and I apologize.  But
24  let's do this.  Start with the job that takes up the
25  most time and work me to the job that takes the least
```

21

1   time.  In other words, rank them and then describe
2   the time you spend with them.
3        A.   Okay.  They're all approximately equal.  I
4   have an urgent care, primary care walk-in clinic,
5   that I run everyday, Monday through Friday, 8:00 to
6   5:00 and 8:00 to 1:00 on Saturdays.  I don't deliver
7   all the direct care.  I have a nurse practitioner, as
8   well.  So when I'm occupied with something else, the
9   nurse practitioner is there by himself and he calls
10  me by phone as necessary.  I see patients there some
11  days.  Some days more than others.
12       Q.   Would you two, you and the nurse
13  practitioner, be the only two people providing
14  medical care there at that facility?
15       A.   Yes, that's correct.  In addition to that,
16  I have the jail, and I have a full-time RN who now
17  works with me 24/7, as well.  In other words, she's
18  there Monday through Friday 8:00 to 5:00.  But in
19  addition to that we both -- we share call in the
20  evening time.  In other words, if she gets a call and
21  doesn't know what to do I take it.  So I take call 24
22  hours a day for the jail.
23       Q.   Is she physically located at the jail?
24  Does she have an office there?
25       A.   She does.

22

1        Q.   Do you have an office at the jail?
2        A.   I share the office with her.
3        Q.   Which office do you spend more time in,
4   talking about the last year now, the office there at
5   the jail or the urgent care office?  Or is it the
6   same?
7        A.   Well, I physically don't spend as much time
8   at the jail.  I'm mainly located at my office in
9   Oxford, but now with electronic medical records I --
10  you know, in other words, I spend more time in my
11  office at the urgent care than I do at the jail
12  physically.
13       Q.   All right.  We haven't talked about the
14  other third of your time, which as I understand it
15  would go to the addiction facility?
16       A.   That's right.
17       Q.   The Oxford Centre?
18       A.   That's right.
19       Q.   You said that was in Etta?
20       A.   Yes.  That is 15 miles from here.  That's
21  where the inpatient facility is, and in addition to
22  that I have an outpatient office center in Oxford, as
23  well.  But there's detox -- we have comprehensive
24  level of services.  We have detox services,
25  residential treatment, and outpatient.

23

1        Q.   Do you have somebody that's physically
2   there at the Etta office?
3        A.   We have a full-time psychiatrist that works
4   with me.
5        Q.   All right.  And he or she would be located
6   at the Etta office?
7        A.   That's right.
8        Q.   They would be there all day?
9        A.   Yes, that's right.
10       Q.   And so compared to the jail, do you spend
11  more time at your office in the jail or more time at
12  your office in Etta?
13       A.   I spend more time in my office at my clinic
14  doing work on all three of them, though.
15       Q.   I understand.
16       A.   And I'm a business owner, as well.  I own
17  that business.  So some of my time is not direct
18  patient care, but operating --
19       Q.   Right.  And I'm not trying to discount
20  that, but my question -- I'm trying to get an idea of
21  where you're sitting most days.  And --
22       A.   It's in my urgent care clinic.
23       Q.   Wait till I'm done with my question.  I
24  know you sit there mostly, but I'm trying to compare
25  -- I know you've got an office and sometimes you're

24

1   at the jail.  And I'm sure -- I know you have an
2   office in Etta, and sometimes I'm sure you're at that
3   office.  Compared to the jail, do you spend more time
4   in Etta or more time at the jail?  Physically spend
5   time?
6        A.   Etta.
7        Q.   Okay.  Do you have any psychiatric
8   training?
9        A.   I have training on mental illness and
10  substance abuse as part of my emergency medical
11  training.  It's a fairly big portion of emergency
12  medicine training.
13       Q.   Would that be considered psychiatric
14  training?
15       A.   It would be considered training to deal
16  with psychiatric patients and substance abuse
17  patients.  Absolutely.  It's a core competence of
18  emergency medicine.
19       Q.   I understand that.  You would agree with me
20  that there is a specialty that would be called
21  psychiatry?
22       A.   Absolutely.  And I'm not board certified in
23  psychiatry.
24       Q.   I understand that.  You're not board
25  certified, but do you have a degree in psychiatry?

25

```
 1        A.   I do not have a degree in psychiatry.
 2        Q.   Have you taken, you know, higher education
 3   courses specifically on the topic of psychiatry?
 4        A.   Yes.
 5        Q.   Where would you have taken those and tell
 6   me what areas those would involve.
 7        A.   In my emergency medicine residency, the
 8   training to deal with psychiatric patients and
 9   substance abuse patients.  So, for instance, there's
10   a rotation at the Western PA Psych Hospital.  That's
11   one of my rotations at the Western Pennsylvania
12   Psychiatric Institute.
13        Q.   All right.
14        A.   And there's other -- I mean, in the
15   emergency department there's another rotation that I
16   did specifically at the psychiatric emergency
17   department at The Med in Memphis.
18        Q.   Your CV says you're a certified medical
19   review officer for drug and alcohol testing.  Tell me
20   what that means.
21        A.   In order to review drug tests for federal
22   programs through the Department of Transportation you
23   have to be certified as a medical review officer.  In
24   other words, you have to take a course and pass a
25   test to interpret and certify drug testing under the
```

26

```
 1   Department of Transportation programs, so drunk
 2   drivers -- those kinds of people.
 3        Q.   So if -- I know sometimes if they're in an
 4   accident they drug test the truck driver?
 5        A.   That's right.
 6        Q.   And maybe that's pursuant to DOT
 7   procedures?
 8        A.   It is.
 9        Q.   And you would be certified to interpret
10   those drug tests?
11        A.   That's correct.
12        Q.   Is that the only thing that that
13   certification is used for?
14        A.   That's the only thing that you are required
15   to be certified in.  Now, obviously, there was more
16   training -- the reason I took it was not so I could
17   be certified to do DOT, but so I could be -- so I
18   could have more knowledge from a clinical standpoint
19   about drug testing and drug testing procedures and
20   results, and how to interpret -- I use drug tests on
21   a daily basis clinically.
22        Q.   All right.  The urgent care practice that
23   you have, let me ask you about that just for a
24   moment.  I know, for example, here in our area I know
25   The Med is a Level I trauma center.  And you know
```

27

```
 1   that, too.
 2        Q.   Okay.
 3        Q.   I mean, am I right on that?
 4        A.   I think it still has that designation.
 5   Tennessee has gone through -- different states go
 6   through different levels, but, yes, it is --
 7        Q.   And this is sort of a background for my
 8   question.  What designation level care would you be
 9   providing at the urgent care facility, how would you
10   designate it here in Mississippi?  Your facility?
11        A.   There's no such designation.
12        Q.   Well, I mean, for example, Baptist here in
13   Oxford, Baptist Hospital, does it have a designation
14   as to level of care it can provide in its emergency
15   department?
16        A.   The trauma -- it has a designation from a
17   trauma standpoint.  In other words, there is some
18   trauma money -- I mean, there is federal money and
19   there is designations of federal trauma centers, but
20   only as the treatment relates to trauma services.  So
21   in other words, it is a -- Baptist Hospital, I
22   believe, is a Level II trauma center designation.
23   And only hospitals are designated under the trauma
24   system, and some are -- most are Level III.  Baptist
25   may even be Level III, but it has to do with the
```

28

```
 1   amount of staffing, and so a number of possibilities,
 2   so -- you know, but it's only a hospital and it's
 3   only related to trauma.
 4        Q.   So you would have no trauma designation for
 5   your urgent care facility?
 6        A.   As any other non-hospital facility would,
 7   that's correct.
 8        Q.   And I guess I'm just trying to get an idea
 9   in my mind the difference between urgent care
10   facility and the emergency room in a hospital, you
11   know, as far as the care and treatment that can be
12   provided to a patient.  Can you describe that for me?
13        A.   Well, an urgent care setting by definition
14   is not in a hospital.  And therefore, it lacks, you
15   know, some of the resources which a hospital needs.
16   So when we identify patients who need a level of care
17   as a for instance, admission to a hospital, we refer
18   them to a hospital rather than we don't have any way
19   to hospitalize people or way to deliver some of those
20   services.  So, for instance, if you need surgery, you
21   would have to go to a hospital.  We don't have a CT
22   scan or a CAT scan.  We actually order them at the
23   hospital.
24        Q.   All right.  So would a fair way to
25   characterize the difference between urgent care
```

29

```
 1    facility, like the one that you all have, and an
 2    emergency room be it's a lower level of care for
 3    emergency patients?  And if there's a better way to
 4    characterize it, please, do so.
 5        A.   It's a different site.  It's not hospital
 6    based.
 7        Q.   It's obviously a different site and there
 8    is no hospital, but is there any difference in the
 9    level of care in treatment that the patient receives
10    in an urgent care facility compared to an emergency
11    room at a hospital?
12            MR. O'DONNELL:  Object to the form as
13    vague in terms of the term level of care.
14        A.   Certainly more services can be provided in
15    a hospital than in a non-hospital setting, yes.  So,
16    yes.  More services can be provided in a hospital
17    than in urgent care.
18        Q.   Well, let me ask you this.  You've read the
19    records with regard to Princess Anderson and her
20    emergency room visit to Baptist DeSoto Hospital, have
21    you not?
22        A.   I have.
23        Q.   All right.  And let's pull those records.
24    Pull those records for me if you have those.
25        A.   Right there.
```

30

```
 1        Q.   The clinical impression with regard to
 2    Princess Anderson for her admission to Baptist DeSoto
 3    on February 7th was what?
 4            MS. BANKS:  What number is that at
 5    the bottom?
 6        Q.   I'm looking at BMHD30, where it says
 7    clinical impression.  Do you see that?
 8        A.   Yes.  Do you want me just to read that?
 9        Q.   Yeah.  What was the clinical impression?
10        A.   Okay.  There was apparently two things
11    written in one hand at one time, drug reaction and
12    positive pregnancy.
13        Q.   All right.
14        A.   And then in another hand out to the side,
15    so apparently added later, was acute psychosis and
16    substance abuse.
17        Q.   And you understand that there were two
18    different physicians that took care of Ms. Anderson?
19        A.   That's right.
20        Q.   But all those, the drug reaction, the
21    pregnancy, the acute psychosis, and the substance,
22    what did you say?
23        A.   Substance abuse.
24        Q.   -- and the substance abuse, were all part
25    of the clinical impression with regard to this
```

31

```
 1    patient, right?
 2        A.   Apparently -- I don't know if they were all
 3    part of that.  In other words, this may have been two
 4    physicians and the first physician had the impression
 5    drug reaction and pregnancy, and did not consider
 6    acute psychosis or substance abuse as diagnosis.  The
 7    second physician may have added those two.
 8        Q.   I understand --
 9        A.   One physician or another thought that, yes.
10        Q.   Right.  But, I mean, that's part of -- when
11    you go to the emergency room you might get taken care
12    of by two physicians?
13        A.   It certainly happens.
14        Q.   And both physicians contribute to the
15    record, to the charge?
16        A.   That's right.
17        Q.   So there's a specific designation in the
18    chart for clinical impression by whatever physician
19    is handling this patient, even if it's more than one?
20        A.   That is correct.
21        Q.   And so the diagnosis, whether it's by one
22    or both physicians, regardless, the diagnosis, or
23    clinical impression, was drug reaction, positive
24    pregnancy, acute psychosis, and substance abuse for
25    this patient.
```

32

