Deposition of Thomas Fowlkes, M.D., taken January 9, 2014

1

**Page 1**

```
  1    UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF MISSISSIPPI
  2         WESTERN DIVISION
  3
       ANGELA ANDERSON, Personally,
  4    and on behalf of the WRONGFUL
       DEATH BENEFICIARIES of PRINCESS
  5    ANDERSON, Deceased          PLAINTIFF
  6    VS.    NO. 3:12-CV-92-MPM-SAA
  7    MARSHALL COUNTY, MISSISSIPPI and
       BAPTIST MEMORIAL HOSPITAL-DESOTO   DEFENDANTS
  8
  9
 10
 11    ********************************************
 12    DEPOSITION OF THOMAS FOWLKES, M.D.
 13    ********************************************
 14
 15
          TAKEN AT THE INSTANCE OF THE PLAINTIFF
 16     IN THE LAW OFFICES OF CLAYTON O'DONNELL, PLLC
        1300 ACCESS ROAD, SUITE 200, OXFORD, MISSISSIPPI
 17        ON JANUARY 9, 2014, BEGINNING AT 9:00 A.M.
 18
 19
 20         APPEARANCES NOTED HEREIN
 21
 22    Reported by: LUANNE FUNDERBURK, CCR, 1046
 23
           ADVANCED COURT REPORTING
 24           P.O. BOX 761
            TUPELO, MS 38802-0761
 25           (662) 690-1500
```

**Page 2**

```
  1    APPEARANCES:
  2    For the Plaintiff:
  3      DANIEL M. CZAMANSKE, JR., ESQUIRE
         Chapman, Lewis & Swan, PLLC
  4      501 First Street
         P.O. Box 428
  5      Clarksdale, MS 38614
         (662) 627-4105
  6
  7      DANESE BANKS, ESQUIRE
         The Cochran Firm
  8      One Commerce Square
         40 South Main, Suite 1700
  9      Memphis, TN 38103
         (901) 523-1222
 10
 11
       For the Defendant
 12    Marshall County, Mississippi:
 13      DAVID D. O'DONNELL, ESQUIRE
         Clayton O'Donnell, PLLC
 14      1300 Access Road, Suite 200
         P.O. Box 676
 15      Oxford, MS 38655-0676
         (662) 234-0900
 16
 17
       For the Defendant
 18    Baptist Memorial Hospital-DeSoto:
 19      WALTER A. DAVIS, ESQUIRE
         Dunbar Davis, PLLC
 20      324 Jackson Avenue E., Suite A
         Oxford, MS 38655-3808
 21      (662) 281-0001
 22
 23
 24
 25
```

**Page 3**

```
  1              TABLE OF CONTENTS
  2    WITNESS                         PAGE
  3    THOMAS FOWLKES, M.D.
  4      Examination by Mr. Czamanske........  4
  5
  6    EXHIBITS-
  7      1  Curriculum Vitae................  14
  8      2  Report and Curriculum Vitae of Dr.
            Richard Sobel..................  37
  9
 10      3  Medical Records of Baptist Union..  51
 11      4  Condensed Copy of Dr. Richard
            Sobel's Deposition.............  51
 12      5  Notes on Altered Sensorium.......  53
 13      6  Notes on Mississippi Civil
            Commitment Law.................  53
 14
         7  Report from Dr. Fowlkes to David
 15         O'Donnell dated 11/22/13.......  53
 16      8  Designation of Expert Witness.....  54
 17      9  Mississippi Code Section 41-21-61. 88
 18     10  Reference Documents..............  125
 19     11  Handwritten Notes................  132
 20
 21
 22
 23
 24
 25
```

**Page 4**

```
  1         THOMAS FOWLKES, M.D., after being
  2    duly sworn, testified as follows:
  3              EXAMINATION
  4    BY MR. CZAMANSKE:
  5       Q.  Would you please state your full name for
  6    the record.
  7       A.  Thomas Fowlkes.
  8       Q.  And I don't need your specific address, but
  9    generally where do you reside?
 10       A.  I live in Oxford, Mississippi.
 11       Q.  And, Dr. Fowlkes, have you ever given a
 12    deposition before like we're doing here today?
 13       A.  I have.
 14       Q.  I introduced myself just before we started,
 15    my name is Dan Czamanske.  And I along with Danese
 16    Banks, we represent the family of Princess Anderson.
 17    Do you understand that?
 18       A.  I do.
 19       Q.  You understand that every question I ask
 20    and every answer you give is going to be taken down
 21    today?
 22       A.  I do.
 23       Q.  You understand that you're sworn in under
 24    oath to testify just the same as if you were sitting
 25    in a courtroom?
```

