## Page 1

```
 1    UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF MISSISSIPPI
 2            WESTERN DIVISION
 3
      ANGELA ANDERSON, Personally,
 4    and on behalf of the WRONGFUL
      DEATH BENEFICIARIES of PRINCESS
 5    ANDERSON, Deceased        PLAINTIFF
 6    VS.      NO. 3:12-CV-92-MPM-SAA
 7    MARSHALL COUNTY, MISSISSIPPI and
      BAPTIST MEMORIAL HOSPITAL-DESOTO    DEFENDANTS
 8
 9
10
11    *******************************************************
12        DEPOSITION OF THOMAS FOWLKES, M.D. (Con't)
13    *******************************************************
14
15
          TAKEN AT THE INSTANCE OF THE PLAINTIFF
16        IN THE LAW OFFICES OF CLAYTON O'DONNELL, PLLC
          1300 ACCESS ROAD, SUITE 200, OXFORD, MISSISSIPPI
17        ON MARCH 5, 2014, BEGINNING AT 9:30 A.M.
18
19
               APPEARANCES NOTED HEREIN
20
21
22    Reported by: LUANNE FUNDERBURK, CCR, 1046
23    _____
              ADVANCED COURT REPORTING
24               P.O. BOX 761
              TUPELO, MS 38802-0761
25               (662) 690-1500
```

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        DANIEL M. CZAMANSKE, JR., ESQUIRE
          Chapman, Lewis & Swan, PLLC
 4        501 First Street
          P.O. Box 428
 5        Clarksdale, MS 38614
          (662) 627-4105
 6
 7        DANESE BANKS, ESQUIRE (Via Telephone)
          The Cochran Firm
 8        One Commerce Square
          40 South Main, Suite 1700
 9        Memphis, TN 38103
          (901) 523-1222
10
11
     For the Defendant
12   Marshall County, Mississippi:
13        DAVID D. O'DONNELL, ESQUIRE
          Clayton O'Donnell, PLLC
14        1300 Access Road, Suite 200
          P.O. Box 676
15        Oxford, MS 38655-0676
          (662) 234-0900
16
17
     For the Defendant
18   Baptist Memorial Hospital-DeSoto:
19        WALTER A. DAVIS, ESQUIRE
          Dunbar Davis, PLLC
20        324 Jackson Avenue E., Suite A
          Oxford, MS 38655-3808
21        (662) 281-0001
22
23
24
25
```

## Page 3

```
 1              TABLE OF CONTENTS
 2   WITNESS                              PAGE
 3   THOMAS FOWLKES, M.D.
 4     Examination by Mr. Davis............  4
       Examination by Mr. O'Donnell........ 39
 5     Examination by Mr. Davis............ 45
       Examination by Mr. Czamanske........ 46
 6
 7
     EXHIBITS
 8
 9    12  Chancery Court File............. 46
10
      13  First Page of Ms. Anderson's
          Deposition...................... 48
```

## Page 4