```
 1            MR. O'DONNELL:  Object to the form.
 2            MR. DAVIS:  Object.
 3        Q.   Is that not right?
 4        A.   They wrote them in the clinical impression.
 5    The diagnoses that were assigned to this chart
 6    probably wasn't done here, but on a different form
 7    with a CBT.  So that's the clinical impression.  I
 8    don't know if it's the specific diagnosis that they
 9    used.
10        Q.   Well, clinical impression, let's use that.
11        A.   That's right.
12        Q.   And I didn't mean it to be such a
13    controversial question, but what I was getting to was
14    this.  But my question is this, given those clinical
15    impressions, is that the kind of patients that would
16    be seen at an urgent care or is that the kind of
17    patient that would be referred to an ER at a
18    hospital?
19        A.   Well, this kind of patient I see, if you're
20    asking about my specific experience -- is that what
21    you're asking about or in general about this kind of
22    patient?
23        Q.   I'm asking about urgent care facilities
24    like your facility.
25        A.   Yes.
```

33

1    Q.    Not you personally, but I'm talking about

2  urgent care facilities.

3    A.    Yes.

4    Q.    Would this be the type of patient that an

5  urgent care facility would see and treat or would

6  this be the type of patient they would say, hey, this

7  person needs more care than we can offer here at the

8  urgent care, we're going to send this person to the

9  emergency room?

10    A.    This kind of patient would certainly be a

11  kind of patient that we would see and treat.  The

12  ultimate disposition may be that they need to go to a

13  hospital.  But, I mean, we certainly see this kind of

14  patient at the jail.  I see this kind of patient at

15  my urgent care, at my jail, and my substance abuse

16  treatment facilities.  Some of them we treat.  Some

17  of them we say need a higher level of care.

18    Q.    I'm just trying to be specific here, with

19  regard to Princess Anderson, you've seen the record

20  at Baptist DeSoto, and let's exclude the jail and

21  your addiction facility, I'm just asking about the

22  urgent care because originally I was trying to find

23  out from you the difference between urgent care and

24  emergency room.  Do you understand that?

25    A.    Uh-huh (indicating yes).  I mean -- I do

34

1  understand.

2    Q.    So my ultimate question is, given you

3  reviewed the entire chart -- let's get away from the

4  clinical impressions because that's obviously

5  throwing everybody, but you reviewed the entire

6  chart.  Is this the kind of patient that if she came

7  to your urgent care facility that y'all would say,

8  hey, this person needs to go to the emergency room to

9  be medically cleared to go wherever she needs to go,

10  or would you all be capable of medically clearing her

11  there at your urgent care facility?

12    A.    Well, first of all, I think that it's

13  important for me to say that I wasn't retained to

14  give an opinion about -- I mean, I wasn't retained to

15  review the records from Baptist DeSoto with an

16  opinion about whether she could be treated in an

17  urgent care or not.  So, I mean, that wasn't the

18  purpose of my review of the record.

19    Q.    I understand.

20    A.    A person with similar kind of symptoms to

21  Princess Anderson who was brought by ambulance and

22  who was under psychiatric commitment would likely not

23  have been treated in the urgent care setting, but

24  would have likely been treated in an emergency

25  department.  So even if they had presented to my

35

1  urgent care, would be referred on.  But she was

2  brought by EMS.  She wouldn't have been brought to an

3  urgent care setting to begin with.

4    Q.    Okay.  Can you tell me what's on the disk

5  here just for the record?

6    A.    I believe that is your -- no, the documents

7  that came from Baptist -- they're big files of

8  Baptist records.  And I think some of them may have

9  even been printed, but there's some 542 page things

10  -- some of them were even -- the 542 was actually 250

11  twice or something.  It was almost the same record

12  that was duplicated, but it was those big Baptist

13  records and I don't know who provided them.

14    Q.    So that would be the Baptist records after

15  Princess Anderson was taken from the jail to

16  ultimately Baptist DeSoto?

17    A.    No.  I think there's -- I think there's the

18  Baptist DeSoto record.  I think there is the Baptist

19  Union County record.  And I think -- the next and

20  then the final Baptist DeSoto.  I believe all of

21  those are on there.  Those are all Baptist records.

22    Q.    Okay.  And I know I got away from this,

23  but we were going through what you had in your file.

24  Did you bring your entire file with you?

25    A.    Yes.

36

1    Q.    Did you pull anything out of it before we

2  got started here?

3    A.    No.

4    Q.    You've got the chart for Baptist DeSoto.  I

5  don't see any -- other than what's written BMH DeSoto

6  on the top, I don't see any other writing, any notes

7  made on that?

8    A.    That's correct.

9    Q.    So I'm not going to mark that as an

10  exhibit, but for the record it goes from BMHD26

11  through BMH85, correct?

12    A.    Okay.

13    Q.    And then you have a copy of the Marshall

14  County Detention Facility Policy and Procedure

15  Manual, correct?

16    A.    Correct.

17    Q.    All right.  Of course, this is not Bates

18  stamped.  I don't think anybody's Bates stamped it

19  yet.  But I don't see any marks on here other than

20  one that looks like it was actually marked probably

21  not by you --

22    A.    That's right.

23    Q.    -- so you didn't mark that up any?

24    A.    That's right.

25    Q.    I'm not going to mark that as an exhibit

37

1    either.  You have Dr. Richard Sobel's report and CV,
2    etcetera, correct?
3        A.   Correct.
4        Q.   Let's take a look and see if you made any
5    notes or marked it up.  You did make a few marks on
6    this one so we'll mark this one as --
7            MR. CZAMANSKE:  David, how do you
8    want to do this?  Do you want me to mark his that are
9    here and then somebody will copy them or what do you
10   want -- how do you guys want to do that?  Because I
11   want to make this Exhibit 2 because it's got notes on
12   them.
13           MR. O'DONNELL:  You can just make
14   that the exhibit and we'll just work through the
15   court reporter on that.
16           MR. CZAMANSKE:  Okay.
17           (Exhibit No. 2 was marked.)
18       Q.   So Exhibit 2 -- and it may be confusing
19   because it's got a photograph Exhibit 1, but I'm
20   going to put Exhibit 2 on the left corner and I'm
21   going to note "depo exhibit."
22           MR. O'DONNELL:  I think Exhibit 1 is
23   your reference --
24           MR. CZAMANSKE:  Yeah.  Just so the
25   record is clear, it's going to have an exhibit

38

1    sticker that says "Depo EX" on it.
2        Q.   I'm just looking at your notes on this.
3    You put a little bracket where Dr. Sobel says that he
4    has served as a reviewer of medical standards under
5    EMTALA for professional review organizations
6    hospitals, and forensic setting.  Was there any
7    significance to that or why you did that?
8        A.   I just -- it was a credential which I
9    had -- which I was -- it was a credential which I
10   noted that he had -- you know, that he had testified
11   or had reviewed about before.  And so in addition to
12   other stuff, it was just a notation of his -- of a
13   specific review he had done before.
14       Q.   Have you ever been a reviewer of medical
15   standards under EMTALA, professional review
16   organization?
17       A.   Is your question, have I ever been -- have
18   I ever reviewed those standards?
19       Q.   No, no.  Have you been a reviewer of
20   medical standards under EMTALA for professional
21   review organizations, hospitals --
22       A.   No.
23       Q.   -- or in a forensic setting?
24       A.   No.
25       Q.   On Page 3 of what I marked as Exhibit 2 for

39

1    this deposition you note an HR -- you wrote down HR
2    equals 150 hyperventilation.
3        A.   Uh-huh (Indicating yes).
4        Q.   Was there some significance of that to you?
5        A.   Yes.  I was making notes -- things that I
6    thought were pertinent in the record.  And so there
7    was a record of a heart rate of 150 and she was
8    hyperventilating when she arrived.
9        Q.   Do you agree with that based on your review
10   of the records?
11       A.   That was the report from the EMS, yeah, I
12   mean, that's what was going on with her, yes.
13       Q.   All right.  You wrote down -- below that
14   you wrote down "acute psychosis" in the column on the
15   right.  Is it your opinion that on the February 7th
16   visit to Baptist Hospital DeSoto that this patient,
17   Princess Anderson, was suffering from acute
18   psychosis?
19           MR. O'DONNELL:  Dan, you're getting
20   into areas that Dr. Fowlkes has not been retained to
21   provide opinions on.  As long as we're clear about
22   that.  I mean, you can ask him if he happens to have
23   an opinion on it.
24           MR. CZAMANSKE:  I'll rephrase it.  I
25   was just going on his notes.

40

1        Q.   I wasn't trying to pick on you.  But do you
2    have an opinion as to whether or not Princess
3    Anderson at her admission and ultimate discharge from
4    Baptist DeSoto on February 7th through February 8th
5    was suffering from acute psychosis?
6        A.   I do.
7        Q.   What is your opinion?
8        A.   She was not.
9        Q.   Okay.  You have a number -- on Page 4 you
10   have a number of symptoms written down in the right
11   column.  Do you see that?  Maybe not symptoms is not
12   the right word, but a description of --
13       A.   Behavioral descriptions.  Yes.
14       Q.   Thank you.  Why did you write those
15   behavioral descriptions in that column?
16       A.   Well, they are -- the reason they're
17   written over here where they are is they're direct
18   quotes or close to it from over here in the text at
19   these places.  And I was trying to describe what her
20   behaviors were at Baptist DeSoto.  So these were ones
21   that your expert was describing at Baptist DeSoto, so
22   I was basically, rather than underlining I was maybe
23   rephrasing somewhere along the way.  But,
24   essentially, writing what your plaintiff -- your
25   expert's description of her behaviors were at Baptist

41

1    DeSoto and this is a list of some of them.
2        Q.    Did you disagree in any way with his
3    description of the behaviors?
4        A.    No.
5        Q.    Was there some significance to those
6    behaviors to you with regard to your opinions in this
7    case?
8        A.    Yes.
9        Q.    Tell me what that was.
10       A.    In my report I described symptoms that Ms.
11   Anderson had at Baptist DeSoto on Page 5 of my
12   report.
13       Q.    Okay.
14       A.    I paraphrased or rewrote many of those same
15   symptoms and described her behaviors at Baptist
16   DeSoto, which were similar to descriptions of her
17   behavior at jail.
18       Q.    Okay.
19       A.    So it was notes where my later report.
20       Q.    On Page 5 of that report you wrote down
21   "excited delirium."  Do you see that up on the upper
22   right?
23       A.    Yes.  He had made reference to excited
24   delirium and I was calling attention that he had
25   called it excited delirium.

42

1        Q.    Are you familiar with excited delirium,
2    that phrase?
3        A.    I am.
4        Q.    Is that a medically recognized phrase?
5        A.    It remains controversial.
6        Q.    What's your understanding of excited
7    delirium?
8        A.    My understanding of excited delirium is
9    it's a synonym of agitated delirium.  You'll also see
10   that term as well.  Those mean the same thing.
11   Though are really more legal terms or law enforcement
12   terms than they are medical terms to describe a
13   scenario in which a person is exhibiting acute
14   delirium usually in the setting of a substance
15   ingestion.  They're acutely delirious.  And it's
16   usually used in the setting of there were -- they
17   have an encounter with law enforcement or with some
18   other people who restrain them, and then suddenly the
19   person dies and it's an attempt to -- or it describes
20   that scenario.  It describes that syndrome where a
21   person was exhibiting an agitated state.  They were
22   delirious.  They fought with law enforcement
23   personnel, were restrained and then died.
24       Q.    Okay.
25       A.    And it doesn't explain why they died.  It

43

1    just explains that scenario.
2        Q.    All right.  I thought I had pulled together
3    the ones I wanted to go through with you and sat them
4    in a separate pile, but apparently I didn't.  Let's
5    finish going through your documents here.  You've got
6    the Department of Mental Health Pre-Evaluation
7    Screening Form, which is Core Disclosure -- MCKD Core
8    Disclosure 65 through 68.  You reviewed that?
9        A.    Is this the one from Baptist DeSoto?  No,
10   this is the one from Marshall County.  Okay.  Yes, I
11   have reviewed it.
12       Q.    Is that something that Marshall County
13   would have had when they received this patient?
14       A.    No.
15       Q.    What's your understanding as to who had
16   that document?
17       A.    This document was prepared by a master's
18   level mental health therapist who works for
19   Communicare, which is the designated community mental
20   health center for Marshall County.  And she performed
21   this evaluation on 2/9, so a day after Princess got
22   there.
23       Q.    All right.
24       A.    And it's my understanding based on my
25   experience as the physician examiner who reviews

44

1    these record from Communicare, that she was preparing
2    this for the physicians who were going to see the
3    patient the next day.
4        Q.    Do you know Debra Shelton?
5        A.    I do not.
6        Q.    You never met her?
7        A.    No, I've never met her.
8        Q.    I was thinking she was here in Oxford for a
9    while, but I could be wrong on that.  Have you dealt
10   with Communicare before?
11       A.    Yes.
12       Q.    In what setting?
13       A.    That very setting.  I've been the evaluator
14   for psychiatric Writs for Communicare -- I'm sorry,
15   not Communicare, for Lafayette County, for the last
16   15 years, and Communicare does the prescreenings for
17   us.
18       Q.    Okay.
19       A.    So I review those on a weekly basis.
20       Q.    Is it your testimony that based on your
21   experience that this information, the pre-evaluation
22   screening form is not provided to the jail?
23       A.    Well, you asked me -- your question was
24   would they have had it when she was admitted there.
25   And, no, they wouldn't have had it when she was

45

1  admitted there because it wasn't prepared till the
2  next day.  But, no, she wouldn't leave this with the
3  jail.  It is my experience you would not leave that
4  with the jail.
5      Q.  Is it your experience that the Communicare
6  folks discussed with the jail their evaluation on the
7  inmates?
8      A.  No, they do not.
9      Q.  You've seen the Writ to take in custody?
10      A.  Is that for DeSoto County or Marshall
11  County?
12      Q.  Marshall County.  It's marked MCKD Core
13  Disclosure 69 through 70.  Would the Writ to take
14  into custody, would that be based on your experience,
15  if you know -- and if you don't know, tell me -- but
16  would that something that would be provided to the
17  Marshall County Sheriff's Office?
18      A.  It would be, but it was -- it actually had
19  to be prepared the next day, but it would have been
20  faxed back over to the -- she was -- that was the one
21  that was prepared on February the 9th the next day
22  after she was brought there.  But, yes, it would have
23  been provided to them.
24      Q.  You reviewed the pathological -- basically
25  what I would call an autopsy report, with regard to

46

1  Princess Anderson, correct?
2      A.  That is correct.
3      Q.  I don't see any notes.  Did you make any
4  notes on it?
5      A.  No, I did not.
6      Q.  You reviewed the booking report marked MCKD
7  Core Disclosure 1 through 8.
8      A.  I did.
9      Q.  In your capacity working for the jail that
10  you work for, do you -- do they have a similar type
11  of booking report?
12      A.  They do.
13      Q.  Do they have a similar type of medical
14  condition, health history profile that they'll do on
15  the inmates?
16      A.  They do.
17      Q.  And as medical director there at the jail,
18  do you have an understanding as to why the county
19  jail would put together a medical health history
20  profile?
21      A.  Yes.
22      Q.  What's your understanding as to why they
23  would do that?
24      A.  To identify medical condition -- medical
25  and psychiatric conditions that require attention.

47

1      Q.  Including suicidal tendencies?
2      A.  Yes.
3      Q.  And is it based on your experience the
4  inmates that have the psychiatric issues and the
5  suicidal tendencies require normally under their
6  protocol or their, what do you call them, their
7  policies and procedures, they require more
8  supervision than a normal inmate?
9      A.  Yes.
10      Q.  And can we agree that with regard to
11  Princess Anderson there was an indication on the
12  medical condition health history profile suicidal
13  tendencies and psychiatric care?
14      A.  Can we agree that those boxes are checked,
15  is that what you're saying?
16      Q.  Yeah.
17      A.  Yes.  Those boxes are checked.
18      Q.  Isn't that significant with regard to the
19  supervision she's going to receive at the jail?
20      A.  Well, more significant was -- no, not
21  really, not what was marked on there.  What's
22  significant is that she was brought there under a
23  court order for psychiatric treatment.  Automatically
24  -- irrespective of what would be checked there, she
25  should be treated in the fashion that psychiatric

48

1  commitment patients are treated.
2      Q.  Based on your review of the policies and
3  procedures of the paperwork, how often was she
4  supposed to be checked on by the jail staff?
5      A.  She was supposed to be held in -- apart
6  from other inmates and checked on frequently.
7      Q.  But how -- can you give me more than --
8  other than saying frequently, can you give me a time,
9  how often time-wise she was supposed to be checked
10  on?
11      A.  I would have to review that for the
12  specific time, but I know that all -- what I know is
13  that all patients -- yes -- I wasn't trying to be
14  argumentative.  And yes, because if she had suicidal
15  tendencies and psychiatric care, she should receive
16  additional increased monitoring, increased
17  supervision, kept separate from other patients.  But
18  that should occur not as a result of this checkmark
19  here, but by the fact that she was a psychiatric --
20  so in other words, they have a policy of dealing with
21  all psychiatric commitment patients that has that
22  increased level of screening and increased level of
23  monitoring whether those boxes were checked or not.
24      Q.  And I just want to be clear so we're on the
25  same page.  Are you saying that if somebody who's

49

1    committed and they're going to jail under the
2    policies and procedures for Marshall County, that
3    they're going to be checked on the same regardless of
4    whether there's any indication of suicide tendencies
5    or not?
6         A.   The Marshall County Jail and other jails,
7    there are state regulations about handling those
8    psychiatric patients.  So, yes, whether they were
9    suicidal as part of their psychiatric commitment, I
10   mean -- I mean, they're known to be -- that is by
11   definition they're psychiatric patients.  So in other
12   words, it doesn't really matter whether they had this
13   box checked or not.  But they're presumed to be --
14   that is the whole reason that they're there.  You
15   have to be a danger to yourself or others in order to
16   be committed.  So that is by definition the treatment
17   that they'll receive.
18        Q.   You've got the statements from the various
19   jailers.  These aren't Bates stamped, so let's --
20   you've got the statement from Alnita Kimmons, jailer.
21   You've reviewed that, haven't you?
22        A.   I have.
23        Q.   You've got the statement from Ardella
24   Anderson.  You've reviewed that, true?
25        A.   I have.

50

1         Q.   You reviewed the booking log that's marked
2    MCKD Core Disclosures 9 through 34?
3         A.   I have.
4         Q.   And you've reviewed that.  I didn't see any
5    marks on there.  Did you mark that up at all?
6         A.   I did not.
7         Q.   And you've got the records from Holly
8    Springs Hospital, Alliance Healthcare System, and you
9    reviewed those, right?
10        A.   I have.
11        Q.   And those are marked -- well, I don't see a
12   Bates on them, but we all know what they are.  I'm
13   not going to mark those.  I'm going through a list of
14   what you've got here in your file.  You've got the
15   records from the Baptist Memorial Hospital Union
16   County?
17        A.   Yes.  Can I explain something to you for
18   just a second?
19        Q.   Sure.  Go ahead.
20        A.   These records are -- I think they were on
21   that disk.  This is for however many pages that I
22   thought were particularly relevant of those 500
23   pages.  So those are the relevant pages off of those
24   542.
25        Q.   Got you.

51

1         A.   Even if I ultimately decided they weren't
2    relevant, they were the ones I wanted to print off.
3    See, that's --
4         Q.   Yeah, I was going to ask, what are the
5    numbers on the upper right?
6         A.   There's 446 pages of records and that would
7    go at the page number these were.
8         Q.   I tell you what, I'm going to go ahead and
9    mark that as Exhibit 3 since they're selected copies.
10             (Exhibit No. 3 was marked.)
11        Q.   We'll keep those separate because we're
12   going to go through some of the medical stuff so I
13   want to keep those out.  You've reviewed the
14   deposition of Dr. Sobel it looks like?
15        A.   Yeah, I have reviewed that preliminary -- I
16   mean, I'm not sure that it's the version that is
17   final.  It was a draft copy.
18        Q.   A signed version?
19        A.   I'm not sure.  It is what I was provided.
20   And it's obviously printed four pages -- I printed it
21   on my own computer from a PDF.
22             MR. CZAMANSKE:  I'm going to mark
23   this as Exhibit 4.
24             (Exhibit No. 4 was marked.)
25        Q.   I'm doing that because you've got notes on

52

1    this one.
2         A.   That's fine.  Do you mind if I look at it
3    -- this and this just for a second?
4         Q.   Go ahead.
5         A.   (Perusing documents).  Essentially, if I'm
6    not mistaken, these may have been done at separate
7    times, but this is all notes on the Baptist Union.
8    This is all really one thing.  I don't know -- I'm
9    not exactly sure why there's -- this is notes from --
10   that's notes -- and it may be double.  Sort of
11   doubled.  But it's all related to the Union.  Some of
12   those are even the same page numbers.  It's all one
13   pile.  I don't know how it got into two separate --
14        Q.   Okay.  We're just going to include that.
15        A.   That's what I'm saying.  That's really one
16   pile --
17        Q.   It should all be part of Exhibit 3?
18        A.   All one document.  That's right.
19        Q.   They're all records from Baptist Union?
20        A.   That's right.
21        Q.   You've got a couple of -- these looks like
22   notes maybe that you put together.  Is that true?
23        A.   Yes, that's right.  They were notes that I
24   put together for you.
25             MR. O'DONNELL:  That's correct.  I've

53

1  looked at those.
2           MR. CZAMANSKE:  I'm going to mark the
3  notes on Altered Sensorium as Exhibit 5.
4           (Exhibit No. 5 was marked.)
5           MR. CZAMANSKE:  And the notes on
6  Mississippi Civil Commitment Law as 6.
7           (Exhibit No. 6 was marked.)
8      Q.   Then we've got it looks like your report
9  but your report with notes on it.
10     A.   That's right.
11     Q.   Is this an earlier report that was revised
12 or is this just some notes maybe you had on a
13 conversation?
14     A.   This is notes that I had -- that I made on
15 that after reading Dr. Sobel's deposition.
16     Q.   Okay.
17          MR. CZAMANSKE:  We're going to mark
18 that as Exhibit 7.
19          (Exhibit No. 7 was marked.)
20     Q.   Then you've got another copy of the
21 policies and procedures, but this one appears to be
22 -- have some earmarks --
23     A.   Let me see if this is -- yes.  This is -- I
24 did earmark sections that I believed were relevant to
25 medical procedures and stuff.

54

1      Q.   Let's set this aside.  We're going to go
2  through that separately.  You've also got the Baptist
3  Memorial Hospital DeSoto's Expert Designation that
4  you have notated, right?
5      A.   Yes.
6           MR. CZAMANSKE:  We're going to mark
7  that as Exhibit 8.
8           (Exhibit No. 8 was marked.)
9      Q.   And I want to go through this a little bit
10 with you, so I'm going to pull out here Baptist
11 DeSoto's records, which I believe we marked as
12 Exhibit 3; is that right?
13     A.   No.  This is the Baptist Union County's.
14     Q.   Excuse me.  I'm sorry.  That's Baptist
15 Collierville.
16     A.   That's right.
17     Q.   What did we do with Baptist?  Did we not
18 pull those already?
19     A.   I think you set it to the side.
20     Q.   I'm sorry.
21     A.   It's all right.  It's right there.  First
22 of all, let me ask you if you're familiar, especially
23 having worked in the emergency room department
24 with --
25          MR. O'DONNELL:  Can we take a short

55

1  break?
2           MR. CZAMANSKE:  Yeah.  I'm changing
3  topics, good time to take a break.
4           (Short recess).
5      Q.   I wanted to ask you about the Baptist
6  DeSoto records.  Okay.  And they're Bates stamped
7  BMH-D.  And I know you've worked in emergency rooms,
8  and I'm looking at BMH-D34, which, guys, it's this
9  one.  It's the protocol.  You're familiar with
10 standing orders in emergency room departments?
11     A.   I am.
12     Q.   And you probably can describe it better
13 than I can, how would you describe standing orders?
14     A.   Standing orders or a more appropriate term
15 is probably protocols for certain scenarios.  So
16 given certain scenarios, there are certain standard
17 orders that expedite care and ensure that
18 standardized and good care is delivered.
19     Q.   And there's a set of standing orders for
20 various conditions that are set forth there on
21 BMH-D34, right?
22     A.   That is correct.
23          MR. DAVIS:  Object to form.
24     Q.   As part of the record you reviewed in this
25 case?

56

1      A.   That is correct.
2      Q.   There is a section called Altered Mental
3  Status.  It's the third box on the left side.  Do you
4  see that?
5      A.   I do.
6      Q.   Based on your review of the records, did
7  Princess Anderson, would you as an emergency room
8  doctor categorize as suffering from altered mental
9  status?
10     A.   Yes.
11     Q.   Do you see the orders that are listed in
12 there?
13     A.   I do.
14     Q.   Were any of those orders carried out?
15          MR. DAVIS:  Object to form.
16     Q.   Or protocols I guess I should call them?
17 Well, let's go through them.  Was a CBC done?
18     A.   No.
19     Q.   Was BMP done?
20     A.   No.  I was just looking down through there
21 for just a second.  I think that a saline lock, or I
22 think an IV may have been started and then was pulled
23 out.  That's the only one of those that I see.  And
24 cardiac monitor, also.  So two of those were done.
25     Q.   And urinalysis was done?

57

1      A.   Yes, that's correct.

2      Q.   And urine drug screen, the next one.  UA,

3  UVS and cardiac monitoring.  And in addition to that,

4  CT head, which is not on there.  It has to be ordered

5  separately.

6      Q.   But the CT head was done?

7      A.   That's right.

8      Q.   Was there a finger stick for blood sugar?

9      A.   I do not believe so.

10     Q.   Was she given O2?

11     A.   I do not believe so.  It says pulse

12 oximetry next and that was performed.  It was.

13     Q.   Oh, it was?  I didn't see that.

14     A.   You'll have to look in some of the nursing

15 notes, but you'll see it where it will describe -- I

16 saw where Dr. Sobel said it wasn't done, but -- like

17 right there, that's pulse oximetry.

18     Q.   Let's get a page.  You're looking at 39?

19     A.   Okay, 39, SA02, that's pulse oximetry 100

20 percent.  So her Oxygen level was 100 percent, so she

21 didn't need Oxygen.

22     Q.   Right.  So some of the protocols were

23 carried out and some weren't?

24     A.   That's right.

25     Q.   And you know working in emergency rooms

58

1  there can be multiple diagnosis on a given patient?

2      A.   That is correct.

3      Q.   So there can be -- multiple protocols

4  might be applicable to that patient?

5      A.   That is correct.

6          MR. DAVIS:  Objection.

7      Q.   If you go to the middle column right about

8  the middle there is a protocol for medical clearance

9  for psych evaluation?

10     A.   That is correct.

11     Q.   That would apply to Princess Anderson?

12     A.   It would.

13     Q.   Under that protocol CBC is called for.

14 That was not done, was it?

15     A.   Not at this visit.

16     Q.   Not at this hospital?

17     A.   Not at this hospital.  That's correct.

18     Q.   And not for this admission?

19     A.   Not at this ER and not during this

20 admission, no.

21     Q.   And BMP, that was not done, was it?

22     A.   It was not.

23     Q.   Alcohol level, that was not done, was it?

24     A.   That is correct.

25     Q.   And then over on the right column there is

59

1  pregnant with abdominal pain.  Do you see that, very

2  top one?

3      A.   I do.

4      Q.   Would that apply in this instance?

5      A.   I don't believe so because it was

6  adequately worked up at Collierville.

7      Q.   And then on that same column but down see

8  where it says suspected overdose?

9      A.   I do.

10     Q.   Would that apply?

11     A.   It would.

12     Q.   We've gone through the -- I mean, it's fair

13 to say no blood was drawn at all at Baptist DeSoto?

14     A.   That's correct.

15     Q.   Acetaminophen level, that's one that wasn't

16 in the other protocol?

17     A.   Right.

18     Q.   How do you get that?

19     A.   That is a Tylenol -- that's a Tylenol and

20 overdoses should be screened for Tylenol because it's

21 -- it's potentially lethal if untreated and

22 potentially very treatable if it is.  So because many

23 people won't tell you that I ingested Tylenol, if you

24 suspect an overdose you ought to check the Tylenol

25 level.

60

1      Q.   And I was wondering how do you check it, do

2  you check it with the blood or urine?

3      A.   Blood level.

4      A.   Blood level.

5      A.   And same with salicylate.  That's Aspirin.

6  The next one is Aspirin.

7      Q.   We've already gone over the finger stick.

8  Cardiac monitor.  You're saying he was on cardiac

9  monitor, right?

10     A.   Yes.

11     Q.   EKG protocol, do you know what that is?

12     A.   I do not.

13     Q.   All right.  Now in looking at the Baptist

14 DeSoto designation of expert, you have some notes

15 written on here, and I'm going to go to Page 2.

16     A.   Could you turn it around?

17     Q.   Yeah, so we can both look at it.  There at

18 Page 2, it states that Dr. Carlton was anticipated to

19 testify as an emergency room physician staff at

20 BMH-D.  You understand that to be Baptist Medical

21 Hospital DeSoto, right?

22     A.   Baptist Memorial DeSoto.

23     Q.   You're right.  During emergency room

24 admission of Princess Anderson on February 7 through

25 8th complied with the governing standards of care in

61