ADVANCED COURT REPORTING
662-690-1500



EXHIBIT F

Deposition of Thomas Fowlkes, M.D., taken January 9, 2014

15

Page 57

1   A. Yes, that's correct.
2   Q. And urine drug screen, the next one. UA,
3   UVS and cardiac monitoring. And in addition to that,
4   CT head, which is not on there. It has to be ordered
5   separately.
6   Q. But the CT head was done?
7   A. That's right.
8   Q. Was there a finger stick for blood sugar?
9   A. I do not believe so.
10  Q. Was she given O2?
11  A. I do not believe so. It says pulse
12  oximetry next and that was performed. It was.
13  Q. Oh, it was? I didn't see that.
14  A. You'll have to look in some of the nursing
15  notes, but you'll see it where it will describe -- I
16  saw where Dr. Sobel said it wasn't done, but -- like
17  right there, that's pulse oximetry.
18  Q. Let's get a page. You're looking at 39?
19  A. Okay, 39, SAO2, that's pulse oximetry 100
20  percent. So her Oxygen level was 100 percent, so she
21  didn't need Oxygen.
22  Q. Right. So some of the protocols were
23  carried out and some weren't?
24  A. That's right.
25  Q. And you know working in emergency rooms

Page 58

1   there can be multiple diagnosis on a given patient?
2   A. That is correct.
3   Q. So there can be -- multiple protocols
4   might be applicable to that patient?
5   A. That is correct.
6       MR. DAVIS: Objection.
7   Q. If you go to the middle column right about
8   the middle there is a protocol for medical clearance
9   for psych evaluation?
10  A. That is correct.
11  Q. That would apply to Princess Anderson?
12  A. It would.
13  Q. Under that protocol CBC is called for.
14  That was not done, was it?
15  A. Not at this visit.
16  Q. Not at this hospital?
17  A. Not at this hospital. That's correct.
18  Q. And not for this admission?
19  A. Not at this ER and not during this
20  admission, no.
21  Q. And BMP, that was not done, was it?
22  A. It was not.
23  Q. Alcohol level, that was not done, was it?
24  A. That is correct.
25  Q. And then over on the right column there is

Page 59

1   pregnant with abdominal pain. Do you see that, very
2   top one?
3   A. I do.
4   Q. Would that apply in this instance?
5   A. I don't believe so because it was
6   adequately worked up at Collierville.
7   Q. And then on that same column but down see
8   where it says suspected overdose?
9   A. I do.
10  Q. Would that apply?
11  A. It would.
12  Q. We've gone through the -- I mean, it's fair
13  to say no blood was drawn at all at Baptist DeSoto?
14  A. That's correct.
15  Q. Acetaminophen level, that's one that wasn't
16  in the other protocol?
17  A. Right.
18  Q. How do you get that?
19  A. That is a Tylenol -- that's a Tylenol and
20  overdoses should be screened for Tylenol because it's
21  -- it's potentially lethal if untreated and
22  potentially very treatable if it is. So because many
23  people won't tell you that I ingested Tylenol, if you
24  suspect an overdose you ought to check the Tylenol
25  level.

Page 60

1   Q. And I was wondering how do you check it, do
2   you check it with the blood or urine?
3   A. Blood level.
4   Q. Blood level.
5   A. And same with salicylate. That's Aspirin.
6   The next one is Aspirin.
7   Q. We've already gone over the finger stick.
8   Cardiac monitor. You're saying she was on cardiac
9   monitor, right?
10  A. Yes.
11  Q. EKG protocol, do you know what that is?
12  A. I do not.
13  Q. All right. Now in looking at the Baptist
14  DeSoto designation of expert, you have some notes
15  written on here, and I'm going to go to Page 2.
16  A. Could you turn it around?
17  Q. Yeah, so we can both look at it. There at
18  Page 2, it states that Dr. Carlton was anticipated to
19  testify as an emergency room physician staff at
20  BMH-D. You understand that to be Baptist Medical
21  Hospital DeSoto, right?
22  A. Baptist Memorial DeSoto.
23  Q. You're right. During emergency room
24  admission of Princess Anderson on February 7 through
25  8th complied with the governing standards of care in