```
 1       (Whereupon, the deposition of Thomas
 2   Fowlkes, M.D., resumed on 3/5/14, having been
 3   continued from 1/9/14.)
 4              EXAMINATION
 5   BY MR. DAVIS:
 6       Q.  Good morning, Dr. Fowlkes.
 7       A.  Good morning.
 8       Q.  We're here today to conclude your
 9   deposition.  I don't think that I have a ton of
10   questions, but I do have a few.
11       A.  Okay.
12       Q.  And I appreciate you coming back this
13   morning so we could finish.  One of the things that
14   was discussed in your prior portion of your
15   deposition was your qualifications to practice
16   addiction medicine.  And you're board certified in
17   addiction medicine?
18       A.  That is correct.
19       Q.  And when did you get that certification?
20       A.  I believe 2010.
21       Q.  And what's required in order to get board
22   certified in addiction medicine?
23       A.  Addiction medicine is a relatively new
24   specialty that has actually only existed since 2008.
25   Before 2008, you could have a certificate of
```

Page 13

1   Q. And without knowing the dosage, do you have
2  an opinion as to where that dividing line is?
3   A. No.
4   Q. Okay. And changing gears a little bit, you
5  were also asked about -- I realize it's not a
6  disclosed opinion of yours -- but a note you made
7  about the effect of Ms. Anderson's pregnancy, and the
8  statement that she needed follow-up within 48 hours
9  of discharge from DeSoto, correct?
10   A. No. Actually, when she needed -- she
11  needed follow-up at, not within, but at 48 hours of
12  discharge from Baptist Collierville.
13   Q. Okay. Well, that's not the important part
14  of the question.
15   A. Okay. So she did need follow-up in 48
16  hours, but it was from the time of the first
17  pregnancy test.
18   Q. And if I understand correctly, the reason
19  that you have the opinion she needs that follow-up is
20  because of the potential of a rupture of the
21  fallopian tubes from the ectopic pregnancy?
22   A. Well, at Baptist -- yes. But if I may
23  clarify -- well, let me clarify, not say yes. At
24  Collierville she was found to have a low level of
25  pregnancy hormone and an ultrasound that was

Page 14

1  suspicious for ectopic pregnancy. So it was more
2  than just the potential. It was suspicious that it
3  was an ectopic pregnancy that had not ruptured. So
4  you don't require -- if it had ruptured -- if it was
5  suspicious that it had ruptured she would have needed
6  surgery right then, but there was no suspicion that
7  it had ruptured, but it was a decision that it was an
8  ectopic pregnancy.
9   And the way you determine it's an ectopic
10  pregnancy is in 48 hours from the first test you do
11  another blood test to see if the pregnancy hormone is
12  doubling. If it's doubling they've done studies that
13  show that normal pregnancies double the pregnancy
14  hormone every 48 hours. So if the pregnancy hormone
15  is double at 48 hours, you could say that's not an
16  ectopic pregnancy; it's one that's developing
17  normally in the uterus.
18   And so if it were not doubling, then you would
19  be suspicious that it was ectopic, still had not
20  ruptured. But the danger is that if that goes on
21  for, you know, several days, that at some point it
22  could rupture and you could die from internal
23  bleeding.
24   Q. Well, my point, Doctor, was that the reason
25  that you have that opinion is because if I understand

Page 15

1  it, you're saying the physicians at the emergency
2  room should have been suspicious or concerned about a
3  potential complication of the pregnancy and therefore
4  required further evaluation?
5   A. Well, it needed follow-up the next day,
6  yes. And the people at Collierville had said that,
7  she needs follow-up at 48 hours. And so one day had
8  already passed, so she needed follow-up the next day
9  and she needed to make sure that she got that test.
10  I'm sorry, I'm still missing your point.
11   Q. The reason that you have that opinion is
12  because they should have followed up about potential
13  problems with her pregnancy as opposed to any other
14  medical problem for that reason?
15   MR. O'DONNELL: Object to the form.
16   A. The reason that she needed to follow-up the
17  next day is that's the standard care for a suspected
18  ectopic pregnancy.
19   Q. Right. Potential pregnancy related
20  problem?
21   A. For that situation, absolutely.
22   Q. That's what I was getting at. As opposed
23  to some other type of medical problem, the reason
24  that she needed 48 hour follow-up for purposes of
25  that specific opinion is because of potential

Page 16

1  pregnancy related problems?
2   A. Potential ectopic pregnancy or suspected
3  ectopic pregnancy.
4   Q. And, in fact, she did not have an ectopic
5  pregnancy?
6   A. That is correct.
7   Q. And she never developed any problems
8  related to her pregnancy?
9   A. That is correct.
10   Q. All right. Now, turning to your opinions
11  about -- and help me make sure I pronounce this
12  correctly -- Rhabdomyolysis?
13   A. Uh-huh (Indicating yes).
14   Q. I think that's the first time I got that
15  right.
16   A. Okay. It's acceptable as Rhabdomyolysis or
17  Rhabdomyolysis you'll hear some people say it.
18  Either way is acceptable.
19   Q. On one of the notes you had put on your
20  review of Dr. Sobel's deposition, and it's at the
21  bottom of the page containing -- this is the
22  condensed copy -- between Pages 31 and 32.
23   MR. CZAMANSKE: The condensed copy of
24  what?
25   MR. DAVIS: Dr. Sobel's deposition