```
 1   all respects with regard to their evaluation, care
 2   and treatment of Princess Anderson.  And I didn't
 3   finish reading the whole paragraph, but you write
 4   down "disagree" over here.
 5        A.   That is correct.
 6        Q.   What part do you disagree with?
 7        A.   That they complied with the standards of
 8   care with regard to evaluation, care, and treatment.
 9             MR. DAVIS:  Object.
10             MR. O'DONNELL:  We have not tendered
11   Dr. Fowlkes to testify as to standard of care
12   delivered at Baptist DeSoto prior to the time that
13   Ms. Anderson was brought to the jail February 8,
14   2011.  But he has reviewed the records.  It's outside
15   his designation.  It's outside of the retention, so
16   we'd object to those questions on that basis.
17             MR. CZAMANSKE:  I understand.
18        Q.   Dr. Fowlkes, one of the issues we're
19   looking at in this case is, with regard to the
20   defendants, is who has what responsibility with
21   regard to Princess Anderson, isn't it?
22        A.   It is.
23             MR. O'DONNELL:  Calls for a legal
24   conclusion.
25        Q.   And one of the issues in this case is
```

62

```
 1   whether or not at the time she's transferred to the
 2   jail is whether or not she was in a condition that
 3   she should have been transferred to the jail.  Isn't
 4   that part of the issue in this case?
 5        A.   Well, I was asked to review Marshall
 6   County's role in this and the jail's role in this.
 7   And so the view with which I reviewed this case was
 8   that whether I personally disagree with the care that
 9   she did or didn't receive at Baptist DeSoto, she was
10   determined to be medically clear and determined by
11   physicians at Baptist DeSoto to be medically clear to
12   not require hospitalization and not require
13   prescriptions to not require any further ongoing, you
14   know, any further care, and was medically clear to be
15   at Marshall County Jail, which they knew was a
16   nonmedical facility.  So that is the presumption
17   under which she came to Marshall County Jail and what
18   they could or should have known.
19        Q.   I understand that.  And part of the issue
20   you have to consider is that person, Princess
21   Anderson, her underlying condition while she's at
22   jail.  That's part of your opinion, isn't it?
23             MR. O'DONNELL:  Object to the form.
24   Vague.
25             MR. CZAMANSKE:  Let me try and
```

63

```
 1   rephrase it.
 2        Q.   Isn't it part of your opinion to look at
 3   her underlying medical condition and the symptoms she
 4   had in that condition or the symptoms --
 5        A.   Yes.
 6        Q.   -- she didn't have in that condition while
 7   she's in jail?
 8        A.   Yes.
 9        Q.   And to do that you have to look at her
10   condition when she came into jail?
11        A.   That is correct.
12        Q.   Her medical condition.
13        A.   Her -- what I have to look at is her -- the
14   symptoms she was demonstrating, her behavior that was
15   demonstrated to the jail staff as opposed to or as
16   compared to the symptoms she was exhibiting at
17   Baptist DeSoto where trained medical professionals
18   saw her, determined that she was medically clear,
19   determined that she was safe and stable to be in a
20   jail environment.  So what I reviewed in my records
21   was did her behavior, did her symptoms, did the
22   things that the jailers were seeing, did they deliver
23   substantially from -- in other words, was there a
24   deterioration in her condition.  Because the hospital
25   had seen her and declared that she was medically
```

64