Deposition of Thomas Fowlkes, M.D., taken January 9, 2014

16

Page 61

1 all respects with regard to their evaluation, care
2 and treatment of Princess Anderson. And I didn't
3 finish reading the whole paragraph, but you write
4 down "disagree" over here.
5     A. That is correct.
6     Q. What part do you disagree with?
7     A. That they complied with the standards of
8 care with regard to evaluation, care, and treatment.
9         MR. DAVIS: Object.
10        MR. O'DONNELL: We have not tendered
11 Dr. Fowlkes to testify as to standard of care
12 delivered at Baptist DeSoto prior to the time that
13 Ms. Anderson was brought to the jail February 8,
14 2011. But he has reviewed the records. It's outside
15 his designation. It's outside of the retention, so
16 we'd object to those questions on that basis.
17        MR. CZAMANSKE: I understand.
18    Q. Dr. Fowlkes, one of the issues we're
19 looking at in this case is, with regard to the
20 defendants, is who has what responsibility with
21 regard to Princess Anderson, isn't it?
22    A. It is.
23        MR. O'DONNELL: Calls for a legal
24 conclusion.
25    Q. And one of the issues in this case is

Page 62

1 whether or not at the time she's transferred to the
2 jail is whether or not she was in a condition that
3 she should have been transferred to the jail. Isn't
4 that part of the issue in this case?
5     A. Well, I was asked to review Marshall
6 County's role in this and the jail's role in this.
7 And so the view with which I reviewed this case was
8 that whether I personally disagree with the care that
9 she did or didn't receive at Baptist DeSoto, she was
10 determined to be medically clear and determined by
11 physicians at Baptist DeSoto to be medically clear to
12 not require hospitalization and not require
13 prescriptions to not require any further ongoing, you
14 know, any further care, and was medically clear to be
15 at Marshall County Jail, which they knew was a
16 nonmedical facility. So that is the presumption
17 under which she came to Marshall County Jail and what
18 they could or should have known.
19    Q. I understand that. And part of the issue
20 you have to consider is that person, Princess
21 Anderson, her underlying condition while she's at
22 jail. That's part of your opinion, isn't it?
23        MR. O'DONNELL: Object to the form.
24 Vague.
25        MR. CZAMANSKE: Let me try and

Page 63

1 rephrase it.
2     Q. Isn't it part of your opinion to look at
3 her underlying medical condition and the symptoms she
4 had in that condition or the symptoms --
5     A. Yes.
6     Q. -- she didn't have in that condition while
7 she's in jail?
8     A. Yes.
9     Q. And to do that you have to look at her
10 condition when she came into jail?
11    A. That is correct.
12    Q. Her medical condition.
13    A. Her -- what I have to look at is her -- the
14 symptoms she was demonstrating, her behavior that was
15 demonstrated to the jail staff as opposed to or as
16 compared to the symptoms she was exhibiting at
17 Baptist DeSoto where trained medical professionals
18 saw her, determined that she was medically clear,
19 determined that she was safe and stable to be in a
20 jail environment. So what I reviewed in my records
21 was did her behavior, did her symptoms, did the
22 things that the jailers were seeing, did they deliver
23 substantially from -- in other words, was there a
24 deterioration in her condition. Because the hospital
25 had seen her and declared that she was medically

Page 64

1 stable to be in the jail and had no conditions that
2 required her to be in the hospital.
3     Q. So did you consider as part of your opinion
4 Princess Anderson's underlying medical condition at
5 the time she's transferred from Baptist DeSoto to
6 Marshall County Jail?
7     A. I did.
8     Q. And one of the ways that you're going to
9 determine her condition is by looking at the medical
10 records for Princess Anderson before she went to that
11 jail?
12    A. I did.
13    Q. And part of the thing that you're going to
14 look at and consider as an expert in determining her
15 medical condition before she goes to jail are tests
16 that were run on her?
17    A. That is correct.
18    Q. And the results of those tests?
19    A. That is correct.
20    Q. But you also have to consider what tests
21 weren't run on her, don't you?
22    A. That is correct.
23    Q. And what tests should have been run on her?
24        MR. DAVIS: Object to form.
25    A. I did -- I considered the result, the