```
 1   stable to be in the jail and had no conditions that
 2   required her to be in the hospital.
 3        Q.   So did you consider as part of your opinion
 4   Princess Anderson's underlying medical condition at
 5   the time she's transferred from Baptist DeSoto to
 6   Marshall County Jail?
 7        A.   I did.
 8        Q.   And one of the ways that you're going to
 9   determine her condition is by looking at the medical
10   records for Princess Anderson before she went to that
11   jail?
12        A.   I did.
13        Q.   And part of the thing that you're going to
14   look at and consider as an expert in determining her
15   medical condition before she goes to jail are tests
16   that were run on her?
17        A.   That is correct.
18        Q.   And the results of those tests?
19        A.   That is correct.
20        Q.   But you also have to consider what tests
21   weren't run on her, don't you?
22        A.   That is correct.
23        Q.   And what tests should have been run on her?
24             MR. DAVIS:  Object to form.
25        A.   I did -- I considered the result, the
```

65

```
 1   result more so than anything else.  In other words,
 2   she had been determined by the physicians to be
 3   medically clear.
 4       Q.   You're not endorsing that determination in
 5   any way, are you?
 6       A.   No.
 7       Q.   You don't -- based on what you've told me,
 8   you don't even necessarily agree with their decision
 9   to medically clear her for --
10            MR. DAVIS:  Object to form.
11            MR. CZAMANSKE:  Okay.  Wait till I'm
12   done.
13       Q.   You don't agree with their decision to
14   medically clear her for the jail setting, do you?
15            MR. DAVIS:  And just to save time,
16   will you give me a standing objection?
17            MR. CZAMANSKE:  I sure will.
18       A.   That's correct.
19            MR. O'DONNELL:  And, of course, we're
20   objecting to the extent that he's being asked to
21   offer opinions beyond the scope of his retention and
22   his report.
23       Q.   On Page 5 of the designation --
24            MR. O'DONNELL:  Which designation?
25            MR. CZAMANSKE:  I'm sorry.  Thank
```

66

```
 1   you.  Baptist DeSoto.  I marked it as Exhibit 8.
 2       Q.   On Page 5 there's a note about consult
 3   under the lower third, I guess, of the page there.
 4       A.   Right.
 5       Q.   And explain to me what you mean by the
 6   comments you have written down there.
 7       A.   Princess had been seen earlier in the day
 8   at Baptist Collierville where she was determined to
 9   be pregnant, and the ultrasound findings were
10   suspicious for an ectopic pregnancy.  So we had a
11   potential ectopic pregnancy and what that calls for
12   is in 48 hours having another, at least, quantitative
13   HCG to be done in 48 hours.  Which by this time would
14   then be the next day, so 24 hours essentially from
15   the morning of being at Baptist DeSoto.  And so
16   basically I made a note here that Baptist DeSoto
17   consulted with an OBGYN who said that there's no
18   medical reason to admit her because of her pregnancy,
19   although follow-up was needed within a few days.  Few
20   days is not true.  She needed 48 hours from the first
21   time her blood was drawn, which would now be 24 more
22   hours.  And it was incumbent upon them to see that
23   that was done.
24       Q.   And you noted that not able to -- not able
25   to reliably follow-up, should have admitted.  Is that
```

67

```
 1   what your note is?
 2       A.   Well, it is appropriate for outpatient
 3   care.  This condition is appropriate for outpatient
 4   care if you can assure good follow-up.  In other
 5   words, if she could -- if she had told the jail that
 6   -- they had told the jail that she needed a blood
 7   test the next day or something.  But in the absence
 8   of the ability to follow-up ordinarily you would need
 9   to be in the hospital.
10       Q.   And my original question was, if I read
11   your note right?  "Not -- in quote, "not able to
12   reliably follow-up - should have admitted."  Did I
13   read your note right?
14       A.   That is correct.
15       Q.   And is the reason that you noted not able
16   to reliably follow-up because of Princess Anderson's
17   mental condition at the --
18       A.   Yes.
19       Q.   -- time she was at Baptist DeSoto?
20       A.   Yes.
21       Q.   So really in that regard, you agreed with
22   Dr. Sobel on that one particular issue?
23       A.   Yes.
24       Q.   And Page 7 of Exhibit 8 you note that --
25   explain your note there where it says "no, Writ
```

68