Deposition of Thomas Fowlkes, M.D., taken January 9, 2014

17

Page 65

1  result more so than anything else. In other words,
2  she had been determined by the physicians to be
3  medically clear.
4      Q. You're not endorsing that determination in
5  any way, are you?
6      A. No.
7      Q. You don't -- based on what you've told me,
8  you don't even necessarily agree with their decision
9  to medically clear her for --
10     MR. DAVIS: Object to form.
11     MR. CZAMANSKE: Okay. Wait till I'm
12 done.
13     Q. You don't agree with their decision to
14 medically clear her for the jail setting, do you?
15     MR. DAVIS: And just to save time,
16 will you give me a standing objection?
17     MR. CZAMANSKE: I sure will.
18     A. That's correct.
19     MR. O'DONNELL: And, of course, we're
20 objecting to the extent that he's being asked to
21 offer opinions beyond the scope of his retention and
22 his report.
23     Q. On Page 5 of the designation --
24     MR. O'DONNELL: Which designation?
25     MR. CZAMANSKE: I'm sorry. Thank

Page 66

1  you. Baptist DeSoto. I marked it as Exhibit 8.
2      Q. On Page 5 there's a note about consult
3  under the lower third, I guess, of the page there.
4      A. Right.
5      Q. And explain to me what you mean by the
6  comments you have written down there.
7      A. Princess had been seen earlier in the day
8  at Baptist Collierville where she was determined to
9  be pregnant, and the ultrasound findings were
10 suspicious for an ectopic pregnancy. So we had a
11 potential ectopic pregnancy and what that calls for
12 is in 48 hours having another, at least, quantitative
13 HCG to be done in 48 hours. Which by this time would
14 then be the next day, so 24 hours essentially from
15 the morning of being at Baptist DeSoto. And so
16 basically I made a note here that Baptist DeSoto
17 consulted with an OBGYN who said that there's no
18 medical reason to admit her because of her pregnancy,
19 although follow-up was needed within a few days. Few
20 days is not true. She needed 48 hours from the first
21 time her blood was drawn, which would now be 24 more
22 hours. And it was incumbent upon them to see that
23 that was done.
24     Q. And you noted that not able to -- not able
25 to reliably follow-up, should have admitted. Is that

Page 67

1  what your note is?
2      A. Well, it is appropriate for outpatient
3  care. This condition is appropriate for outpatient
4  care if you can assure good follow-up. In other
5  words, if she could -- if she had told the jail that
6  -- they had told the jail that she needed a blood
7  test the next day or something. But in the absence
8  of the ability to follow-up ordinarily you would need
9  to be in the hospital.
10     Q. And my original question was, if I read
11 your note right? "Not -- in quote, "not able to
12 reliably follow-up - should have admitted." Did I
13 read your note right?
14     A. That is correct.
15     Q. And is the reason that you noted not able
16 to reliably follow-up because of Princess Anderson's
17 mental condition at the --
18     A. Yes.
19     Q. -- time she was at Baptist DeSoto?
20     A. Yes.
21     Q. So really in that regard, you agreed with
22 Dr. Sobel on that one particular issue?
23     A. Yes.
24     Q. And Page 7 of Exhibit 8 you note that --
25 explain your note there where it says "no, Writ

Page 68

1  only."
2      A. Basically this says a commitment order and
3  technically that is not true. A commitment order had
4  not been issued, only a Writ of commitment. So only
5  the detainer of Writ had been issued. She has not
6  been court ordered to involuntary treatment at that
7  time, only a Writ.
8      Q. That's just a different -- they just hadn't
9  got to that point in the process?
10     A. That's correct. So she was not ordered for
11 involuntary psychiatric treatment at this point. She
12 was ordered to detention.
13     Q. On that same page, Page 7 of Exhibit 8,
14 where it's noted Dr. Carlton disagrees with Dr.
15 Sobel's opinion that the emergency room physicians
16 breached the standard of care by determining that Ms.
17 Anderson was medically stable for discharge for
18 further psychological evaluation and treatment. You
19 noted again your disagreement there, correct?
20     A. I disagree with Dr. Carlton's disagreement.
21     Q. All right. And would it be fair to say
22 then with regard to that one particular issue you
23 agree with Dr. Sobel's opinion?
24     A. Yes, that is correct.
25     Q. I should have asked you this, do you know