```
 1   only."
 2       A.   Basically this says a commitment order and
 3   technically that is not true.  A commitment order had
 4   not been issued, only a Writ of commitment.  So only
 5   the detainer of Writ had been issued.  She has not
 6   been court ordered to involuntary treatment at that
 7   time, only a Writ.
 8       Q.   That's just a different -- they just hadn't
 9   got to that point in the process?
10       A.   That's correct.  So she was not ordered for
11   involuntary psychiatric treatment at this point.  She
12   was ordered to detention.
13       Q.   On that same page, Page 7 of Exhibit 8,
14   where it's noted Dr. Carlton disagrees with Dr.
15   Sobel's opinion that the emergency room physicians
16   breached the standard of care by determining that Ms.
17   Anderson was medically stable for discharge for
18   further psychological evaluation and treatment.  You
19   noted again your disagreement there, correct?
20       A.   I disagree with Dr. Carlton's disagreement.
21       Q.   All right.  And would it be fair to say
22   then with regard to that one particular issue you
23   agree with Dr. Sobel's opinion?
24       A.   Yes, that is correct.
25       Q.   I should have asked you this, do you know
```

69

1    any of the experts involved in this case?  Dr.
2    Carlton or Dr. Sobel or any of those?
3         A.   I know Rick Carlton socially.  He's in the
4    emergency medicine in Mississippi and I run into him
5    at meetings.  But other than --
6         Q.   Are y'all social acquaintances?  Go out --
7         A.   In fact, I'm not sure I'd recognize him.
8    You know, we all age.  I'm not even sure I'd
9    recognize him.
10        Q.   Do you know Dr. Sobel?
11        A.   I do not.
12        Q.   Do you know any of the emergency room
13   physicians involved in this case, Dr. Olmstead or Dr.
14   Black?
15        A.   I don't.  I've seen both of their names,
16   but I don't know what either one of them look like
17   and don't know them.
18        Q.   On Page 8 of the opinion where it indicates
19   that laboratory testing did not reveal any organic or
20   metabolic basis for her prior delirium and she was
21   not otherwise medically unstable you note, quote, did
22   not do labs or tox testing.  Did I read that right?
23        A.   That's right.
24        Q.   What labs or tox testing -- are you talking
25   about the ones we went through on the protocols?

70

1         A.   That's correct.  It said as laboratory
2    testing did not reveal, and the opinion was that
3    limited amount of laboratory testing was done.
4         Q.   The urinalysis that they did, can you turn
5    the page there?
6         A.   The one at Collierville or the one at
7    Baptist?
8         Q.   The one at Baptist.
9         A.   Okay.
10        Q.   Because I had a question about this.  You
11   see the specific -- is it the specific gravity?  You
12   know what, let's not --
13        A.   Don't mark --
14        Q.   You know what, that's your copy, I guess if
15   you want to mark on it you can.  That's fine.  The
16   specific gravity, what's the range for specific
17   gravity?
18        A.   In this laboratory 1.003 to 1.030, and
19   anything over 1.030 is listed as greater than.  So
20   that's concentrated.  Although Baptist DeSoto has a
21   different range because theirs earlier in the day was
22   1.034 and it was reported --
23        Q.   Baptist Collierville?
24        A.   I'm sorry, yes.  Baptist Collierville.
25        Q.   And that's where I was going.  I was

71

1    looking at that and I wanted to ask about that
2    because the -- have you ever worked with Baptist
3    DeSoto before?  Have you ever gotten labs from them?
4         A.   Yes.
5         Q.   And you've gotten labs from other places,
6    so I wanted to ask you.  With regard -- what's the
7    significance of Princess Anderson's urinalysis and
8    the specific gravity on February 7 -- no, it's
9    actually dated February 8th.
10        A.   At 4:00 a.m.
11        Q.   At 4:00 a.m.  What's the significance of
12   that finding?
13        A.   Well, did you ask about the finding of the
14   urinalysis only?
15        Q.   I could have gone that way.  Number one,
16   what is the finding?
17             MR. DAVIS:  What's the page you're
18   on?
19             MR. CZAMANSKE:  Seventy-four,
20   BMH-D74.
21        A.   The urine is concentrated.  Meaning in
22   other words, that the urine -- there's not been --
23   the urine is concentrated and the person is retaining
24   as much fluid as they can.  So in other words, it
25   doesn't necessarily indicate dehydration.  It can be

72

1    an early sign of dehydration.  But in any event, the
2    urine is concentrated.  All of our urines are
3    concentrated in the morning, too.  It reflects not a
4    dilute urine.  And there's other findings, as well.
5         Q.   But the amount of the concentration is
6    greater than 1.030?
7         A.   Right.  That's correct.
8         Q.   I mean, that's based on the way they've got
9    it written here there's a greater than sign --
10        A.   Well, we don't know how much greater.
11        Q.   Well, that's what I was going to ask.  We
12   know earlier it was 1.034?
13        A.   Right.  So it was greater earlier in the
14   day and it's still greater.  It's concentrated.  You
15   would call it concentrated no matter -- either of
16   those things, it's concentrated urine.
17        Q.   But the greater the concentration the more
18   significant the finding?
19        A.   Yes, that's right.  But they don't measure
20   anything other than 030 at most places, so in other
21   words, this is considered concentrated.
22        Q.   Right.
23        A.   It's considered concentrated.
24        Q.   Well, I mean, you can't assume that it's
25   1.030?

73

1    A.  No.

2    Q.  It could be any number above that?

3    A.  That's correct.

4    Q.  And that's significant with regard to her

5  condition there at the hospital before she

6  transferred to the jail?

7    A.  I believe so.

8    Q.  Okay.

9    A.  But there's some other findings on here --

10  I mean, there's some other findings that are as well

11  significant.  The blood -- the dip blood is negative

12  so she did not have Rhabdo.  She did not have Rhabdo

13  at this time.

14    Q.  Rhabdo?

15    A.  Rhabdomyolysis.

16    Q.  You're saying Rhabdo -- if she did have

17  Rhabdo it would result in blood in the urine?

18    A.  It would result in the dip test being

19  positive.

20    Q.  And the dip test measures what?

21    A.  It measures hemoglobin is what it's

22  designed to measure.  But in the case of

23  Rhabdomyolysis it also reads myoglobin.  So a finding

24  of -- a hallmark of Rhabdomyolysis is dark urine,

25  coca-cola colored urine with a positive dip for blood

74

1  which is supposed to measure hemoglobin, but in the

2  case of Rhabdomyolysis also reacts to myoglobin.  But

3  down here, no red blood cells.  So in other words,

4  the dip test indicates blood is there, but when you

5  look in the microscope you don't see red blood cells

6  because there's not red blood cells.  They're

7  myoglobin.

8    Q.  Did you read the testimony of Princess

9  Anderson's mother?  Was that one of the depositions

10  you were provided?

11    A.  No.

12    Q.  Okay.  So you're not aware of her testimony

13  and her description of the urine sample that her

14  daughter gave there at Baptist DeSoto, her

15  description of the color and consistency?

16    A.  I'm not -- I'm aware -- no, I'm not.  There

17  was a reference in Union County's records to having

18  -- previously had dark urine.  So I'm aware of that

19  reference in Union County's, but I'm not aware

20  directly of her mother.

21    Q.  Well, and you would have been aware of it

22  from reading Dr. Sobel's deposition?

23    A.  Yes, exactly.

24    Q.  But you didn't read that testimony.  Did

25  you ask for her deposition?

75

1    A.  I don't recall even knowing that she had

2  been deposed.

3    Q.  Did they do a -- strike that.  I can't read

4  your note on Page 8 of Exhibit 8, right there in the

5  right column, this bottom note.  Could you read that

6  for me?  I can't read your writing.  That's all.

7    A.  Dr. Carlton disagrees with Dr. Sobel's

8  opinion that the potential of an ectopic pregnancy

9  required admission to the hospital.  And I said that

10  -- this is somewhat controversial, but I said

11  disagree because lack of ability for follow-up.  The

12  same thing we talked about before.

13    Q.  Okay.  Page 9 of Exhibit 8, I can't read

14  your writing on the right column there.  What does

15  that say?

16    A.  Ms. Anderson's -- it's in reference to this

17  sentence, Ms. Anderson's clinical course indicates an

18  adequate response to the use of Ativan without

19  anti-psychotics.

20    Q.  What did you write on the side?

21    A.  Did not send prescription and you would

22  expect the symptoms to recur without more medicine.

23  I didn't write with more medicine.

24    Q.  You didn't write what?  I'm sorry?

25    A.  Would expect symptoms to recur without more

76

1  medicine.

2    Q.  In other words, they were sending her to

3  jail and that Ativan was going to wear off?

4    A.  That's correct.

5    Q.  With regard to Dr. Carlton's opinion that

6  Ms. Anderson's mental state was not the result of

7  reported marijuana and codeine based cough syrup you

8  wrote down disagree and you underlined it three

9  times.

10    A.  Yes.

11    Q.  I take that to mean you strongly disagree?

12    A.  Yes.

13    Q.  This is something that you deal with it

14  sounds like at your addiction clinic?

15    A.  Right.

16    Q.  Something that you -- drug use, something

17  where you're very familiar with?

18    A.  Yes.

19    Q.  Tell me why you disagree so strongly with

20  that opinion.

21    A.  I believe her mental state was an acute

22  delirium that was caused by drug ingestion most

23  likely something called purple drink.

24    Q.  What's that?

25    A.  And I'm sorry that I didn't put that.  It

77

1  is Phenergan with codeine cough syrup, which is why
2  she tested positive for opiates.  It's one of the --
3  there are about three ingestants that could have
4  caused the acute delirium that she had, and the most
5  likely of them is purple drink mainly because of
6  testing positive for the opiates.  The other two,
7  bath salts and synthetic cannabinoids don't have drug
8  tests to go with them.  So they could have existed.
9      Q.   If we went with this scenario that you
10 have, this purple drink scenario, is there a time
11 period where you would expect the effects of the drug
12 to wear off of the patient?
13     A.   In general, 12 to 24 hours, but it's very
14 variable and I've seen people remain in this
15 condition for several days due to it.  So it's very,
16 very long.  It's longer than the actual half-life of
17 the medicine in the body.  And it depends on also
18 their underlying psychiatric conditions.
19     Q.   Page 10 of Exhibit 8 where Dr. Carlton
20 indicates that it would not have been appropriate for
21 Dr. Black or Olmstead to admit Ms. Anderson, you have
22 a note there.  Could you read that for me because I
23 can't read it at all.
24     A.   The first sentence that I was responding to
25 was, it would have been inappropriate for Dr. Black

78

1  or Dr. Olmstead to have admitted Ms. Anderson to
2  Baptist DeSoto.  Baptist DeSoto does not have a
3  psychiatric unit and the medical floors are simply
4  not equipped to handle psychiatric patients.
5      Q.   I can read that.  I couldn't read your note
6  there.
7      A.   My note is that it was a medical problem
8  that she had, an acute delirium.  She needed a
9  medical intensive care unit, not a psychiatric ward.
10     Q.   Are you still of that opinion today?
11     A.   Yes.
12     Q.   Just read for me what you have written down
13 there again on Page 10, that last bottom note on the
14 right column, right down there of Exhibit 8.
15     A.   True, not applicable in this case.  I'm
16 referring to the excited delirium syndrome.
17     Q.   Okay.  Dr. Fowlkes, I'm looking at the
18 Holly Springs Alliance Healthcare System records.
19     A.   Yes.
20     Q.   And specifically their urinalysis.
21     A.   Yes.
22     Q.   And I was trying to -- maybe you can help
23 -- I was trying to read where it says blood.  What's
24 that finding?  It's handwritten.  I couldn't read
25 that.

79

1      A.   Large.
2      A.   Large.
3      A.   Large amount.  There are some people use
4  one plus two plus three plus four plus.  Some people
5  use trace, small, moderate, large.  And that's large,
6  so four plus.
7      Q.   All right.  What are the other ways to
8  measure myoglobin in the body?  What other tests?
9      A.   Well, the best test for myoglobin itself is
10 to send off the urine for myoglobin, but that's not
11 the best way to guide when it's Rhabdomyolysis.
12     Q.   No.  I'm just asking what test would it
13 show up.  Would it show up in blood tests?
14     A.   Myoglobin itself would not.  You would
15 normally order CPK, creatine phosphokinase, which is
16 an enzyme that is associated with muscle breakdown.
17 When muscle breaks down more substance than myoglobin
18 are released.  And one of the main ones that we
19 measure in the blood is CPK or creatine
20 phosphokinase.
21     Q.   Okay.  I know you've got, and we're going
22 to go through here what I've marked as Exhibit -- I
23 think I marked it -- the policy and procedure manual
24 for Marshall County.  Maybe I didn't mark it.  No, I
25 haven't marked it yet.  And I may not.  I want to go

80

1  through the parts that you earmarked.  But before I
2  do that, in looking through your files I don't see
3  the deposition of any of the jailers, administrators,
4  30(b)(6) depositions of the jail people.  Do you have
5  it?  Did you ever read any of those?
6      A.   Yes, I have reviewed those.  In fact, I
7  thought they were in this stack.  We moved a
8  different -- we had a different stack.
9          MR. O'DONNELL:  He reviewed those.  I
10 have those in my office.
11     A.   I didn't make any notes on any of them but
12 I read them.
13     Q.   Well, I'd like to know which ones you
14 reviewed.
15     A.   You'll have to get -- I can't tell you the
16 names of them without -- he can check his stack of
17 the ones I reviewed.
18         (Pause in proceedings.)
19     A.   This is Dr. Sobel.  I did not review this
20 piece of paper.  I reviewed that document that you
21 have.
22     Q.   All right.
23     A.   Stevella Faulkner, I reviewed.
24     Q.   Would you have reviewed the exhibits to
25 this deposition, as well?

81

1    A.   I review these documents.

2    Q.   But you see how there's exhibits attached

3 like photographs and things like that, would you have

4 reviewed those?

5    A.   No.  I review the deposition only.  And I

6 can't see the name on this one.  This is Bobby

7 Harris.  Dr. Charles Skelton.  Ardella Anderson.

8 Alnita Kimmons.  And Janice Rahman.

9    Q.   I was going to ask if you had read the

10 deposition of Loretha Harris, an inmate, but I

11 understand we haven't received that transcript yet,

12 so you couldn't have read that.

13    A.   No, I have not read that.

14    Q.   Have you been provided any information as

15 to what she testified to?

16    A.   No.

17    Q.   I'm going to go through the policies and

18 procedures.  I don't think I'm going to mark this

19 unless there's something significant.  But 2.18 you

20 underlined something there, and I just wandered what

21 the significance of that policy and procedure was.

22    A.   Actually, I did not underline it.

23    Q.   Okay.  You work with the Lafayette County

24 Jail?

25    A.   That is correct.

82

1    Q.   Have you seen their policies and

2 procedures?

3    A.   Yes.

4    Q.   Have you seen the policies and procedures

5 of any other jail other than Lafayette County?

6    A.   Yes.

7    Q.   Which ones?

8    A.   Prentiss County, Yalobusha County.  I want

9 to say Union County also.  I believe Union County.

10    Q.   Had you seen Marshall County's policies and

11 procedures before being hired in this case?

12    A.   I had.

13    Q.   Have you ever been involved in drafting any

14 policies and procedures for any of the jails?

15    A.   Lafayette County.  Not of the -- no.

16 Lafayette County's but none of the others.

17    Q.   So you have been involved in drafting

18 polices and procedures for the Lafayette County Jail?

19    A.   Yes.

20    Q.   Like what areas of the policies and

21 procedures?

22    A.   As it relates to medical care of inmates.

23    Q.   In the Marshall County policies and

24 procedures under Admissions, Records and Release,

25 Subject Classification 1.5, indicates that inmates

83

1 suffering mental illness or other health illnesses

2 shall be housed in a separate area from other

3 inmates.  What's your understanding of how that policy

4 is supposed to be carried out?

5    A.   That the inmate should be housed in a

6 single man cell to avoid injury to other inmates, to

7 the person with the psychiatric illness or to other

8 inmates.

9    Q.   But within that policy it's okay to put

10 them in the same pod as other inmates as long as they

11 have a separate cell?

12    A.   Yes, in general.

13    Q.   There is a policy in Marshall County's

14 polices and procedures with regard to restraints that

15 you earmarked.

16    A.   Can I read what I said -- not used.

17    Q.   Yeah.  I'm going to -- I should probably

18 show it to you.  No restraints were used with regard

19 to Princess Anderson?

20    A.   Not that I could find record of.  Not that

21 I could find documentation of or not that have any --

22 I believe to the best of my knowledge, no.

23    Q.   In other words, when you looked through the

24 jail logs you didn't see any notations of restraint?

25    Or in the deposition -- or in the

84

1 statements of the jailers or the depositions of any

2 records that I have reviewed.  No one -- I didn't see

3 any reference to restraining of her.

4    Q.   You starred policy under Title Separation,

5 Subject Mental Disorder -- excuse me, Mentally

6 Disordered/Disoriented Inmates, Section 1.0 with

7 regard to the job of the jailer that is not to

8 diagnose mental illness or emotional disturbance, but

9 be on the lookout for the common behavioral signs or

10 symptoms that could indicate problems with the mental

11 illness or emotional disturbance.  What are the most

12 common behavioral signs or symptoms with regard that

13 would indicate problems with mental illness or

14 emotional disturbance?

15    A.   Bizarre behavior, confusion, refusing to

16 eat, refusing to keep clothes on, refusing to comply,

17 being non-responsive, not answering questions.

18    Q.   All those would apply to Princess Anderson,

19 would they not?

20    A.   Yes.

21    Q.   With regard to --

22    A.   Could I elaborate on my answer to the last

23 thing you just said --

24    Q.   Yes, absolutely.

25    A.   -- all those would apply.  Yes, they do

85

1  apply to Princess Anderson and she was there
2  precisely for mental -- I mean, she was there
3  precisely for that.  So, I mean, she didn't even --
4  she was known to have -- they didn't have to be on
5  the lookout for psychiatric illness, she was sent
6  there specifically for psychiatric illness.  She was
7  known ahead of time to have that.  So it certainly
8  applied.
9       Q.   Right.
10      A.   I mean, she was psychiatrically ill, that
11  was why she was sent there under the statutes
12  regarding mental health.
13      Q.   And what you gave us was a description of
14  those behavioral signs?
15      A.   That's right.
16      Q.   The section of the same, I guess, Title,
17  Section 2.4 indicates that if there's -- if the
18  jailer thinks the problem is serious, the behavior
19  should be reported to the jail administrator or chief
20  deputy.  Do you see that section?
21      A.   I do.
22      Q.   Based on your review of the records, was
23  the jail administrator or chief deputy ever consulted
24  in accordance with this section where -- let me start
25  the question over. It was a bad question.  It says if

87

1  deputy having a problem with Princess Anderson?
2            MR. O'DONNELL:  Object to the form of
3  the question.
4       A.   I believe what never happened was a medical
5  emergency.
6       Q.   I understand.  Along with that, you would
7  agree with me that there was no notification at any
8  time of any medical emergency with regard to Princess
9  Anderson to the jail administrator or chief deputy?
10  Can we agree on that?
11      A.   I'm not aware of any notification and I'm
12  not aware of any medical emergencies.
13      Q.   Take a look through there and see if there
14  are any other policies and procedures that you
15  dog-eared or noted that I missed that we didn't go
16  through that you think are applicable in this case.
17      A.   I don't believe so.
18      Q.   Do you believe there's a violation of any
19  of the policies and procedures with regard to the
20  handling of Princess Anderson during her detention
21  there at the Marshall County jail?
22      A.   I believe that the policies and procedures
23  were substantially followed in this case.  In
24  addition to these policies and procedures, there are
25  state mandated policies and procedures for dealing

86

1  you think the problem is serious, report the behavior
2  to the jail administrator.  Did you ever see any
3  reports to the jail administrator in the jail records
4  with regard to Princess Anderson's behavior?
5       A.   I don't believe that paragraph applies.
6       Q.   But my question was, did you see any
7  reports to the jail administrator with regard to
8  Princess Anderson's behavior?
9       A.   I'm not aware of any reports to the jail
10  administrator.
11      Q.   Section 6 titled Medical Services with the
12  subject Medical Procedures, Section 2.2A --
13      A.   I can't read it from over here.  Sorry.
14      Q.   That's all right.
15      Q.   Okay.
16      Q.   That deals with medical emergencies?
17      A.   Yes.
18      Q.   The first action that occurs on medical
19  emergency is notification of the jail administrator
20  or chief deputy, right?  Under the policies and
21  procedures?
22      A.   That's what the policies and procedures
23  say, yes.
24      Q.   And that never occurred here where there
25  was notification of the jail administrator or chief

88

1  with psychiatric Writs that are not part of this, but
2  that the state mandates to be followed and I believe
3  they were followed, as well.
4       Q.   Do you have those with you?
5       A.   I do.  Right there.
6       Q.   Thank you. I'm going to mark those, what
7  you just handed me, Mississippi Code 41-21 --
8       A.   There's multiple sections.
9       Q.   Sure.  I'm just reading along on the front
10  page.  -- 61.
11           MR. CZAMANSKE:  I'll mark that as
12  Depo Exhibit 9.
13           (Exhibit No. 9 was marked.)
14      Q.   I'm going to Section 2.6 of the separation,
15  the title Separation Subject Mental Disorder,
16  Disoriented Inmates.  It indicates there that when an
17  order for mental evaluation is issued -- you see
18  which paragraph I'm talking about?
19      A.   Yes.
20      Q.   Let me start with that.  Was an order for a
21  mental evaluation issued?
22      A.   Yes.
23      Q.   Notes that it's the responsibility of the
24  jail administrator to make sure the admission packet
25  is received and properly filled out and returned to

89

1  the state mental hospital.  What's the admission
2  packet?
3      A.  That Communicare evaluation that was done
4  and the paperwork associated with the Writ.  So the
5  order appointing an attorney, appointing physician
6  examiners, the report of Communicare, the report of
7  the physician examiners.
8      Q.  And so would those reports -- well,
9  according to their policies and procedures those
10 reports are received, reviewed, to make sure they're
11 properly filled out and then returned to the state
12 mental hospital?
13     A.  What that means is, when the person was
14 ultimately transferred to the state hospital after
15 the hearing that they would -- that the state
16 hospital would receive all the necessary paperwork.
17 So once a person is committed to the state hospital
18 and they go, the state hospital doesn't want to be
19 left with no information, so they need the
20 pre-evaluation report, the report of a physician, the
21 report of the hearing, the order for commitment, all
22 of that is the admission packet to the state
23 hospital, and when they went -- it needs to be
24 complete and sent with the patient.
25     Q.  And they did all that from the jail?

90

1      A.  Well, the jail is the one that transports
2  the person to the state hospital ultimately, and so
3  it's the jail's responsibility to send that
4  paperwork.
5      Q.  Yeah.  It's the jail administrator's
6  responsibility?
7      A.  When they transport the person to the state
8  hospital to send it to the state hospital with the
9  patient, which never occurred in this case.
10     Q.  Okay.  Is that the way it works at
11 Lafayette County as well, that it's the jail
12 administrator's responsibility to make sure the
13 admission packet is received and properly filled out
14 and returned to the state mental hospital?
15     A.  Actually, in Lafayette County the chancery