Deposition of Thomas Fowlkes, M.D., taken January 9, 2014

28

Page 109

1  that you testified you don't believe she had at
2  Baptist DeSoto because there's no blood on the dip
3  test?
4      A. Well, the Rhabdo had one of two -- I
5  believe the Rhabdo had one of two cause --
6      Q. Let me try this. Do you have an opinion as
7  to whether or not Princess Anderson had Rhabdo when
8  she was discharged from Baptist DeSoto and sent to
9  jail?
10          MR. DAVIS: Object to form.
11     A. I have an opinion about what caused her
12 Rhabdomyolysis, and it is of two things. One of them
13 is directly related to the drug ingestion, the purple
14 drink. And if so, it was probably in the early
15 stages -- it was in the early stages and was caused
16 due to that amount. I don't think any person is
17 going to know for certain whether the Rhabdomyolysis
18 was as a direct result of her drug ingestion, which
19 is very likely, and was therefore starting at Baptist
20 DeSoto, so the answer could be. Or she could have
21 remained immobile for most of the night of the 10th
22 and the 11th and developed Rhabdomyolysis on the
23 basis of immobility. And I can't determine which of
24 those two it was. So I don't -- the short answer is
25 I don't know whether she had Rhabdo when she left

Page 110

1  Baptist DeSoto.
2      Q. All right. She had it when she was taken
3  to -- when Dr. Mangle saw her?
4      A. Yes. She had it when she first arrived at
5  Alliance Healthcare.
6      Q. Okay. That's right. Alliance Healthcare.
7  And then she went from Alliance healthcare to I think
8  we've been calling it Baptist Union?
9      Q. Baptist Union County or Baptist New Albany.
10 It's referred as both. But Baptist Union?
11     Q. When was the last time you took care --
12 that you had a patient admitted to the hospital --
13 well, strike that. Rhabdo, hypernatremia, there's no
14 doubt those are emergency medical situations?
15     A. Yes.
16     Q. Dehydration can be -- can certainly be an
17 emergency medical situation?
18     A. Yes.
19     Q. When was the last time that you -- strike
20 that. Do you have admitting privileges at any of the
21 hospitals?
22     A. No.
23     Q. When was the last time you had admission
24 privileges at a hospital?
25     A. Emergency physicians don't have admitting

Page 111

1  privileges. Never had admitting privileges.
2      Q. All right. Is hypernatremia typically
3  treated by admitting somebody to the hospital and
4  treatment going on?
5      A. Yes.
6      Q. Have you ever been a physician who's
7  involved in the actual treatment of hypernatremia?
8      A. Multiple times. Regularly.
9      Q. So that's something you could also treat in
10 the ER?
11     A. Yes.
12     Q. Is that somebody that you would treat --
13 initially treat in the ER and then admit that person
14 to the hospital, or can you treat it and discharge
15 somebody in the ER?
16     A. You can sometimes treat them in the
17 emergency department. Often people with
18 hypernatremia are admitted to the hospital, but not
19 always.
20     Q. Have you ever had anybody come in with
21 hypernatremia that you treated and released and you
22 didn't admit to the hospital?
23     A. Yes.
24     Q. What about Rhabdomyolysis -- I know I'm
25 pronouncing it wrong --

Page 112

1      A. Rhabdomyolysis.
2      Q. Is that something that can be treated in
3  the ER and without an admission?
4      A. There are cases -- most of them get
5  admitted, but there are cases when they're treated
6  and discharged.
7          MR. DAVIS: Just to be clear, since
8  we're back to ER, just want to make sure my standing
9  objection is still in place.
10         MR. CZAMANSKE: Okay. Yeah.
11     Q. Have you ever treated a person for
12 Rhabdomyolysis and discharged them from the ER?
13     A. Well, that's a difficult question because I
14 see people daily -- or not daily -- weekly that I
15 believe may have Rhabdomyolysis, and I either do the
16 test or send them to the emergency room and give IV
17 fluids. Sometimes people have a very mild case and
18 they get discharged. But in general if it were
19 anything near this serious, they would ultimately be
20 admitted to the hospital, but I regularly treat
21 people in my practice at the jail and at my clinic
22 who I either suspect or, you know, know. So in other
23 words, I have people that come to my clinic regularly
24 with dark urine, with the clinical signs of
25 Rhabdomyolysis. I might start IV fluids and, you