16 clerk faxes all of that so the jail doesn't have to
17 do it.
18     Q.  Okay.
19     A.  I mean, if they don't have it we send it
20 with the patient, but in general the chancery clerk
21 faxes it.
22     Q.  Section 6, Medical Services Medical
23 Procedures --
24     A.  Hold on.  Section 6, I'm on it.
25     Q.  All right.  Under 2.0 Medical -- well, I'm

91

1  going to do this for the record so we'll all know
2  what we're looking at since these aren't numbered.
3  Titled Medical Services, subject Medical Procedure
4  Section 2.0, says receiving medical screening shall
5  be performed on every inmate admitted to the
6  detention facility.  Do you see that?
7      A.  I do.
8      Q.  Was a medical screen performed on Princess
9  Anderson?
10     A.  Yes, it was performed.
11     Q.  Can you show me a copy of it?
12     A.  It's the form that you had with regards to
13 the --
14     Q.  The one that said suicide?
15     A.  Psychiatric suicide, that's right.  That's
16 a medical screening.  Here is one portion of it, I
17 believe that's a medical screening.  And then there
18 is -- most of it -- and that actually is the -- this
19 is part of it.  That's the suicide screening and then
20 medical health -- there it is right there.
21     Q.  Okay.  If you would, turn to Section 8,
22 which is titled Food Services.  It's about three or
23 four pages past, titled Food Services, subject Food
24 Preparation.
25     A.  Okay.

92

1      Q.  Turn to Page Section 2.10.  An inmate may
2  refuse a meal; however, this fact will be noted in
3  the jailer's log.  Do you see that?
4      A.  I do.
5      Q.  Is that the same of Lafayette County, that
6  if a prisoner refuses to eat a meal that you note it
7  in the log?
8      A.  No.
9      Q.  Did you see any notations in the log where
10 Princess Anderson refused to eat any meals?
11     A.  Yes.  There is a reference -- and I'll have
12 --
13     Q.  I'm not talking about the log now.  We've
14 got it right here.  If there is, let's take a look at
15 it.
16     A.  All right.
17     Q.  I'm not trying to be a trick question
18 because I don't remember seeing anything about --
19     A.  No.  I remember about her refusing -- in
20 this statement, I believe it's going to be in this
21 statement of the jailer's.  I'm not certain.  There
22 actually was something about -- let me keep looking
23 here.  I do not see any note of her refusing to eat.
24     Q.  Do you see any note when you look through
25 the log book there, since we're on it and since you

93

1    just looked through it, did you see any notes
2    indicating that Princess Anderson was communicative
3    with the staff at any point?
4         A.   In that booking log just then?
5         Q.   In the booking log.
6         A.   I don't recall.  I recall references to
7    Princess Anderson.  I don't recall what they all
8    were.  And communicative, I don't -- I recall much in
9    the statement of the jailers, but I don't recall
10   anything specifically in the booking log about
11   whether she was communicative or not.
12        Q.   And the booking log's kept contemporaneous
13   with the events that occur or should be kept
14   contemporaneous?
15        A.   Well, I misspoke.  The booking log
16   typically refers to people who are booked into the
17   jail and people who are booked out actually.  There
18   would be a log of jail activity --
19        Q.   What are you looking at?
20        A.   This is called jailer's -- no, not in the
21   booking log.
22        Q.   But that's what you've been looking through
23   to answer my questions is jailer's log?
24        A.   Yes.  But the booking log is something
25   different.  It's a log of people who are booked into

94

1    the jail.
2         Q.   Just so the record is clear, we called -- I
3    called it a booking log, but you were actually
4    looking through the jailer's log?
5         A.   That is correct.  It is a report of
6    activity that occurred, yes.
7         Q.   So it's kept contemporaneous with when the
8    activity occurs?
9         A.   Yes.  But, obviously, as you'll note on
10   here, it's more -- it is -- it doesn't have nearly
11   all the activity that occurs at a jail.  It has some
12   notations such as beginning and end of feeding time
13   and when people left and when they came back.
14        Q.   Well, under the policies and procedures,
15   should there be a notation in the jail log when the
16   jailers check on a mental patient who is at suicide
17   risk such as Princess Anderson?
18        A.   I believe that -- I believe that the policy
19   calls for frequent monitoring, and I did in there --
20   I believe that they did do that, and I believe --
21   sometimes they notated things in the log and
22   sometimes they didn't.
23        Q.   Right.  My question, though, is do the
24   policies and procedures require them to note when
25   they check on a mental patient who is at suicide

95

1    risk.  That is my question.
2         A.   Let's find that specific language.  If you
3    can point it out to me, the specific one about that
4    one.
5         Q.   Let me see.  Look at title Administration
6    Operations subject Suicide, which is towards -- go
7    back Section 11.
8         A.   So towards the back?
9         Q.   Towards the back, yeah.  Section 2.5.
10        A.   It says when the inmate is released from
11   the hospital and returned to the facility, inmates
12   will be placed in isolation cell for observation.
13   The inmate shall be visually checked every 15 minutes
14   and the tech code bar shall be scanned with a digital
15   scanner.  But it doesn't say anything about making a
16   notation in the jailer's log.
17        Q.   I never heard, what's a tech code bar?  I'm
18   not familiar with that.
19        A.   I do not know.
20        Q.   Do you guys have it there in Lafayette
21   County?
22        A.   No.
23        Q.   Were you provided any records with regard
24   to scanners and tech code bars in this case?
25        A.   No.

96

1         Q.   All right.  Let me look at Exhibit 9 for a
2    moment.
3              MR. CZAMANSKE:  Let's go off the
4    record a second.
5              (Pause in proceedings)
6         Q.   Section 3, title Separation, subject
7    Mentally Disordered/Disoriented Inmates.
8         A.   Back in the policies and procedures?
9         Q.   Yeah, I'm sorry, back in the policies and
10   procedures.
11        A.   Which section?
12        Q.   Section 3, title Separation.  It's the one
13   where it talked about the jailers not to diagnose
14   mental illnesses.
15        A.   Okay.  I just passed it.  Sorry.
16   Separation mentally -- yes, I have it.
17        Q.   2.2, when an inmate exhibits one or more of
18   the above behaviors, the jailer shall place the
19   inmate in a separate confined area, parenthesis,
20   isolation cell, closed parenthesis.  Do you see that?
21        A.   I do.
22        Q.   The cell in which the inmate is placed
23   shall be located where increased observation by the
24   jailer is possible.  Do you see that?
25        A.   I do.

97

1    Q.   All right.  Have you been to the actual
2  jail?
3    A.   I have not.
4    Q.   Do you know whether or not the cell in
5  which Princess Anderson was placed whether or not it
6  was located where increased observation would be
7  possible?  Do you know one way or the other?
8    A.   I do not know.
9    Q.   You see that a security log, parenthesis,
10  Appendix G, will be started as soon as the inmate is
11  placed in the isolation cell.  Do you see that?
12    A.   Yes.  And where it says C tank A11 and A12,
13  yes, I see that.
14    Q.   Do you know what C tank A11 A12 means?
15    A.   My guess is that this is an isolation,
16  specific suicide watch cell in the booking area, not
17  in the -- so in other words, there is a specific
18  isolation cell that's designated that where maybe
19  three of them, C tank and cell number A11 and A12,
20  are specifically used for isolation.  So in other
21  words, when they have a suicide watch or if a person
22  that they determine needs increased observation, they
23  often used these cells I guess.
24    Q.   Well, it says when an inmate exhibits one
25  or more of the above behaviors.  Do you see that?

98

1  That's how it starts out, 2.2?
2    A.   Yes, I do see that.
3    Q.   Those are the behaviors you and I went
4  through before that we agreed Princess Anderson
5  exhibited while she was in jail and even before she
6  got to the jail?
7    A.   Right.  She was there specifically for
8  those reasons.
9    Q.   Right.  And she was put in a cell by
10  herself, right?
11    A.   That is correct, or that's my
12  understanding.
13    Q.   What I guess my question is, you read
14  these, should a security log have been started for
15  Princess Anderson?
16    A.   Well, she was not in the jail and developed
17  mental problems.  She was held there specifically for
18  mental illness and was awaiting a Writ process.  So
19  she should not have been held with other inmates and
20  she wasn't.  But as far as this is for when people --
21  when they're observing someone that's showing signs
22  of mental illness to determine, you know, do they
23  maybe -- do they have a mental illness.  But in her
24  case, we know that she does because, I mean, that's
25  -- from her records we know that that's precisely why

99

1  she was sent there.
2    Q.   But shouldn't a security log have been
3  started with her under 2.2?
4    A.   If this applied to her.  But this is
5  talking about inmates that they're observing with
6  apparent mental problems, inmates with apparent
7  mental problems.  She wasn't an inmate with an
8  apparent mental problem.  She was a detainee
9  specifically there for psychiatric illness.
10    Q.   So you're saying she's not an inmate under
11  the policies and procedures of Marshall County?
12    A.   No, I'm not saying that.
13    Q.   I'm probably making this more difficult
14  than I intended.  I'm just wanting to know if you're
15  going to testify in trial that this section with
16  regard to security log, that a security log should or
17  should not have been started on Princess Anderson.
18  That's all I want to know.
19    A.   I believe that she was -- what I believe is
20  that she was placed in a cell by herself, and that
21  they did not implement this policy.  In other words,
22  they did not observe behavior that they felt
23  justified removing a patient from where they were and
24  moving them to a specific isolation cell.  So this
25  policy and procedure is written for you have an

100

1  inmate who's in general population who's exhibiting
2  signs of a mental illness and they're moving out from
3  general population and moving them into an isolation
4  cell and starting a security log.  And that isn't the
5  situation with Princess Anderson.  She was brought to
6  the jail with a known psychiatric illness and was
7  placed in a solitary cell where she couldn't injure
8  other people or, you know, where she could be under
9  close observation, but it's not necessarily under
10  this policy and procedure.
11    Q.   So the shorter answer is, no security log
12  needed under the policies and procedures for Princess
13  Anderson in your opinion?
14    A.   There -- it is -- I'm not aware of a
15  security log being started.
16    Q.   I understand that.  But I want to make sure
17  I understand your opinion and I'm trying to get --
18  you've explained it.  I've heard you explain it, but
19  I haven't actually heard you answer it.  Is it true
20  that your opinion is there's no security log required
21  under the policies and procedures for Princess
22  Anderson when she is detained there at Marshall
23  County according to their own policies and
24  procedures?
25    A.   I believe that the procedures that -- I

101

1 believe that the procedure you showed us a minute
2 ago, which required frequent observation, 15 minute
3 observation, and placing in a cell by themselves does
4 apply, but this procedure is not -- this is not -- is
5 not designed for psychiatric holding patients, no.
6 That procedure was not written for those patients.
7     Q.   It doesn't apply to Princess Anderson?
8     A.   Okay.
9     Q.   Is that what you're saying?  I understand
10 your explanation, but I'm trying to get to the --
11 usually we ask that people answer yes or no and then
12 explain.  I get the explanation, but I don't get the
13 yes or no.  And I'm not trying to pick on you, but I
14 want to make sure we're clear, you don't believe this
15 policy applies to Princess Anderson?
16     A.   I can't give you a yes or no.  Let me read
17 the whole policy.
18     Q.   All right.  So we're clear, the section I
19 was referencing was 2.2. under title Separation
20 subject Mentally Disordered/Disoriented Inmates.
21     A.   I believe that in general this policy
22 applies to Princess Anderson; however, I don't
23 believe that she was put in an isolation cell C tank
24 A11 or A12.  And, therefore, since she was not put in
25 one of those three cells I don't believe a security

102

1 log was necessary in this case.
2     Q.   Okay.  Thank you.  What was Princess
3 Anderson's condition on February 11th when she was
4 transferred from the jail to Alliance Healthcare?
5     A.   She was suffering from four conditions:
6 Acute delirium, pregnancy, dehydration and
7 hypernatremia.  Those are -- hypernatremia is -- goes
8 along the dehydration, and Rhabdomyolysis.
9     Q.   Not to quibble with your math, but that's
10 five I count.
11     A.   No, that's -- I'm sorry.  Dehydration and
12 hypernatremia is from the same --
13     Q.   Oh, the same.  You're combining --
14     A.   Those are the same.  They're one in the
15 same.  Hypernatremia is a characteristic of people
16 who are significantly dehydrated.
17     Q.   Okay.  It was my understanding -- I've
18 attended the depositions that at the time Princess
19 Anderson's mother came in on February 11th to check
20 on her daughter, she was found naked on the
21 ground in her on excrement.  Is that your
22 understanding?
23     A.   It is my understanding that she was -- no,
24 well, what my understanding was is that she was
25 unable to stand on her own and an ambulance was

103

1 summoned.  And her mother -- it was also my
2 understanding that her mother came not to check on
3 her, but to take her to the hospital that morning for
4 treatment of her pregnancy.  And it was my
5 understanding that she was lying down and potentially
6 on the floor, and I don't know about the state of
7 undress at that particular time.  There were other
8 times when she was described as not being clothed.
9 But I know that she was lying down unable to stand up
10 and an ambulance was called, yes.
11     Q.   My question is, do you know how long she
12 had been in that condition where she was lying down
13 and unable to stand up?
14     A.   I know that there --
15         MR. O'DONNELL:  Object to the form of
16 the question.  Go ahead.
17     A.   I know that there were reports -- there
18 were reports at least from the evening before that
19 she was standing up, the day before.  That's -- and
20 the record doesn't -- to the best of my knowledge the
21 record doesn't reflect anything about the night or
22 the morning of the 11th.
23     Q.   When you say reports, are you talking about
24 deposition testimony?
25     A.   Well, there are statements.  There are

104

1 logs.  There's statements.  And then also Dr.
2 Mangle's statement in his admission H and P where he
3 said, was found down after being seen up ambulatory
4 the day before, he said.  Something that he wrote on
5 that date.
6     Q.   You said log statements and Dr. Mangle's
7 history.  Let's take those one at a time.  Is there
8 anything in the logs about the last time Princess
9 Anderson was able to stand on her own prior to being
10 found on February 11th?
11     A.   Some of the difficulty I'm having with my
12 memory is that I read the statements of the jailers
13 and the booking log all at the same time.  Those are
14 getting confused in my mind.
15     Q.   In fairness, the booking logs were done in
16 February, right?  We can say booking logs.  The logs
17 that you're looking at were done in February?
18     A.   Yes.  And the statements were done in
19 April, or at least that statement was done in April.
20 There may be a couple more.  But, also, in fairness,
21 the booking logs do not list all that went on with
22 Princess Anderson.  I haven't seen anything in the
23 booking log as to that whether she was standing or
24 lying.  I don't know any reference to her position in
25 the day prior, no.

105

1      Q.   Let's take a look at the written statement
2  of Ardella Anderson.  She does her by days.  See at
3  the top where they're dated?
4      A.   That's right.
5      Q.   So according to Ardella Anderson's
6  statement, when is the last time she saw Princess
7  Anderson up and about before the morning of?
8      A.   1:15 p.m. on February 10th.
9      Q.   And with regard to Ardella Anderson's notes
10  about the day, the month, which would February 11th.
11      A.   Mom came on a couple of days.
12      Q.   Well, I'm talking about the last time that
13  they found her, February 11th.
14      A.   Okay.
15      Q.   What time does Ardella Anderson indicate
16  that Mom came?
17      A.   12:37 p.m.
18      Q.   Is there any indication by Ardella Anderson
19  or a statement that she ever observed Princess
20  Anderson -- strike that.  Is there any indication
21  that Princess Anderson was able to get up off the
22  floor at all up until the time they transported her
23  by way of ambulance?
24      A.   You mean on the day of the 11th?
25      Q.   On the day of the 11th.

106

1      A.   No.
2      Q.   And according to the statement, and I
3  assume it would be backed by the logs, what time was
4  that that they took her out to the hospital?
5      A.   She left at 12:50 p.m.  And the ambulance
6  was called at 12:40 p.m., and I think they arrived
7  and transported her before one o'clock.
8      Q.   So we've looked at the jail logs.  We've
9  looked at least one of the statements, and there's
10  other statements there.  Here's my question.  We know
11  if we're to believe Ardella Anderson's statement that
12  she saw Princess Anderson up and about at 1:15 p.m.
13  on February 10th, right?
14      A.   That is correct.
15      Q.   And is there any indication in the records
16  anywhere, now I'm excluding deposition testimony,
17  that anybody saw Princess Anderson up off the floor
18  at any time after 1:15 p.m. on February 10th?
19      A.   I'm not aware of it.
20      Q.   With regard to the conditions, the acute
21  delirium, I think you've already testified that's a
22  condition that Ms. Anderson came to the jail with?
23      A.   That's right.
24      Q.   Pregnancy, that would be another condition
25  she came into the jail with?

107

1      A.   That's correct.
2      Q.   Dehydration and hypernatremia, let's talk
3  about that for a second.
4      A.   Okay.
5      Q.   How do you determine whether somebody is
6  dehydrated?  What do you look for as an ER doctor?
7      A.   Well, there are clinical appearances, but
8  in addition to that the most reliable are actually
9  laboratory tests such as the urinalysis, such as
10  electrolytes in the blood.  Then that's it, in fact,
11  is -- I mean, that's what made the diagnosis in this
12  case.
13      Q.   All right.
14      A.   Hypernatremia.
15      Q.   Well, the hypernatremia, wouldn't that
16  indicate the amount of I guess sodium in the blood?
17      A.   It indicates the relative lack of water.
18  There's no extra sodium.  There's lack of water
19  making the sodium too high.
20      Q.   More concentrated?
21      A.   Exactly.  More concentrated blood, more
22  concentrated urine.
23      Q.   Now at the time of Princess Anderson's
24  discharge from Baptist DeSoto prior to going to the
25  jail we know that her urine was concentrated --

108

1      A.   Yes.
2      Q.   -- greater than whatever their range was?
3      A.   Correct.
4      Q.   We don't know what her blood concentration
5  was because there was no blood test done?
6      A.   Correct.
7      Q.   If you were to just go on the urinalysis,
8  there's a pretty good chance she was dehydrated when
9  she went to jail, wasn't there?
10          MR. DAVIS:  Object to form.
11      A.   Well, there's good evidence that she wasn't
12  taking fluids even at Baptist DeSoto.  So in other
13  words, she was in the early stages of -- you can
14  presume that she was at Baptist DeSoto for -- I mean,
15  not presume, she was at Baptist DeSoto for 18 hours.
16  No evidence that she took any oral fluid during that
17  time.  So she was in the early stages of dehydration,
18  yes.
19      Q.   All right.  So as far as whether or not she
20  had hypernatremia, we wouldn't be able to tell at
21  that time, at the time of her discharge from Baptist
22  DeSoto, we wouldn't be able to tell because there was
23  no blood test?
24      A.   Correct.
25      Q.   The Rhabdo, now that would be a condition

109

1  that you testified you don't believe she had at
2  Baptist DeSoto because there's no blood on the dip
3  test?
4      A.   Well, the Rhabdo had one of two -- I
5  believe the Rhabdo had one of two cause --
6      Q.   Let me try this.  Do you have an opinion as
7  to whether or not Princess Anderson had Rhabdo when
8  she was discharged from Baptist DeSoto and sent to
9  jail?
10          MR. DAVIS:  Object to form.
11     A.   I have an opinion about what caused her
12  Rhabdomyolysis, and it is of two things.  One of them
13  is directly related to the drug ingestion, the purple
14  drink.  And if so, it was probably in the early
15  stages -- it was in the early stages and was caused
16  due to that amount.  I don't think any person is
17  going to know for certain whether the Rhabdomyolysis
18  was as a direct result of her drug ingestion, which
19  is very likely, and was therefore starting at Baptist
20  DeSoto, so the answer could be.  Or she could have
21  remained immobile for most of the night of the 10th
22  and the 11th and developed Rhabdomyolysis on the
23  basis of immobility.  And I can't determine which of
24  those two it was.  So I don't -- the short answer is
25  I don't know whether she had Rhabdo when she left

110

1  Baptist DeSoto.
2      Q.   All right.  She had it when she was taken
3  to -- when Dr. Mangle saw her?
4      A.   Yes.  She had it when she first arrived at
5  Alliance Healthcare.
6      Q.   Okay.  That's right.  Alliance Healthcare.
7  And then she went from Alliance healthcare to I think
8  we've been calling it Baptist Union?
9      Q.   Baptist Union County or Baptist New Albany.
10  It's referred as both.  But Baptist Union?
11     Q.   When was the last time you took care --
12  that you had a patient admitted to the hospital --
13  well, strike that.  Rhabdo, hypernatremia, there's no
14  doubt those are emergency medical situations?
15     A.   Yes.
16     Q.   Dehydration can be -- can certainly be an
17  emergency medical situation?
18     A.   Yes.
19     Q.   When was the last time that you -- strike
20  that.  Do you have admitting privileges at any of the
21  hospitals?
22     A.   No.
23     Q.   When was the last time you had admission
24  privileges at a hospital?
25     A.   Emergency physicians don't have admitting

111

1  privileges.  Never had admitting privileges.
2      Q.   All right.  Is hypernatremia typically
3  treated by admitting somebody to the hospital and
4  treatment going on?
5      A.   Yes.
6      Q.   Have you ever been a physician who's
7  involved in the actual treatment of hypernatremia?
8      A.   Multiple times.  Regularly.
9      Q.   So that's something you could also treat in
10  the ER?
11     A.   Yes.
12     Q.   Is that somebody that you would treat --
13  initially treat in the ER and then admit that person
14  to the hospital, or can you treat it and discharge
15  somebody in the ER?
16     A.   You can sometimes treat them in the
17  emergency department.  Often people with
18  hypernatremia are admitted to the hospital, but not
19  always.
20     Q.   Have you ever had anybody come in with
21  hypernatremia that you treated and released and you
22  didn't admit to the hospital?
23     A.   Yes.
24     Q.   What about Rhabdomyolysis -- I know I'm
25  pronouncing it wrong --

112

1      A.   Rhabdomyolysis.
2      Q.   Is that something that can be treated in
3  the ER and without an admission?
4      A.   There are cases -- most of them get
5  admitted, but there are cases when they're treated
6  and discharged.
7          MR. DAVIS:  Just to be clear, since
8  we're back to ER, just want to make sure my standing
9  objection is still in place.
10         MR. CZAMANSKE:  Okay.  Yeah.
11     Q.   Have you ever treated a person for
12  Rhabdomyolysis and discharged them from the ER?
13     A.   Well, that's a difficult question because I
14  see people daily -- or not daily -- weekly that I
15  believe may have Rhabdomyolysis, and I either do the
16  test or send them to the emergency room and give IV
17  fluids.  Sometimes people have a very mild case and
18  they get discharged.  But in general if it were
19  anything near this serious, they would ultimately be
20  admitted to the hospital, but I regularly treat
21  people in my practice at the jail and at my clinic
22  who I either suspect or, you know, know.  So in other
23  words, I have people that come to my clinic regularly
24  with dark urine, with the clinical signs of
25  Rhabdomyolysis.  I might start IV fluids and, you

113

```
 1   know, get tests and then ultimately say, no, it's not
 2   a serious case, they -- no, it is a serious case,
 3   they need to go to the hospital.  I'm having a little
 4   difficulty with your --
 5        Q.   Let me be more specific.  A case like
 6   Princess Anderson's presents with when she leaves the
 7   jail and goes to get medical care, after the jail,
 8   that situation, she can't get up off the ground,
 9   whatever your understanding is as to her physical
10   condition, that kind of situation, is that something
11   that you would defer to a -- I don't know who treats
12   it, internal medicine doctor, or somebody like that,
13   that has privileges at a hospital and treats that
14   kind of thing?
15             MR. O'DONNELL:  Object to form.
16   Vague.
17        A.   Well, emergency physicians don't admit
18   people to the hospital.  So everybody gets admitted
19   to a hospital is -- short answer is yes.  When I'm in
20   a scenario when a person would have that severe a
21   thing, they would be admitted to the hospital.  It
22   would not be me that was caring for them beyond the
23   initial time in the emergency department.  Now
24   sometimes remain in the emergency department or in my
25   care for 24 hours or something.  So, you know, I
```

114

```
 1   would treat them for the first 24 or 48 hours,
 2   however long they remained in my care.  But,
 3   ultimately, they would be admitted to the hospital.
 4        Q.   What type of specialty would treat that
 5   kind of thing in the hospital?
 6        A.   Typically internal medicine doctor or
 7   family practice who's working these days as a
 8   hospitalist.  Most places have hospitalists.  Such as
 9   Dr. Mangle was a hospitalist.  I don't know whether
10   he's board certified in internal medicine or family
11   medicine, but he's a hospitalist.  He is admitting
12   patients from the emergency department and taking
13   care of them with a medical problem as opposed to a
14   surgical.
15        Q.   Okay.  And my understanding of reading your
16   opinions that you're critical of Dr. Mangle's care of
17   this patient.  Is that a fair way to put it?
18        A.   That is correct.
19        Q.   Do you believe that he violated the
20   standard of care with regard to his treatment of this
21   patient?
22        A.   That is correct.
23        Q.   And I'd like to know all the ways in which
24   you believe he violated the standard of care.
25        A.   Well, there are two main -- my two main
```

115

```
 1   problems, or my two main ways that I believe he
 2   violated the standard of care, one of them in regard
 3   to the hypernatremia in which it was essentially
 4   never -- it was never corrected during the four days
 5   that she was at the hospital.  So she was -- she was
 6   severely dehydrated and she did not receive enough
 7   fluids, specifically enough free water, to correct
 8   her hypernatremia.  And that ultimately resulted
 9   after -- so even four days, 96 hours after she had
10   been in the hospital, she still had symptoms of the
11   same sodium level that she had to begin with, and
12   that resulted in seizures and ultimately is what led
13   to her demise.
14        Q.   That's one way, not getting enough fluids
15   for the hypernatremia, if I can kind of condense it?
16        A.   That's right.
17        Q.   What's the second one?
18        A.   It took almost 24 hours after she presented
19   to a hospital for him to even consider Rhabdomyolysis
20   and it was another six hours till he actually said
21   that that's what she had.
22        Q.   Are you critical of the treatment of the
23   Rhabdo?
24        A.   It was not -- yes, it not aggressive,
25   although -- although, later people said that the
```

116

```
 1   reason that he didn't -- the usual treatment would be
 2   give sodium bicarbonate in IV fluids to try to -- to
 3   make the urine have a higher pH and get rid of
 4   myoglobin and limit the damage to the kidneys.  And
 5   the reason that it was said by later caregivers that
 6   he didn't do that was because she already had a high
 7   sodium and he didn't want to give her more sodium
 8   bicarbonate.  There's some rationale that can be made
 9   to that, although she certainly did not -- the other
10   treatment of Rhabdomyolysis is aggressive fluid and
11   getting aggressive amounts of fluid without the
12   sodium bicarbonate.  She didn't receive that either
13   so it was inadequate treatment.
14        Q.   All right.  With regard to -- let's go to
15   the hypernatremia.
16        A.   Okay.
17        Q.   You said that he did not give enough
18   fluids?
19        A.   Yes, sir.
20        Q.   And I know there's a calculation that y'all
21   do and I saw it in your notes.
22        A.   That's right.
23        Q.   Explain to me the calculation of how you
24   figure how much fluids to give somebody.
25        A.   Okay.  There are two different things that
```

117

1    are discussed in general.  One of them is the amount
2    of fluids that somebody requires on an ongoing basis.
3    So in other words, just a hospitalized patient who's
4    not taking fluids by mouth, there's a way to
5    calculate what is called your maintenance fluid
6    requirements.  And her maintenance fluid requirements
7    -- so in other words, to replace the ongoing urine
8    that she was making, the ongoing sweating -- and
9    that's higher in a hospitalized patient than in other
10   people -- but her ongoing fluid requirements were
11   about 3200 cc's per --
12       Q.   What's the --
13       A.   Holliday-Segar formula.
14       Q.   Tell me in layman's terms, if I was going
15   to calculate it how I would do it.  If I take a
16   person's weight times --
17       A.   That's right.  You give so much for the
18   first ten kilograms, so much for the second kilogram
19   because it's based on their weight.
20       Q.   Right.
21       A.   And so hers comes out to 137 cc's an hour,
22   or using the Holliday-Segar formula that comes out to
23   around 3200 cc's per day as her maintenance fluid
24   requirement.  So that's not the correcting water
25   deficits, but only for ongoing losses.

118

1        Q.   And then how much to correct?
2        A.   To correct the hypernatremia she needs free
3    water.  And the amount of free water deficit that she
4    had was 8.2 liters.  I actually put in my report 10.
5    That was an error on my part and I used -- I used
6    presuming she was a male, not a female.  Using the
7    female correction is 8.2 liters of free water that
8    she had lost.  In other words, she was -- she had a
9    water deficit or a free water deficit of 8.2 liters.
10   And how much fluids she needs depends on how
11   concentrated -- in other words, we don't inject just
12   plain water.  If you injected just plain water it
13   would be 8.2 liters, but because there's some sodium
14   in -- so half normal saline you should require
15   essentially 16 liters, or twice as much fluid as the
16   free water deficit.  She had a free water deficit of
17   8.2 liters.
18       Q.   So how many cc's per hour whatever do you
19   have to give her for that?
20       A.   You have to correct that 8.2 liters over
21   the -- and you either can correct it quickly or
22   slowly depending on how quickly the hypernatremia
23   develops.
24       Q.   If we're going to do it slowly, I know
25   we've got 137 cc's per hour just to maintain.  How

119

1    many more cc's per hour to correct slowly?
2        A.   You're going to correct it over two days,
3    and typically you're going to give some boluses.  So
4    it needs to be in total over a couple -- the two
5    days.  You can say essentially 10 liters of fluid,
6    but over a couple of days.  I don't have the --
7    typically you wouldn't give that over -- in an hour.
8    You would have given boluses of -- it's 10 liters.
9        Q.   What would be the steady rate and then tell
10   me how many boluses and at what amount?  I'm just
11   trying to figure this out.
12       A.   It doesn't work like that.
13       Q.   Tell me how much it would be.
14       A.   She needed approximately 10 liters of fluid
15   over the first couple of days that she was there.
16       Q.   At what rate, though?  That's what I'm
17   asking.  At what rate would she get --
18       A.   Take 10 liters and divide it by 48 and it
19   will tell you.  Anybody got a calculator?
20       Q.   No, that's all right.
21       A.   But that's not how you do it, though.  You
22   give two liters all at once and then you give the
23   balance over the remaining 48.  Do you understand
24   what I'm -- I'm sorry.  I -- you typically would give
25   a bolus of a couple of liters -- in other words,

120

1    right away she would have received a couple of bags.
2    Then you would give it at 200/225 an hour till you
3    can correct -- and you keep measuring your sodium to
4    make sure it's coming down.  You keep on till her
5    sodium gets normal.
6        Q.   Does the renal production or the renal
7    capacity affect how much you give a person?
8        A.   Certainly if they're in renal failure
9    you're going to ultimately have to dialyze them.  So
10   it does affect it; however, in this case what she
11   needed was more fluid to flush her kidneys in other
12   words.
13       Q.   Did she have renal failure, though, I guess
14   is the question?
15       A.   She had some degree of renal failure but
16   not enough to stop urine production.  And, in fact,
17   it would have been improved by more fluids.  There
18   was some degree of renal failure as just her
19   dehydration, not a lack of production of urine due to
20   lack of blood.  In other words, lack of -- being so
21   dehydrated.  That causes the creatine to be elevated
22   itself.
23       Q.   Don't these conditions, both Rhabdo and
24   hypernatremia, affect the organs including the
25   kidneys?

121

1    A.    Absolutely.
2    Q.    And one of the things a physician has to
3 consider who's treating this as an inpatient in the
4 hospital is that person's renal failure and how much
5 fluids they're -- assuming they don't have dialysis,
6 do you know whether or not Baptist Union had the
7 capacity to do dialysis?
8    A.    First of all -- I do not know that, but she
9 didn't even come anywhere close to needing dialysis.
10 Her renal failure was not nearly of a level to
11 indicate the need for dialysis.  It indicated the
12 need for fluids, not dialysis.
13   Q.    And it could have -- there may have been a
14 need for dialysis if she had received the increased
15 fluid, correct?
16   A.    It is possible to -- it is possible she
17 could have gone on to more renal failure that she
18 had, but she never did.  I mean, it is possible that
19 her kidneys could have -- that the Rhabdomyolysis
20 could have worsened her kidney function to where she
21 needed dialysis, but it did not ever go to that
22 point.
23   Q.    And when you talked about the sodium, the
24 sodium did not drop while she was at Baptist Union.
25 I think that's what you said, right?

122

1    A.    That's right.  Essentially not.  I mean, it
2 went -- the numbers, believe I put them in my report,
3 are like 161, 158, 159, 167.  It was all within --
4 those are all essentially the same number.
5    Q.    Did those numbers drop when she was
6 transferred to Baptist DeSoto?
7    A.    Yes, within a day or two.
8    Q.    They did --
9    A.    They ultimately corrected them, yes.
10   Q.    The Rhabdo is measured by the creatine; is
11 that right?  Or is that the myoglobin?  Well, both of
12 them, isn't it?
13   A.    Rhabdo is the -- Rhabdomyolysis is the
14 breakdown of muscle and what -- a protein in your
15 muscle called myoglobin spills out into your blood,
16 travels around and is filtered out by your kidneys,
17 and because it -- you can think of it it's like mud.
18 I mean, it clogs up your kidneys causing kidney
19 failure.  That's the main problem that Rhabdomyolysis
20 and the myoglobin causes, it stops up your kidneys.
21   Q.    How long does it take the Rhabdo to start
22 clogging up the kidneys?
23   A.    Within 12 to 24 hours of -- you know, of a
24 certain -- obviously, that's to get to a certain
25 threshold.

123

1    Q.    Right.
2    A.    There's a threshold below which your
3 kidneys can clear it, but then once you cross that
4 threshold then it's going to start damaging the
5 kidneys pretty quickly.
6    Q.    Are you going to express an opinion as to
7 when that threshold occurred in Princess Anderson's
8 case?
9    A.    No.  But the threshold had been crossed by
10 the time she presented to Alliance Healthcare.  I
11 mean, she was in significant Rhabdo and needed
12 significant treatment to try to correct that.
13   Q.    I mean -- strike that.  Did Princess
14 Anderson receive Lasix while she was at Baptist
15 Union?
16   A.    I know that he discussed that.  I believe
17 that he, in fact, did use some Lasix.
18   Q.    And what's the purpose of Lasix then?
19   A.    Is to try to increase the urine flow
20 through the kidneys to try to essentially flush the
21 kidneys to flush that myoglobin out.
22   Q.    It's to try and get rid of fluid, isn't it?
23   A.    Well, in the case of -- in her case she was
24 already significantly dehydrated, so giving her Lasix
25 would make her dehydration worse unless you had given

124

1 lots and lots of fluid.  That would be the treatment
2 is to give plenty of fluids first to see if on your
3 -- just with fluids you could correct the
4 dehydration, you could flush the kidneys.  And if
5 that wasn't working, you could potentially give Lasix
6 to try to stimulate the kidneys further.  I believe
7 that he did give Lasix but without the first part of
8 giving enough fluids to -- the first step was to get
9 fluids and see if you could get her kidneys working
10 on that basis.
11   Q.    But there is a risk to the patient if you
12 overload them with fluid, is there not?  If you give
13 them -- in other words -- let me strike that.  Let me
14 ask it a different way.  Can you give a patient too
15 much fluid?
16   A.    Absolutely you can.
17   Q.    And that can be harmful to the patient?
18   A.    It could be.  Any patient can be
19 overloaded.  However, in this case he never even got
20 to the enough.  So in other words, he was a long way
21 from fluid overloading her.
22   Q.    These documents are research it looks like
23 on different things, a lot of it seems to have to do
24 with cough syrups, maybe some bath salts,
25 addiction -- Rhabdo.

125

1    A.   Those articles are about the three most
2 likely causes of her acute delirium that she had at
3 Baptist DeSoto.
4          MR. CZAMANSKE:  Let's take a break
5 here.
6          (Short recess.)
7          (Exhibit No. 10 was marked.)
8    Q.   I'm going to sort around here because I've
9 got some notes here, so bear with me and get whatever
10 you need to get.
11    A.   You just had -- I just want to say, you had
12 -- this last thing you were going to make an exhibit,
13 like my reference documents, those two are part of
14 those reference documents if you want to include
15 that.  That's part of the reference.
16    Q.   Thank you.  I marked at the break as
17 Exhibit 10, deposition exhibit for lack of a better
18 word, the research that you did?
19    A.   That's fine.
20    Q.   And it's multiple articles.  It's not just
21 one.  It's multiple articles.  Base on your testimony
22 and based on what I've heard you say, is it your
23 opinion that the Rhabdomyolysis is what ultimately
24 caused Princess Anderson's death?
25    A.   She had multisystem organ failure, but, no,

126

1 it was the hypernatremia that most directly related
2 -- resulted in her death.  The hypernatremia caused
3 seizures and metabolic encephalopathy.  The
4 Rhabdomyolysis essentially corrected or -- typically
5 if you don't require dialysis -- you know, even if
6 you require dialysis, but in this case she didn't
7 require dialysis, and it actually corrected on its
8 own.  So technically, one of her causes of death
9 would be multisystem organ failure, including acute
10 -- you'll see the term acute tubular necrosis and
11 Rhabdomyolysis, but in fact that was getting better
12 and would not have killed her but for the
13 encephalopathy.
14    Q.   Caused by the dehydration and
15 hypernatremia?
16    A.   Prolonged hypernatremia, that's correct.
17    Q.   How long does hypernatremia have to go on
18 to be prolonged the way you defined prolonged?
19    A.   I don't believe there is a definition, but
20 four days is long.
21    Q.   Four days?
22    A.   Four days is prolonged.  It's how long it
23 went on this case and that is prolonged.  I don't
24 know there is a definition of how long prolonged is.
25    Q.   Let's talk about symptoms for a minute, get

127

1 away from the test, just the symptoms.  Symptoms for
2 Rhabdomyolysis, or we've been calling it Rhabdo,
3 symptoms for Rhabdo, what would you expect?
4    A.   Weakness, specifically muscle weakness,
5 inability to stand on your own, muscle aches and
6 pains, dark-colored urine.  That's the primary ones.
7    Q.   Symptoms you expect to see in
8 hypernatremia?
9    A.   And that's dehydration, as well.
10 Hypernatremia and dehydration together.
11    Q.   Right.
12    A.   Weakness, confusion, altered mental status.
13 That's the primary ones.
14    Q.   Okay.  If Rhabdo is caused by immobility,
15 because I understand it could be caused by other
16 things, but if it's caused by immobility, how long
17 does the person have to be immobile before the Rhabdo
18 starts -- before you start having a breakdown?
19    A.   I know you're referring to Dr. Sobel having
20 said it had to be -- at least I read a reference in
21 his report that it had to be a prolonged time, but I
22 will just tell you this, the short answer is, several
23 hours, perhaps eight to 12 hours of immobility.  And
24 the demonstration of that is that people get Rhabdo
25 after they get intoxicated and pass out.  So the

128

1 length of time you're intoxicated and pass out, or,
2 you know, in the course of a prolonged operation.  So
3 eight to 12 hours is in the ballpark, overnight.
4    Q.   Okay.  If an inmate at your facility where
5 you work at Lafayette County were to display signs of
6 a seizure, all right, you know what I'm talking
7 about?
8    A.   Uh-huh (Indicating yes).
9    Q.   Would you expect that the county, the
10 jailers, would contact you?  Would you expect them to
11 contact you to examine that person or at least -- if
12 not you, call an ambulance?
13    A.   The short answer is yes.  If someone were
14 exhibiting signs of a seizure, I would expect them
15 to.  Now there are -- all the time jailers see signs
16 that they don't know if it's a seizure and they may
17 ask me the next day this person -- so, not
18 necessarily me, but in general if a person were
19 having a seizure -- and for the record I see no
20 evidence that she had a seizure at the jail.  There's
21 no evidence of that, so a description of a lay -- lay
22 people can't describe seizures very well.  So if a
23 medically trained person said a person was having a
24 seizure, they would need to call an ambulance.  But
25 people in jail exhibit behaviors that lay people may

129

1   describe as a seizure, which is not in fact at all a
2   seizure, and I wouldn't expect to take any action
3   based on that.  But if a medically trained person
4   identifies a seizure, then of course, they need to go
5   to the hospital.
6       Q.   What are the symptoms you would expect to
7   see for a seizure?
8       A.   The person would need to be unconscious.
9   So they would need to be unconscious.  They would
10  need to have jerking of their limbs.  And there's
11  usually -- it's usually followed by postictal so it
12  stops.  In other words, the jerking stops and
13  followed by a postictal state where they're confused
14  and stuff.  Nothing in any description I've read says
15  anything about -- in any statement, any testimony,
16  said anything about Princess Anderson having anything
17  that resembled a seizure at the jail.  I haven't seen
18  anything --
19      Q.   Yeah.  I wasn't asking if you had read
20  anything about it.  I was just wondering if that was
21  the type serious medical condition that you would
22  expect the facility to contact an ambulance or
23  equivalent of?
24      A.   Yes.  And that is -- specifically the
25  answer is yes.  That is a change, a significant

130

1   change in her condition.  That's right.
2       Q.   All right.  The documents for the --
3   Communicare filled out the report, the pre-evaluation
4   screen I think we called it?
5       A.   Yes.
6       Q.   I'm trying to make sure I understand how
7   this works.  The Communicare fills it out.  We know
8   that under the policies and procedures the jail
9   administrator is to make sure that document, when
10  they transfer the person, goes to the state mental
11  hospital?
12      A.   Only after the hearing has occurred, so
13  three days way down the road.
14      Q.   Where does the report go between the
15  hearing and --
16      A.   Typically the Communicare worker gives it
17  to the physicians so that they have it when they
18  conduct their mental and medical examination of the
19  patient.  So the Communicare worker deals with it
20  internally and gives it to the physician.  It's done
21  differently in Marshall County than it is here.  Here
22  we actually do the physician's examinations in the
23  jail, and I believe in Marshall County I believe
24  their policy was to transport the person to the
25  Communicare office.  So I would presume that the

131

1   Communicare worker took it back to her office for the
2   physicians to review the next day.
3       Q.   Do you know what physicians would have been
4   reviewing that?
5       A.   Whichever psychiatrists were on duty at
6   Communicare that next day, but I do not know.
7       Q.   With regard to the reports, I think -- I
8   don't know if it was in Baptist Union's, there's a
9   report somewhere in the record of bruising on the
10  legs.  Do you recall seeing that?
11      A.   Yes.
12      Q.   Is that a symptom you'd associate with
13  either hypernatremia or Rhabdo, or can it be
14  associated with that?
15      A.   Yes, it can be associated with Rhabdo.
16  More specifically, you get -- when you get Rhabdo and
17  hypernatremia, there is the concern about poor
18  clotting.  In other words, easy bruise-ability with
19  both of those conditions.  You would expect bruising
20  with both of those conditions.
21      Q.   One last question, do you believe there are
22  any policies and procedures that -- because when I
23  asked you about whether or not there were any
24  violated, I think your phrase both in your report and
25  to me was, they were substantially complied with.

132

1   But were there some, in fact -- that's kind of a
2   qualifying answer.  Were there some that were in fact
3   violated?
4       A.   Not that I'm aware of.
5       Q.   Okay.  That's all I have.
6           MR. O'DONNELL:  Walt, you want to
7   just recess at this point?
8           MR. DAVIS:  With the understanding
9   we're going to reconvene.  Nothing right now.
10          (Off record discussion).
11          MR. CZAMANSKE:  I thought I had
12  marked these, can I mark his notes as Exhibit 11.
13          (Exhibit No. 11 was marked.)
14          (Deposition recessed at 12:20 p.m.)
15
16
17
18
19
20
21
22
23
24
25

133

1        C E R T I F I C A T E

2   STATE OF MISSISSIPPI        )

3   COUNTY OF LEE               )

4   RE: DEPOSITION OF THOMAS FOWLKES, M.D.

5       I, LuAnne Funderburk, CCR 1046, a Notary Public

6   within and for the aforesaid county and state, duly

7   commissioned and acting, hereby certify that the

8   foregoing proceedings were taken before me at the

9   time and place set forth above; that the statements

10  were written by me in machine shorthand; that the

11  statements were thereafter transcribed by me, or

12  under my direct supervision, by means of

13  computer-aided transcription, constituting a true and

14  correct transcription of the proceedings; and that

15  the witness was by me duly sworn to testify to the

16  truth and nothing but the truth in this cause.

17      I further certify that I am not a relative or

18  employee of any of the parties, or of counsel, nor am

19  I financially or otherwise interested in the outcome

20  of this action.

21      Witness my hand and seal on this 31st day of

22  January, 2014.

23

24  My Commission Expires:  CCR 1046
25  February 28, 2015        Notary Public

---

135

1                ADVANCED COURT REPORTING
                      P.O. BOX 761
2           TUPELO, MISSISSIPPI 38802-0761

3

4                    CORRECTION LIST

5   Angela Anderson, et al
    vs.
6   Marshall County, Mississippi, et al

7   Federal - Western - No. 3:12-CV-92-MPM-SAA

8   CAPTION

9   January 9, 2014          Thomas Fowlkes, M.D.

10  DATE OF DEPOSITION           DEPONENT'S NAME

11  PAGE   LINE   CORRECTION           REASON

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24

25              Thomas Fowlkes, M.D.

---

134

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF MISSISSIPPI
2              WESTERN DIVISION

3

   ANGELA ANDERSON, Personally,
4  and on behalf of the WRONGFUL
   DEATH BENEFICIARIES of PRINCESS
5  ANDERSON, Deceased                    PLAINTIFF

6  VS.            NO. 3:12-CV-92-MPM-SAA

7  MARSHALL COUNTY, MISSISSIPPI and
   BAPTIST MEMORIAL HOSPITAL-DESOTO
8                                        DEFENDANTS

9                 CERTIFICATE

10      I, Thomas Fowlkes, M.D., have read the

11  foregoing pages, 1-132, of the transcript of my

12  deposition given on January 9, 2014, and it is true,

13  correct and complete to the best of my knowledge,

14  recollection and belief except for the list of

15  corrections, if any, attached on a separate sheet

16  herewith.  Witness my hand, this the _____ day

17  of _____, 2014.

18      _____

19              Thomas Fowlkes

20

21              CERTIFICATE

22      Subscribed and sworn to before me, this the
    _____ day of _____, 2014.
23  _____

24                  Notary Public in and for the
                    County of _____
25  My Commission      State of Mississippi